Christine Saunders Haskett (Bar No. 188053)
Tracy O. Zinsou (Bar No. 295458)
Udit Sood (Bar No. 308476)
Lindsey Barnhart (Bar No. 294995)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, California 94111-5356
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
Email: chaskett@cov.com; tzinsou@cov.com; usood@cov.com; lbarnhart@cov.com

*Attorneys for Plaintiffs*
*MARC ANDERSON, KELLY NELSON,*
*and JULIETTE MORIZUR*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARC ANDERSON, KELLY NELSON, and JULIETTE MORIZUR on their own behalf and on behalf of a class of others similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>SEAWORLD PARKS AND ENTERTAINMENT, INC.,<br><br>     Defendant. | Case No.: 4:15-cv-02172-JSW-JCS<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Hearing Date: December 8, 2017**<br>**Hearing Time: 9:00 a.m.**<br>**Judge: Hon. Jeffrey S. White**<br>**Courtroom:  5** |

## <u>TABLE OF CONTENTS</u>

SUMMARY OF ARGUMENT ................................................................................................ 1

I.      INTRODUCTION AND BACKGROUND ............................................................... 1

II.     LEGAL STANDARD ................................................................................................ 3

III.    SEAWORLD HAS FAILED TO SHOW IT IS ENTITLED TO SUMMARY JUDGMENT AS TO EACH OF PLAINTIFFS' CLAIMS. ........................................................... 3

      A.    SeaWorld Is Not Entitled To Summary Judgment On Nelson's Claims. ....................... 3

          1.    Nelson suffered an economic injury by relying on SeaWorld's misrepresentations. ................................................................................. 3

          2.    Nelson was exposed to SeaWorld's misrepresentations and relied on them in deciding to take her family to SeaWorld. ................................................. 5

          3.    Nelson is not pursuing a lack of substantiation case. ............................................ 8

      B.    SeaWorld Is Not Entitled To Summary Judgment On Anderson's Claims Because He Relied On SeaWorld's Misrepresentations. ................................................ 11

      C.    Morizur Has Not Abandoned Her Request For Restitutionary Relief. ........................ 16

      D.    The Ninth Circuit Has Made Clear That Plaintiffs Have Article III Standing To Pursue Their Injunctive Relief Claims. ........................................................... 20

IV.    CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................................ 3

*Bell v. Hummel*,
  136 Cal. App. 3d 1009 (Ct. App. 1982) ........................................................................ 4

*Bird v. First Alert, Inc.*,
  2015 WL 3750225 (N.D. Cal. June 15, 2015) ........................................................ *passim*

*Bronson v. Johnson & Johnson, Inc.*,
  2013 WL 1629191 (N.D. Cal. Apr. 16, 2013) ........................................................... 8, 10

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................................................ 3

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ...................................................................................................... 21

*In re Clorox Consumer Litig.*,
  894 F. Supp. 2d 1224 (N.D. Cal. 2012) ......................................................................... 8

*Davidson v. Kimberly-Clark Corporation*,
  873 F.3d 1103 (9th Cir. 2017) ................................................................................ *passim*

*Ellis v. J.P. Morgan Chase & Co.*,
  2015 WL 9178076 (N.D. Cal. Dec. 17, 2015) ............................................................ 19

*English v. Apple Inc*,
  2017 WL 106299 (N.D. Cal. Jan. 11, 2017) ............................................................... 15

*Fraker v. Bayer Corp.*,
  2009 WL 5865687 (E.D. Cal. Oct. 6, 2009) ......................................................... 10, 11

*Freeman v. Arpaio*,
  125 F.3d 732 (9th Cir. 1997) .................................................................................... 3, 14

*Graham v. VCA Antech, Inc.*,
  2016 WL 5958252 (C.D. Cal. Sept. 12, 2016) ........................................................... 15

*In re iPhone Application Litig.*,
  6 F. Supp. 3d 1004 (N.D. Cal. 2013) ........................................................................... 15

*Keenan v. Allan*,
  91 F.3d 1275 (9th Cir. 1996) .......................................................................................... 3

*Kennedy v. Allied Mut. Ins. Co.*,
  952 F.2d 262 (9th Cir. 1991) .................................................................................. 18, 20

*Klamut v. Cal. Highway Patrol*,
   2017 WL 492824 (N.D. Cal. Feb. 7, 2017) ........................................................................19

*Kyles v. Baker*,
   72 F. Supp. 3d 1021 (N.D. Cal. 2014) ...........................................................................19

*Messick v. Horizon Indus.*,
   62 F.3d 1227 (9th Cir. 1995) ...........................................................................................18

*Millett v. Experian Info. Sol., Inc.*,
   319 F. App'x 562 (9th Cir. 2009) ......................................................................................5

*Nat'l Council Against Health Fraud, Inc. v. King Bio Pharm., Inc.*,
   107 Cal. App. 4th 1336 (2003) .......................................................................................11

*Nelson v. City of Davis*,
   571 F.3d 924 (9th Cir. 2009) ...........................................................................................20

*Nelson v. Patel*,
   2009 WL 5183814 (C.D. Cal. Dec. 22, 2009) ...............................................................20

*Nilon v. Nat.-Immunogenics Corp.*,
   2013 WL 5462288 (S.D. Cal. Sept. 30, 2013) ...............................................................10

*Quiksilver, Inc. v. Kymsta Corp.*,
   247 F.R.D. 579 (C.D. Cal. 2007) ....................................................................................17

*Reed v. NBTY, Inc.*,
   2014 WL 12284044 (C.D. Cal. Nov. 18, 2014) .............................................................11

*Sch. Dist. No. 1J v. ACandS, Inc.*,
   5 F.3d 1255 (9th Cir. 1993) .............................................................................................18

*Schauer v. Mandarin Gems of California, Inc.*,
   125 Cal. App. 4th 949 (2005) ...........................................................................................5

*Sea-Land Serv., Inc. v. Lozen Int'l, LLC*,
   285 F.3d 808 (9th Cir. 2002) ...........................................................................................18

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) ..............................................................................13, 14, 15, 17

*Van Asdale v. Int'l Game Tech.*,
   577 F.3d 989 (9th Cir. 2009) .....................................................................................18, 19

*Wilson v. Frito-Lay N. Am., Inc.*,
   2017 WL 4023152 (N.D. Cal. May 26, 2017) ...............................................................15

**SUMMARY OF ARGUMENT**

This lawsuit concerns SeaWorld's misrepresentations to consumers that its captive orcas live just as long as wild orcas, that its orcas' collapsed dorsal fins are normal, that SeaWorld does not separate orca calves from their mothers, and that captivity is not harmful to orcas.  Plaintiffs Nelson, Anderson, and Morizur bring claims under California law based on their purchases of SeaWorld tickets and merchandise in reliance on SeaWorld's false and misleading statements about its captive orcas, seeking injunctive relief on behalf of a putative class of California consumers and restitution in their individual capacities.

SeaWorld has failed to carry its burden to demonstrate that it is entitled to summary judgment as to each of the Plaintiffs' claims.  ***First***, SeaWorld's argument that Nelson did not suffer pecuniary injury— and therefore does not have standing to seek relief under the UCL—is unsupported by law or fact.  Nelson made the decision to take her family to SeaWorld to see for herself whether SeaWorld's statements about its orca program were true and used her money to purchase the tickets.  ***Second***, SeaWorld's assertion that Nelson did not see SeaWorld's misrepresentations before purchasing her ticket is directly contradicted by her deposition testimony.  Nelson testified that she saw SeaWorld's statements that captive orcas live just as long as wild orcas and that SeaWorld does not separate mother orcas from their offspring, which prompted her to buy a ticket to visit the park and see for herself whether the statements were true.  ***Third***, contrary to SeaWorld's assertions—based on misleading and incomplete deposition transcript excerpts— Anderson testified that he read the challenged statements about SeaWorld's orca program on SeaWorld's website before he visited the park.  Anderson also testified that he would not have purchased merchandise from SeaWorld had he known that SeaWorld's statements were false.  This evidence, as the Court has already ruled, is sufficient to establish reliance under California law.  ***Fourth***, although SeaWorld is correct that Morizur is not "in it for the money," her testimony makes clear that she has not abandoned her request for equitable restitution.  ***Finally***, each Plaintiff has presented sufficient evidence to establish standing to pursue injunctive relief under the Ninth Circuit's recent and controlling *Davidson v. Kimberly-Clark Corporation* decision—a case that SeaWorld fails even to mention in its brief.  Plaintiffs testified that they are unable to rely on SeaWorld's statements about its orca program and thus face an "imminent harm" sufficient to confer Article III standing under *Davidson*.

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION

## I.   INTRODUCTION AND BACKGROUND

Plaintiffs Nelson, Anderson, and Morizur assert claims based on SeaWorld's unfair business practices and false and misleading representations regarding its treatment of orcas.  Specifically, Plaintiffs allege that, in reliance on SeaWorld's deceptive advertising regarding its treatment and the health of captive orcas, Plaintiffs purchased admission tickets to and souvenirs at SeaWorld's San Diego amusement park.  Plaintiffs bring claims under California's Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), and Consumers Legal Remedies Act ("CLRA") based on these allegations.

The operative Third Amended Complaint, Dkt. No. 94 ("TAC"), alleges the following claims:

- Plaintiff Nelson alleges claims under the CLRA, FAL, and UCL premised on her purchase of an admission ticket to SeaWorld San Diego in August 2015 in reliance on SeaWorld's statements that (1) SeaWorld's captive orcas had similar lifespans to orcas in the wild, and (2) SeaWorld does not separate orca calves and mothers.  TAC ¶ 19.

- Plaintiff Anderson alleges claims under the FAL and UCL premised on his purchase of a "Shamu Plush" in June 2014 in reliance on SeaWorld's statements that (1) orca lifespans in captivity are comparable to orca lifespans in the wild, and (2) SeaWorld does not separate calves from orca mothers.  TAC ¶ 18.

- Plaintiff Morizur alleges claims under the "unfair" and "fraudulent" prongs of the UCL premised on her purchase of a Shamu Plush in April 2012 in reliance on statements by a SeaWorld trainer that (1) captive orcas' collapsed dorsal fins were normal and equally common in the wild, and (2) captivity in general does not harm orcas.  TAC ¶ 20.

On the basis of these allegations, Plaintiffs seek restitution in their individual capacities and injunctive relief on behalf of a putative class of California consumers.  In support of their injunctive relief claims, each Plaintiff alleges that they continue to suffer injury as they "cannot be sure about the veracity of SeaWorld's claims" and that they would consider purchasing tickets or merchandise like the Shamu Plush again "if SeaWorld's practices were to evolve to better reflect their stated purposes of conservation and education, and to be honest about the health and status of the orcas."  TAC ¶¶ 19-20.

1    The Court held that the allegations in the TAC were sufficient to state the claims described above

2    and to establish each Plaintiff's Article III standing to seek injunctive relief.  *See* Dkt. Nos. 90, 105.

3    SeaWorld now brings a motion for summary judgment in which it relies on selective and

4    misleading excerpts of deposition testimony and fails to discuss controlling law in an attempt to avoid

5    adjudication of the core issue in this case: whether SeaWorld lied to the public about its treatment of

6    orcas.  For example, SeaWorld argues that Nelson did not see SeaWorld's misrepresentations before her

7    visit to the park, citing to pages 161-62 and 167-74 of her deposition testimony—when she could not

8    remember the "specific website" she saw the statements on—but *excludes* pages 163-66 of her transcript,

9    when she testified that she saw and relied on Exhibit 48, a screenshot of a SeaWorld webpage containing

10   the challenged misrepresentations.  *See infra*, Section III.A.2.  Similarly, in arguing that Anderson never

11   saw the challenged misrepresentations before his trip to the park, SeaWorld cites to Anderson's testimony

12   that he had not seen an exhibit—which contained the misrepresentations—"as a document" before, yet

13   does not discuss the next few pages of Anderson's testimony, which made clear that he had seen the

14   exhibit "*as a website*. . . when [he] was looking at the map trying to plan [his trip]."  *See infra*, Section

15   III.B.  SeaWorld also disregards—on the basis of already-waived objections—Morizur's testimony that

16   she seeks restitution in the amount of the purchase price of the Shamu Plush she bought in favor of her

17   testimony in response to confusing and muddled lines of questioning.  *See infra*, Section III.C.  And

18   SeaWorld does not even mention the Ninth Circuit's *Davidson v. Kimberly-Clark Corporation* decision,

19   which directly addresses the Article III injunctive relief standing issue at issue in SeaWorld's motion and

20   resolves a split amongst district courts in this circuit in Plaintiffs' favor.

21        Finally, in light of SeaWorld's mis-citations of evidence and case law in connection with its

22   motion—which follow after many months of unfounded discovery delays and a barrage of relentless *ad*

23   *hominem* attacks on Plaintiffs and their counsel—Plaintiffs feel compelled to raise their significant

24   concerns with SeaWorld's candor with this Court.  SeaWorld's surgical exclusion of portions of Plaintiffs'

25   deposition testimony that refute its arguments, and its failure to cite controlling law, render SeaWorld's

26   motion untenable and out of compliance with the rules of this Court.

27

28

## II.        LEGAL STANDARD

A court may grant summary judgment only when the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it may affect the outcome of the case, and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *abrogated on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).

The moving party bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets this burden of production, the nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quotation marks and citation omitted).

## III.       SEAWORLD HAS FAILED TO SHOW IT IS ENTITLED TO SUMMARY JUDGMENT AS TO ANY OF PLAINTIFFS' CLAIMS.

### A.        SeaWorld Is Not Entitled To Summary Judgment On Nelson's Claims.

1.        <u>Nelson suffered an economic injury by relying on SeaWorld's misrepresentations.</u>

SeaWorld is wrong that Nelson suffered no injury in fact.  Economic injury by way of lost money is "a classic form of injury in fact," *Kwikset*, 51 Cal. 4th at 323, and here, Nelson made the decision to purchase SeaWorld tickets in reliance on SeaWorld's misrepresentations and lost money as a result.  The fact that Nelson's husband physically paid the money to the cashier is of no consequence.

*First*, as Nelson testified at deposition, it was her decision to take the family to SeaWorld. *See* Declaration of Tracy Zinsou in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ("Zinsou Decl."), Ex. A ("Nelson Tr.") at 247:15-19.  Her husband did not see the film *Blackfish* with her and had no interest in visiting SeaWorld.  *See* Declaration of Kelly Nelson in Support of Plaintiffs' Opposition to SeaWorld's Motion for Summary Judgment ("Nelson Decl.") ¶ 3; *see also*

Nelson Tr. at 126:14:15 (testifying that she did not watch the film with anyone else). It was Nelson who was exposed to SeaWorld's claims that certain "key things that Blackfish brought up were false," more specifically, claims concerning "[orca] babies being separated from their mothers [and orcas] living as long in captivity as the wild," *see* Nelson Tr. at 151:9-152:3, and it was *she* who decided "to go to SeaWorld . . . to see for [herself] whether -- as to whether the Blackfish documentary was, for lack of a better word, accurate," *id*. at 144:14-17. She chose to bring her family with her because "[she] wanted their company." *Id.* at 247:15-17.

*Second*, Nelson lost money as a result of SeaWorld's misrepresentations. She and her husband maintain only two bank accounts, both of which they hold jointly. Nelson Decl. ¶ 2. Nelson keeps all her earnings from her recruiting business in these two accounts. *Id.* The money lost on her SeaWorld ticket was money that came from those accounts. *Id.* SeaWorld neglected to ask Nelson questions about her bank accounts at deposition. As she explains, she answered SeaWorld's question as to who "actually purchased" the tickets by saying "[her] husband" only because it was he that physically reached into his wallet and handed the cash or credit card to the person manning the ticket counter. *Id.* ¶ 4. But that physical act does not mean that it was her husband's decision to purchase her ticket nor that he used "his" money to pay for it. *Id.* Indeed, when asked about the relief she seeks, Nelson testified that she wanted restitution for the price of *her* ticket and not her family's "[b]ecause [she's] the one who's a plaintiff here and has the injury." Nelson Tr. at 230:9-20.

"The fact that a claim, such as we have here, represents a community asset does not change its character from that of being personal to each of its claimants." *See Bell v. Hummel*, 136 Cal. App. 3d 1009, 1017 (Ct. App. 1982). SeaWorld cannot credibly argue that, in a community property state, a plaintiff loses her standing to sue merely by commingling her funds with her spouse's. Nor does SeaWorld cite authority that the requirement that a plaintiff suffer a "personal, individualized loss of money or property"—which requirement is satisfied here—requires additionally that the money be lost from the plaintiff's immediate possession. Dkt. No. 136 ("Mot") at 18-19 (*citing Kwikset* at 325). Indeed, the cases SeaWorld cites support *Plaintiffs'* position. For example, in *Bird*, the Court rejected the plaintiff's assertion that she suffered injury based on her husband's use of community funds to purchase a smoke alarm because "it was [the husband], not plaintiff, who chose to purchase the [] smoke detector,"

the wife was "not even present when the purchase decision was made," and "[she] did not make the decision as to which alarm to buy, and did not review the packaging [with the alleged misrepresentations] until after [the husband] had purchased the smoke alarm." *Bird v. First Alert, Inc.*, 2015 WL 3750225, at *6-7 (N.D. Cal. June 15, 2015).  Based on these facts, the Court rightly concluded that "she cannot establish reliance, causation, or damages." *Id.* at *7.  By contrast, here, Nelson saw and relied on SeaWorld's misrepresentations when she decided to purchase tickets.  As discussed above, her husband played no role in that decision.  Indeed, although he physically handed over the money at the ticket counter, the purchase *decision* was not made at that point in time, but rather was made *by Nelson* at home before the family even drove out to SeaWorld.  *See* Nelson Decl. ¶ 4.  The money spent on Nelson's SeaWorld ticket came from the source where Nelson keeps her earnings from her recruiting business.  *Id.* ¶ 2.  She has sought restitution of her ticket price (not her family's) since that is the injury she believes she suffered.  Nelson Tr. at 230:9-20.  Nelson therefore has standing to sue.[1]

2.  <u>Nelson was exposed to SeaWorld's misrepresentations and relied on them in deciding to take her family to SeaWorld.</u>

SeaWorld's assertion that Nelson's "deposition confirmed that she never saw (and thus could not have relied upon) statements by SeaWorld" prior to deciding to purchase her ticket is not corroborated by the record.  Mot. at 20.  At deposition, SeaWorld asked Nelson relentlessly about her exposure to the statements and Nelson repeatedly testified that she had seen and relied on SeaWorld's statements about lifespans and mother-calf separation.  *See, e.g.*, Nelson Tr. at 130:8-131:8 (wanted to visit SeaWorld because she saw "things said by SeaWorld . . . in the media that disputed what was said in Blackfish . . . That orcas in captivity live as long as orcas in the wild."); *id.* at 141:20-142:3 ("I saw that [Blackfish] was disputed by SeaWorld."); *id.* at 151:3-152:3 ("[W]hen [I] bought these tickets to attend SeaWorld . . . I

---

[1] Neither of the other cases SeaWorld cites support the proposition that a plaintiff who relies on a seller's misrepresentations in deciding to make a purchase cannot sue for such purchase if community funds are used to pay for it.  *See Schauer v. Mandarin Gems of California, Inc.*, 125 Cal. App. 4th 949 (2005) (husband paid for overpriced diamond ring as an engagement gift for his fiancée; the court found that, under the terms of their divorce, he had transferred ownership of the ring itself but retained for himself "[a]ny extant choses in action" relating to his purchase); *Millett v. Experian Info. Sol., Inc.*, 319 F. App'x 562 (9th Cir. 2009) (unclear whether the wife saw and relied on alleged misrepresentations, whether she made the purchase decision, or whether she suffered any loss of money).

relied on the fact that SeaWorld disputed the claims of Blackfish . . . [B]abies being separated from their mothers.  Animals -- orcas not living as long in captivity as the wild."); 155:22-156:22 ("Q. What did SeaWorld say . . . that you relied on in making your visit to SeaWorld? A. What I recall is what I just said; that the animals lived the same amount at least in captivity that they did in the wild . . . [and that] there was . . . no separation at an [in]appropriate time[.]").

A closer read of SeaWorld's motion exposes SeaWorld's attempts to spin Nelson's imperfect recollection about which "specific [web]site" she saw the statements on (*id.* at 132:10-12) as a "confirm[ation] that she *never* saw" anything at all.  Mot. at 20 (emphasis added).  SeaWorld does not dispute that it published the statements at issue on its website and that, as discussed below, once handed the specific webpages, Nelson testified that she had indeed seen and relied on them prior to her visit to the park.  SeaWorld reproduces deposition testimony from *before* SeaWorld showed Nelson printouts of the relevant webpages and faults her inability to recall where she had seen SeaWorld's misrepresentations.  *See* Mot. at 12-14 (citing excerpts from Nelson Tr. at 131:1-11, 132:2-22, 134:8-21 and 156:11-157:7 when the relevant webpages (*e.g.*, Exhibits 48, 50 and 51) were only shown to Nelson starting at 163:6).[2]

*First,* Nelson saw webpages containing SeaWorld's misrepresentations about orca lifespans. For example, she testified that Exhibit 48 (a SeaWorld document entitled "Killer Whale Lifespan") "looks familiar" and she believed it to be "something published on a website somewhere."  Nelson Tr. at 163:6-19.  Testifying again that "[t]he content about the life span of killer whales" looks familiar, *id.* at 163:20-164:10, Nelson proceeded to identify the specific portion of the website that she believes she relied on: a prominent advertisement that stated "**SeaWorld's Killer Whales are THRIVING** Scientific data show that killer whales at SeaWorld are **living as long** as their counterparts in the wild," Zinsou Decl., Ex. B (emphasis in original); *see also* Nelson Tr. at 165:16-19 ("Q. Is that statement [in the box that has the word 'Thriving' in it] one of the statements that you say countered Blackfish that you relied on when you went to your -- made your visit to SeaWorld? A. I believe so.").  Eager to convince the Court that Nelson

---

[2] The documents Nelson testified to having relied on bear SeaWorld's logo, and SeaWorld does not (nor could it) credibly challenge that they are accurate printouts of the content SeaWorld had uploaded on its own website.

"never saw" anything, not only does SeaWorld remain completely silent about Exhibit 48 in its Motion, it excerpts pages 161-62 and 167-74 of Nelson's testimony (see Dkt. No. 142 at 130-139), omitting pages 163-66 in which Exhibit 48 was discussed.[3]

*Second,* Nelson saw webpages containing SeaWorld's misrepresentations about mother-calf separation.  For example, Nelson had seen and relied on Exhibit 50 entitled "SeaWorld: The Truth Is in Our Parks and People An Open Letter from SeaWorld's Animal Advocates."  Zinsou Decl., Ex. C SeaWorld summarily dismisses this evidence by claiming that Nelson admitted she "had never seen the document . . . before."  Mot. at 23.  But that claim is misleading: recognizing Exhibit 50 to be a printout of a SeaWorld webpage she had looked at, Nelson testified that while she had not seen it "as a document before[,] [m]ost of the[] bullet points [were] familiar to her."  Nelson Tr. at 168:9-23.  The webpage states in bold: "**We do not separate killer whale moms and calves[**.]"  Zinsou Decl., Ex. C (emphasis in original).  SeaWorld also mischaracterizes its question about the *specific* time frame prior to her visit to the park that Nelson saw Exhibit 50 as a question asking whether she saw the exhibit prior to her visit at all.  Mot. at 23 n.9.  Nelson had testified earlier that up to six months may have passed between her seeing *Blackfish* and her visit to SeaWorld.  Nelson Tr. at 125:10-19.  SeaWorld asked about when she first saw a different document, and Nelson responded that it would have been "around the same time that [she] saw the Blackfish video on CNN."  Nelson Tr. at 173:12-174:2.  SeaWorld then asked whether "it was *the same time frame prior to [her] visit* to SeaWorld or not" that she saw Exhibit 50, but Nelson was unable to recall.  *Id.*  SeaWorld is wrong to cite this testimony to suggest that Nelson probably saw Exhibit 50 only *after* her trip—to the contrary, Nelson testified that she relied on portions of Exhibit 50 in deciding to visit SeaWorld in the first place.  *See* Nelson Tr. at 169:1-8 ("Q. Which, if any, of these bullet points do

---

[3] SeaWorld also complains about Nelson's inability to recall specific SeaWorld information on television prior to her visit.  But SeaWorld overlooks that *Blackfish* itself reproduces SeaWorld's misrepresentations regarding lifespan: SeaWorld trainers are shown in *Blackfish* saying that orcas live between "25 to 35 years [in the wild]" and that "[i]n the wild they live less [than at SeaWorld]."  Nelson Decl., Ex. A. Another SeaWorld trainer says that "[orcas] are documented in the wild living to be about 35 -- mid-30s. They tend to live a lot longer in this environment because they have all the veterinary care."  *Id.*  Nelson indisputably saw all this on television before her visit.  Nelson Tr. at 125:5-12.

you -- in terms of content do you recall relying on in making your decision to visit SeaWorld? MS. BARNHART: Objection. Asked and answered. THE WITNESS: Well, similar to past statements, not separating killer whale moms and calves and the life spans of those being equivalent with those in the wild.”); *see also id.* at 249:7-23 (reiterating on redirect that she saw and relied on these statements by SeaWorld.). Because SeaWorld is wrong that Nelson “never saw” SeaWorld’s misrepresentations prior to her visit to SeaWorld, SeaWorld’s motion as to Nelson should be denied.[4]

> 3.     Nelson is not pursuing a lack of substantiation case.

Plaintiffs do not dispute that they bear the burden at trial to demonstrate that SeaWorld’s representations are false and/or misleading, and Plaintiffs are entitled to (and intend to) do so using both expert and fact witnesses. That Nelson, who is neither a marine biologist nor an expert on orcas, could not articulate exactly why SeaWorld’s statements are false is not, as SeaWorld contends, proof that she is proceeding under a “lack of substantiation” theory of liability. “Lack of substantiation” cases are those in which a plaintiff does not allege that a seller’s claims are false or misleading but “argue[s] that there are not any studies to support the[m].” *Bronson v. Johnson & Johnson, Inc.*, 2013 WL 1629191, at *9 (N.D. Cal. Apr. 16, 2013). Here, the complaint alleges that SeaWorld’s statements are false and/or misleading (*see, e.g.*, TAC ¶¶ 11-13, 23-24, 28, 30, 55, 62, 76).

To be sure, at deposition, Nelson expressed her skepticism about SeaWorld’s claims owing to SeaWorld’s failure to substantiate them. But that is a reasonable opinion, and SeaWorld is wrong to suggest that, by holding it, she now “cannot maintain the case that she pled—that she was misled by false statements.” Mot. at 26. As illustrated by the *Clorox* case SeaWorld cites, a plaintiff *can* simultaneously believe a statement to be unsubstantiated as well as false or misleading. *See In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1233 (N.D. Cal. 2012) (“Thus, Plaintiffs do more than allege that there is no competent scientific evidence to support Clorox’s claims; they allege that the competent scientific

---

[4] SeaWorld altogether omits discussion of Exhibit 51 entitled “Truth About Blackfish,” which Nelson testified she has seen around the same time she saw *Blackfish*. Nelson Tr. at 172:2-173:19 (testifying she is not sure she saw “this piece of paper before today” but confident that she saw the webpage “before [her] visit to SeaWorld.”). Exhibit 51 prominently states that “the film implies that SeaWorld collects killer whales from the wild and separates mothers and calves. NEITHER IS TRUE.” Zinsou Decl., Ex. D.

evidence shows that Clorox's claims are objectively false."). Nelson's testimony that she would like independent verification of SeaWorld's claims does not warrant the conclusion that she is proceeding exclusively on the basis of a lack of substantiation theory, particularly when Nelson also testified that the statements were misleading. Nelson testified consistently that while she was not an expert in the relevant field, *see, e.g.*, Nelson Tr. at 180:19-23 ("I'm not a veterinarian."), and she suspects both SeaWorld and the anti-SeaWorld lobby may have made certain misstatements, she believes SeaWorld's statements regarding lifespans and mother-calf separation were indeed misleading:

> Q. Is the situation no longer black and white with respect to the statement that SeaWorld made about life spans at the time you bought these tickets, at the time the tickets were purchased?
> ***A. No, I think that SeaWorld was misleading.***
>
> Q. So you believe that, as you sit here today?
> ***A. I believe that piece.***
>
> Q. And as to the other piece, the segments that SeaWorld made about separation of mothers from orca calves, is that still black and white, or has that changed in your mind?
> ***A. I still feel that SeaWorld was misleading.***
>
> Q. And you believe that, as you sit here today?
> ***A. I do.***

Nelson Tr. at 214:9-215:20 (emphasis added). She also testified that she had reasons for believing SeaWorld's statements to be incorrect. *See* Nelson Tr. at 169:17-24 ("Q. Do you have any information to suggest that [SeaWorld's representation regarding mother-calf separation is] incorrect? A. From information that I have seen from other sources . . . Outside sources, like the video of Blackfish and other entities that dispute it. I don't work for SeaWorld, so I don't know for sure."); *id.* at 171:3-16 ("Q. With respect to the life span statement . . . [d]o you have any information to suggest that that statement is inaccurate? A. I would answer the same as before. Just contradicting statements from other entities outside of SeaWorld. Q. Blackfish contradicts that, correct? A. I believe so.").[5] SeaWorld does not

---

[5] Nelson's comment during her further examination by SeaWorld that she "can't recall" whether anything besides SeaWorld's lack of substantiation convinced her that the statement regarding lifespans was a misrepresentation, *see* Nelson Tr. at 255:14-256:19, does not contradict her earlier testimony that there were indeed other sources demonstrating the falsity of SeaWorld's statements (e.g., *Blackfish*) that she ultimately concluded were credible. Moreover, the Court should not attach significant weight to this

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

mention any of this testimony and indeed omits relevant portions from the testimony it does excerpt.  For example, to support its argument, SeaWorld omits from its brief the underlined portion of the below testimony in which Nelson reiterates her belief that she was lied to but that she personally lacks the expertise to prove it:

> Q. As to what they said about the life spans of captive versus wild orcas, was that true or untrue? **A. I don't think -- I don't know if it was either. <u>I don't think it was true, but I can't prove that it wasn't true.</u>**

Mot. at 16 (citing Nelson Tr. at 226:14-21).

Similarly, SeaWorld cites other portions of Nelson's testimony relating to her inability to personally arrive at a "conclusion" with respect to the accuracy of SeaWorld's statements.  *See, e.g.*, Nelson Tr. at 179:6-180:23 (Nelson could not reach "the conclusion" that the statements were inaccurate because "[She's] not -- [she] do[esn't] know.  [She's] not a veterinarian."); 255:14-22 (SeaWorld asked if she "determined" that SeaWorld had misrepresented facts); 257:1-258:18 (SeaWorld asked if she "determined" that the statement about mother-calf separation was untrue).  By taking the position that Nelson must personally attest to the falsity of SeaWorld's statements, SeaWorld improperly urges the Court to deprive Nelson the opportunity to gather scientific evidence through fact and expert discovery and prove the falsity of SeaWorld's claims.

SeaWorld's cases are not to the contrary.  SeaWorld cites cases in which either the complaint was dismissed for alleging only that the statements at issue were unsubstantiated and not false,[6] or the court concluded at the end of discovery, or the conclusion of the plaintiff's case in chief, that a jury could not

---

portion of Nelson's testimony in light of her desire to conclude her deposition given the time of the day and SeaWorld's counsel's harassing conduct.  *See, e.g.*, *id.* at 237:18-239:17 ("Q. Name one thing, one single thing that needs to improve in animal care that will cause you to go back to SeaWorld. One thing. Just one.  Just name one.  MS. BARNHART: Have you finished your question?  MR. SIMPSON: Yes. MS. BARNHART: I will object.  It's argumentative.  It's harassing.  It's been asked and answered.  It calls for speculation.  Everything I've objected to so far.  Please watch your tone.  Please respect my witness.").

[6] Mot. at 24, 27 (citing *Bronson v. Johnson & Johnson, Inc.*, 2013 WL 1629191 (N.D. Cal. Apr. 16, 2013); *Nilon v. Nat.-Immunogenics Corp.*, 2013 WL 5462288 (S.D. Cal. Sept. 30, 2013); *Fraker v. Bayer Corp.*, 2009 WL 5865687 (E.D. Cal. Oct. 6, 2009)).

1    possibly find falsity based on the evidence.[7]

2        Nelson is aware that, "to maintain an action against [SeaWorld] for false or misleading advertising,

3    [Nelson] will be required to adduce evidence sufficient to present to a jury to show that [SeaWorld's]

4    advertising claims [] are actually false; not simply that they are not backed up by scientific evidence."

5    *Fraker v. Bayer Corp.*, 2009 WL 5865687, at *8 (E.D. Cal. Oct. 6, 2009).  She intends to meet her burden

6    at trial, and nothing in Nelson's deposition testimony suggests that, with the benefit of fact and expert

7    discovery, she will not be able to meet it.

8        **B.    SeaWorld Is Not Entitled To Summary Judgment On Anderson's Claims Because He Relied On SeaWorld's Misrepresentations.**

9

10       Anderson saw SeaWorld's misrepresentations before visiting SeaWorld, and SeaWorld's claim to

11   the contrary is not supported by the evidence.  On April 8, 2015, Anderson bought two tickets online to

12   visit SeaWorld San Diego along with a colleague.  *See* Zinsou Decl., Ex. E ("Anderson Tr.") at 80:25-

13   81:10.  Then, while planning his trip online, Anderson read SeaWorld's statements regarding lifespans

14   and mother-calf separation.  While SeaWorld does not dispute this, SeaWorld emphasizes that Anderson

15   "had not seen [the 'Anderson 4'] document[] before he made his Shamu plush purchase."  Mot. at 17.  But

16   SeaWorld's argument is misleading because, while it is true that he did not see the document "as a

17   document" before, he explained that it "is not actually a document" but "a document based on a website"

18   that he *had* indeed seen.  Anderson Tr. at 231:13-234:5; *see also* Zinsou Decl., Ex. F (Anderson 4).  To

19   support its argument, SeaWorld selectively excerpts Anderson's testimony: SeaWorld has filed the

20

21   _____

22   [7] *Reed v. NBTY, Inc.*, No. EDCV130142JGBOPX, 2014 WL 12284044, at *12 (C.D. Cal. Nov. 18, 2014)
     (granting summary judgment; stating that "Plaintiffs have not met their burden of providing evidence that

23   Defendants' advertising claims are false or misleading . . . Plaintiffs' purported expert reports are unsworn
     and therefore cannot be considered by the Court . . . Without the expert reports or the studies relied on

24   therein, Plaintiffs have not presented any evidence of falsity."); *Nat'l Council Against Health Fraud, Inc.
     v. King Bio Pharm., Inc.*, 107 Cal. App. 4th 1336, 1341 (2003) (granting judgment for defendant at the

25   conclusion of plaintiff's case in chief observing that, "[a]t trial, NCAHF proceeded on the theory that
     there is no scientific basis for the advertised efficacy of King Bio's [homeopathy] products. NCAHF

26   performed no tests to determine the efficacy of King Bio's products and presented no anecdotal evidence.
     NCAHF instead . . . asserted that the burden of proof should be shifted to King Bio to prove its products'

27   efficacy.").

28

1   testimony only up through page 232, when in fact, in the very next pages, Anderson explains that he saw

2   the document "*as a website . . . when [he] was looking at the map trying to plan [his trip]*." *Id.* (emphasis

3   added).[8]   Anderson testified further that, while planning his trip, he "read" the headings in big, bold type

4   and "skimmed past" the rest of the text. *See* Anderson Tr. at 236:3-21 (distinguishing between

5   "review[ing] [the] entirety" and "skimm[ing]"); *see also id.* at 264:21-266:9 (testifying that he saw *and*

6   *read* SeaWorld's statements that "[SeaWorld's] killer whales live as long as those in the wild," and that

7   "[SeaWorld respects] the mother-calf bond.").   SeaWorld's motion is silent about this testimony, which

8   directly undercuts SeaWorld's assertion that Anderson had not seen the misrepresentations prior to his

9   purchase.[9]

10          While at the park, Anderson thought the orca souvenir would make a good present for his sister

11   and proceeded to pay "[a]pproximately $25" in cash for it.   Anderson Tr. at 74:10-14, 115:18-19.

12   Anderson believed SeaWorld's misrepresentations to be true at the time of purchase, and was convinced

13   that SeaWorld's orcas were healthy and well cared for. *See id.* at 233:24-234:5 ("See, when I looked at

14   this, and all these statements on here, I didn't know that they were -- they were to be disputed.  I didn't

15   take them at that value.  So I didn't look at this and go [']Oh, well that's false.[']  I just saw [for example]

16   breeding, mothers and calves, is all I saw.  I didn't know until I talked to Mr. Palmer these were false

17   statements.").   Anderson had no reason to think otherwise, and was not even aware of the *Blackfish*

18   documentary. *See, e.g.*, *id.* at 120:17-18 ("I had no idea that this was happening."), 267:7-10 (did not

19   "know of Blackfish at the time [he] went to the park.").   He had also not done any research on the issues

20   of lifespans or mother-calf separation (at that time) and had not independently discovered that SeaWorld's

21

22   _____

23   [8] SeaWorld also complains that certain documents (including Anderson 4) were collected and produced by
     Plaintiffs' counsel and not Anderson himself. But SeaWorld requested "documents that *reflect* the

24   representations purportedly made by Defendant on which [Plaintiffs] relied."  Mot., Ex. E, Request 15
     (emphasis added). As Anderson testified, this document was a printout of SeaWorld webpage that was

25   similar in content to what he had seen and relied on. Anderson Tr. at 232:8-233:1.

26   [9] Although SeaWorld casts aspersions on various aspects of Anderson's testimony (for example,
     SeaWorld characterizes Anderson's allegations about the orca souvenir as being "newly-remembered" and

27   repeatedly comments on the souvenir having been chewed up by a dog), SeaWorld seeks summary
     judgment on one discreet issue—namely, whether SeaWorld's misrepresentations were a factor in

28   Anderson's purchase of the souvenir.

1   representations were false.  *See id.* at 108:9-12 (Anderson had not "gone to the SeaWorld website to read

2   up about care of their animals . . . until after [he] met with [Mr. Palmer].");  *see also id.* at 137:4-139:10

3   (testifying that, before his meeting with Mr. Palmer, he did not think that SeaWorld's orcas do not live as

4   long as the ones in the wild or that SeaWorld separated orca calves from their mothers).

5          Not only did Anderson believe SeaWorld's misrepresentations to be true during his trip to the

6   park, he relied on them in purchasing the orca souvenir.  Contrary to SeaWorld's assumption, the law does

7   not require that a consumer be consciously thinking about every relevant representation that a seller makes

8   about its goods at the very moment of purchase—indeed, like any consumer, Anderson testified that

9   "many different things" were on his mind as he purchased the Shamu Plush.  Anderson Tr. at 121:16-22.

10  Instead, California law requires that the misrepresentations be an "immediate cause" of the injury-

11  producing conduct.  *In re Tobacco II Cases*, 46 Cal. 4th 298, 326, 207 P.3d 20, 39 (2009).  The *Tobacco II*

12  Court explained what "immediate cause" meant, observing that "[a] plaintiff may establish that the

13  defendant's misrepresentation is an 'immediate cause' of the plaintiff's conduct by showing that in its

14  absence the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing

15  conduct."  *Id.*  While it is not necessary that the misrepresentations be "the sole or even the predominant

16  or decisive factor," but merely a "substantial" one, *id.*, for Anderson they were indeed decisive: he

17  testified that he would *not* have purchased the souvenir for his sister had he known at the time that

18  SeaWorld's statements were false.  *See* Anderson Tr. at 174:15-176:15 ("[I]f I would have known what I

19  do now regarding the treatment or mistreatment of the animals, that ***I probably would not have purchased***

20  ***a ticket.  In fact, I'm pretty sure I would not have purchased a ticket***, which then -- being at the park

21  would ***not have purchased a souvenir as well***. . . And even if [I] could buy the merchandise outside the

22  park, [I] wouldn't do that either.") (emphasis added).

23         Nowhere in its motion does SeaWorld mention the above testimony, nor does SeaWorld point to

24  any contradictory testimony by Anderson.  Instead, SeaWorld mischaracterizes Anderson's testimony on

25  *other* issues.  First, SeaWorld focuses on Anderson's *intentions* with the orca souvenir at the time of

26  purchase and asks this Court to conclude that SeaWorld's misrepresentations could not have been a

27  relevant factor in his decision to make that purchase.  But Anderson's testimony that he desired to give his

28  sister something "big," "soft," and "something that a girl would like," *see* Mot. at 15, does not undermine

his testimony that SeaWorld's misstatements were relevant to his purchase decision.  Anderson's

appreciation for its physical attributes aside, Anderson testified that he would not have bought the orca

souvenir had he known SeaWorld's statements were false, and the Court has already ruled that "these

facts would be sufficient to show economic injury based on [SeaWorld's] alleged statements regarding life

spans and calf separation."  Dkt. No. 80 at 16-17.

Second, SeaWorld misleadingly extracts snippets of Anderson's testimony regarding his meeting

with Earth Island—when he learned that SeaWorld's statements were false—to argue that Anderson was

not "thinking about" SeaWorld's misrepresentations at the time of his purchase of the Shamu Plush.  *See*

Mot. at 15-16.  But that testimony (and SeaWorld's questions) concerned whether Anderson was thinking

about the *falsity* of SeaWorld's claims.  Consistent with his TAC allegations that he believed SeaWorld's

misrepresentations to be true at the time of his visit to the park, Anderson testified that he was not thinking

about SeaWorld's orcas having shorter lifespans than wild orcas or calves being separated from their

mothers.  *See, e.g.,* Anderson Tr. at 137:4-139:20 (at the time of his purchase of the Shamu Plush,

Anderson was not "thinking that the whales at SeaWorld *don't* live as long as whales in the wild," nor

"thinking about the fact that the pools *are* too small," nor "about SeaWorld *separating* cal[ves] from their

mothers.") (emphases added).  Indeed, SeaWorld's questions were framed in a way that the opposite

responses from Anderson—*i.e.*, that Anderson thought SeaWorld's orcas did *not* live as long as wild orcas

or that SeaWorld *did* separate calves from its mothers—could arguably have permitted SeaWorld to argue

that there was no reliance.  In considering this motion, the Court should "draw all inferences in a light

most favorable to" Plaintiffs, *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), but here, none of

SeaWorld's chosen sound bites nor the inferences SeaWorld asks the Court to make based on them,

undermine Anderson's unequivocal testimony that he would not have purchased the orca souvenir had he

known the truth about lifespans and mother-calf separation at the time.  *See* Anderson Tr. at 174:15-

176:15.  SeaWorld is wrong that any of Anderson's testimony contradicted his assertion of reliance, and

the Court should therefore deny SeaWorld's Motion as it pertains to Anderson.[10]

---

[10] "Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a
misrepresentation was material." *Tobacco II* at 327.  The close of fact discovery in this case is almost

1

Finally, SeaWorld's attacks on Plaintiffs' counsel and on Earth Island (a consultant to Plaintiffs

2

and their counsel) in connection with Anderson's claims are unfounded and improper.  SeaWorld accuses

3

counsel and Earth Island of attempting "to 'create' clients with standing to sue" and of bringing a "sham

4

lawsuit."  Mot. at 9, 17.  The evidence is undisputed, however, that Anderson went to SeaWorld of his

5

own accord (*see, e.g.*, Anderson Tr. at 34:22-24) and, as discussed above, he relied on SeaWorld's

6

misrepresentations to purchase the orca souvenir before he had any contact with counsel or with Earth

7

Island.  Indeed, the same is true for Nelson and Morizur as to their respective purchases.  Earth Island

8

simply became aware of all three plaintiffs after they had made their purchases and in the course of

9

investigating the impact of SeaWorld's misrepresentations on consumers over the last several years.[11]  By

10

contrast, in the *Wilson* case that SeaWorld cites, Mr. Wilson had "not notice[d] any label statements on

11

Frito–Lay's chips between 2000–2010 . . . [a]nd although [he] testified that he recalled a label statement

12

on his last purchase . . . the undisputed evidence suggest[ed] that this token purchase was made at the

13

direction of his attorney[.]"  *Wilson v. Frito-Lay N. Am., Inc.*, 2017 WL 4023152, at *5 (N.D. Cal. May

14

26, 2017).[12]  SeaWorld's effort to paint counsel and Earth Island as having done something sinister is

15

misleading and inappropriate.  *See* N.D. Cal. Guidelines for Professional Conduct, No. 7(b) ("A lawyer

16

_____

17

eight months away, and Plaintiffs anticipate the evidence will show that SeaWorld recognized that "a
reasonable man would attach importance to [SeaWorld's misrepresentations] in determining his choice of
action in the transaction in question."  *Id.* (quotation marks and citation omitted).

18

19

[11] As it has previously, the Court should continue to ignore SeaWorld's fixation on Earth Island.  *See* Dkt.
No. 111 at 20 ("[T]he issue of the concern of what you call "propaganda" . . . that should be the subject of
your negotiations over the protective order."); Zinsou Decl., Ex. G (Sept. 1, 2017 Hrg. Tr.) at 28-29
("[SeaWorld's counsel]: . . . [P]art of our position from the very beginning, from the very first appearance
with Judge White is **this case is being driven by a third party who's not a party to this case**. THE
COURT: Well, but ***I don't care about that issue because I can prevent it*** . . . so ***that's not the question to
me, what's driving the litigation***.") (emphasis added).

20

21

22

23

[12] Similarly, none of the plaintiffs in the other cases SeaWorld cites had seen the alleged
misrepresentations prior to their purchases. *See, e.g., In re iPhone Application Litig.*, 6 F. Supp. 3d 1004,
1019 (N.D. Cal. 2013) ("[N]one of these declarations actually states that Plaintiffs read or relied on any
particular Apple misrepresentation regarding privacy."); *English v. Apple Inc*, 2017 WL 106299, at *13
(N.D. Cal. Jan. 11, 2017) ("[T]he undisputed facts prove that she did not read the AC+ terms and
conditions, and therefore, could not have relied on them in making her purchase decisions."); *Graham v.
VCA Antech, Inc.*, 2016 WL 5958252, at *5 (C.D. Cal. Sept. 12, 2016) ("Seeing an alleged
misrepresentation for the first time long after the transaction giving rise to a claim does not suffice.").

24

25

26

27

28

should avoid denigrating the intelligence, ethics, morals, integrity, or personal behavior of the opposing party, counsel, or witness, unless such matters are at issue in the proceeding.").

### C. Morizur Has Not Abandoned Her Request For Restitutionary Relief.

SeaWorld argues that Morizur "abandoned her claim for restitution" at her deposition.  Mot. at 19.  Importantly, nowhere in its motion does SeaWorld dispute that Morizur has presented sufficient evidence to prove the required elements of her UCL claim, such as reliance and injury.  Instead, SeaWorld takes the odd position that, despite having a valid claim that would entitle her to an award of restitution, Morizur nevertheless abandoned any request for such relief.[13]  SeaWorld's argument rests on mischaracterization of Morizur's testimony and misunderstanding of relevant legal principles and should therefore be rejected.

SeaWorld first contends that Morizur "testified repeatedly and emphatically that she was not requesting any monetary restitution."  Mot. at 19.  Not so—on the contrary, Morizur testified that she seeks an award of restitution as relief for the pecuniary injury she sustained when she purchased a Shamu Plush in reliance on lies told to her by SeaWorld employees.  *See* Zinsou Decl., Ex. H ("Morizur Tr." at 159:23-160:3 ("Q. . . . Did you have an injury when you first contacted the lawyers? . . . THE WITNESS: Yes . . . I spent that money at SeaWorld after being lied to, which I wish I hadn't done after finding that out."); *id.* at 169:10-19 ("Q. . . . [W]hat is the harm to you as referenced [in the TAC]? . . . THE WITNESS: Well, the harm that's been done to me is that I was lied to, face-to-face, by someone who worked at SeaWorld . . . I thought they would have the right facts and would say the right things.  So that's how I was harmed.  And then I ended up spending more money than now I would have liked to."); *id.* at 261:12-17 ("Q. Do you feel that the money you spent on the orca plush was fairly spent?  A. No, I do not.  Q. Are you asking the court to give you your money back?  A. For the orca plush, yes.").

SeaWorld misunderstands Morizur's testimony about the "money" she seeks in this lawsuit.  Morizur has always taken the position that she is not participating in this lawsuit "for the money."

---

[13] SeaWorld's position is all the more confusing considering its counsel's repeated acknowledgment to this Court—after Ms. Morizur's deposition—that Ms. Morizur's "25-dollar claim" was alive and well.  *See* Zinsou Decl., Ex. G (Sept. 1, 2017 Hrg. Tr.) at 25:24-26:1; *see also id.* at 29:11-13 ("MR. SIMPSON: . . . [A]re we really going to waste federal court time on a claim for $25?  Are we really going to do that?").

Morizur Tr. at 163:22; *see* Declaration of Juliette Morizur in Support of Plaintiffs' Opposition to

SeaWorld's Motion for Summary Judgment ("Morizur Decl") ¶ 2.  Indeed, she could not seek "money"

damages even if she wanted to because the UCL permits only equitable relief.  *See In re Tobacco II*, 46

Cal. 4th at 312 (holding that because "[a] UCL action is equitable in nature; damages cannot be

recovered," and that any relief is limited to injunctive relief and restitution); *see also* Morizur Decl.

¶ 2.  SeaWorld's counsel's questioning blurred the distinction between "money" damages—which

Morizur unequivocally does not seek—and equitable restitution for the injury she suffered when she was

deceived into buying the Shamu Plush from SeaWorld.  *See* Morizur Tr. at 163:2-4 ("Q. Are you asking

the court to *give you* any money?  A. . . . I'm not in this for the money at all.") (emphasis added); *see also*

Morizur Decl. ¶ 3.  To the extent SeaWorld's line of questioning confused the issue, Morizur later

expressly clarified at her deposition that she continues to seek an award of resitution, even though she

does not seek money damages.  Morizur Tr. at 261:6-23 ("Q. . . . [W]hen Mr. Simpson was going through

[the TAC] earlier today, you testified that you're not motivated by the money in bringing this lawsuit; is

that correct?  A. Correct, that is what I said.  Q. Do you feel that the money you spent on the orca plush

was fairly spent?  A. No, I do not.  Q. Are you asking the court to give you your money back?  A. For the

orca plush, yes. . . . Q. But you are not asking for any money damages beyond what you spent on the orca

plush?  A. No, I'm not.); *see also* Morizur Decl. ¶ 4.[14]

   SeaWorld also attempts to argue that the Court should ignore Morizur's unequivocal testimony

that she has not forsaken her claim for restitution on the basis of the "sham affidavit" rule.  That rule,

however, applies to affidavits submitted after a deposition, when the witness is not subject to cross-

examination.  Here, SeaWorld could have cross-examined Morizur on the testimony about her restitution

claim that was elicited on re-direct, but it chose not to.  Moreover, to the extent SeaWorld argues on reply

---

[14] While SeaWorld appears to assert an evidentiary objection to this testimony, claiming that Morizur's
responses were elicited by way of "improper, leading re-direct" questioning, Mot. at 20, SeaWorld did not
object to any of those questions at the deposition and thereby waived "any objection to leading questions."
Wright & Miller, Fed. Prac. & Proc. § 2156 (3d ed.) (discussing Fed. R. Civ. P. 32); *see also id.* § 2113
("A party waives any objection, whether to the form of questions or answers or to other errors that might
be obviated, removed, or cured if promptly presented, by failing to note the objection at the taking of the
deposition."); *Quiksilver, Inc. v. Kymsta Corp.*, 247 F.R.D. 579, 582 (C.D. Cal. 2007) (quoting Wright &
Miller and finding objection to form of deposition question waived).

that the sham affidavit rule precludes consideration of the Morizur Declaration submitted with this

opposition, the rule is again inapplicable.  Because "the sham affidavit rule is in tension with the principle

that a court's role in deciding a summary judgment motion is not to make credibility determinations or

weigh conflicting evidence," *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009), the Ninth

Circuit has instructed district courts to apply the rule "with caution," *Sch. Dist. No. 1J v. ACandS, Inc.,* 5

F.3d 1255, 1264 (9th Cir. 1993).  Specifically, there are "two important limitations on a district court's

discretion to invoke the sham affidavit rule."  *Van Asdale*, 577 F.3d at 998.  First, the rule "does not

automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of

earlier deposition testimony," *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir.

1991); rather, "the district court must make a factual determination that the contradiction was actually a

'sham.'"  *Id.* at 267.  Second, "the inconsistency between a party's deposition testimony and subsequent

affidavit must be *clear and unambiguous* to justify striking the affidavit."  *Van Asdale*, 577 F.3d at 998-99

(emphasis added).  This means that "the non-moving party is not precluded from elaborating upon,

explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor

inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no

basis for excluding an opposition affidavit."  *Messick v. Horizon Indus.,* 62 F.3d 1227, 1231 (9th Cir.

1995); *see also Sea-Land Serv., Inc. v. Lozen Int'l, LLC*, 285 F.3d 808, 820 (9th Cir. 2002) (reversing

district court's exclusion of a declaration as a sham affidavit when "the statements in [the] declaration

supplemented, and did not directly contradict [the] deposition statements").

      Here, the Morizur Declaration is not "clearly and unambiguously" inconsistent with any of her

deposition testimony.  As noted above, Morizur intended her testimony to distinguish between "money"

damages—which she does not seek—and restitution for the purchase she was deceived by SeaWorld into

making.  While SeaWorld contends that its counsel "expressly asked" Morizur about her claim for

restitution, in fact he posed questions such as "Are you asking the court to *give* you any money?," Morizur

Tr. at 163:2 (emphasis added), leading Morizur to believe that she was being asked whether she seeks

money damages rather than an award of restitution.  Morizur Decl. ¶ 3.  Morizur's response was consistent

with her position that she is "not in this for the money" and that, aside from injunctive relief, she merely

seeks return of the purchase price of the orca plush.  Morizur Tr. at 163:4; *see also* Morizur Decl. ¶¶ 3-4.

1    Disregarding Morizur's sworn testimony that she has not abandoned her claim for restitution on the basis

2    of the sham affidavit rule would thus be particularly inappropriate here because the testimony that

3    SeaWorld contends is inconsistent was elicited by a confusing line of questioning. *Van Asdale*, 577 F.3d

4    at 998 ("Aggressive invocation of the [sham affidavit] rule . . . threatens to ensnare parties who may have

5    simply been confused during their deposition testimony and may encourage gamesmanship by opposing

6    attorneys.").[15]

7           Numerous courts in this district have rejected application of the sham affidavit rule in similar

8    circumstances. *See, e.g.*, *Klamut v. Cal. Highway Patrol*, 2017 WL 492824, at *7 (N.D. Cal. Feb. 7,

9    2017) (finding that plaintiff's testimony that he only remembered "flashes" of the event in question did

10   not clearly contradict his affidavit testimony that he had personal knowledge of the event); *Ellis v. J.P.*

11   *Morgan Chase & Co.*, 2015 WL 9178076, at *9 (N.D. Cal. Dec. 17, 2015) (finding that plaintiff's

12   deposition testimony that she was not familiar with certain entities' procedures and policies did not clearly

13   and unambiguously conflict with her affidavit testimony that those entities had different policies); *Kyles v.*

14   *Baker*, 72 F. Supp. 3d 1021, 1032 (N.D. Cal. 2014) (finding that plaintiff's deposition testimony that he

15   "really can't remember" the events in question "not inconsistent" with affidavit testimony revealing

16   additional details about the incident).  The cases cited by SeaWorld, Mot. at 20-21, are not to the

17   contrary—indeed, in both of those cases, the Ninth Circuit *reversed* the district court's exclusion of

18

19   ─────────────────────

20   [15] Morizur's deposition transcript is replete with examples of SeaWorld's counsel's unduly aggressive
     tactics, which caused Morizur confusion at times.  For example, counsel for SeaWorld continuously

21   badgered Morizur—over Plaintiffs' counsel's repeated objections—regarding the undisputed and
     immaterial fact that her dog ate the Shamu Plush she purchased, going so far as to claim that she

22   intentionally "destroyed" evidence. *See* Morizur Tr. at 124:24-125:4 ("Q. Where is [the plush] now?  A.
     My dog tore it up.  Q. All right.  When did that happen?  A. 2016, last year.  Q. Why did you let the dog

23   tear it up?  MS. BARNHART: Objection. Argumentative."); *id.* at 128:6-128:21 ("Q. Is [another stuffed
     orca purchased from Monterey Bay Aquarium and given to Morizur as a gift] still intact?  A. It is.  Q. And

24   you have it at home?  A. Yes.  Q. You haven't given this to the dog?  A. I didn't give the SeaWorld one to
     the dog.  I left my door open and he got to it – Q. But you haven't – A. – or else it would still be here

25   today.  Q. Okay.  So you haven't left the door open for the dog to get this one?  MS. BARNHART:
     Objection. Argumentative, harassing.  Come on, John.  BY MR. SIMPSON: Q. Can I get an answer to

26   my question?").  Indeed, SeaWorld raises this irrelevant fact *again* in its motion for summary judgment.
     *See* Mot. at n.11.  Similarly, SeaWorld opened the deposition by grilling Morizur on personal medical

27   issues, admitting that the questions were "way far afield" yet nevertheless continuing to badger Morizur
     with the abusive line of questioning.  Morizur Tr. at 10:4-11:24.

28

1    evidence based on the sham affidavit rule.  *See Nelson v. City of Davis*, 571 F.3d 924, 929 (9th Cir. 2009);

2    *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991).  This Court should do as SeaWorld's

3    cited cases instruct: apply the sham affidavit rule with caution and disregard it when, as here, the Morizur

4    Declaration is not clearly and unambiguously in conflict with her deposition testimony.

> **D.      The Ninth Circuit Has Made Clear That Plaintiffs Have Article III Standing To Pursue Their Injunctive Relief Claims.**

7            Remarkably absent from SeaWorld's motion is any reference to the Ninth Circuit's decision last

8    month in *Davidson v. Kimberly-Clark Corporation*, 873 F.3d 1103 (9th Cir. 2017).  *Davidson* is

9    controlling and unambiguously provides that Plaintiffs have Article III standing to pursue their injunctive

10   relief claims in this case.  SeaWorld's counsel's failure to even mention this binding precedent, which

11   resolved a split of authority in this circuit regarding Article III standing, is a violation of pertinent rules.

12   *See, e.g.*, California Rule of Professional Conduct 5-200(A); ABA Model Rule 3.3(a)(2); *Nelson v. Patel*,

13   2009 WL 5183814, at *5 (C.D. Cal. Dec. 22, 2009) (failure to notify court of adverse, binding authority is

14   a violation of professional rules of conduct).

15           In *Davidson*, a consumer brought suit against a manufacturer of personal cleansing wipes, alleging

16   that the manufacturer falsely advertised that these wipes were "flushable," in violation of the CLRA, UCL

17   and FAL.  873 F.3d at 1107-08.  The district court dismissed the case finding, *inter alia*, lack of standing

18   to seek injunctive relief because the plaintiff was unlikely to purchase the product in the future.  *Id.* at

19   1108.  On appeal, the Ninth Circuit reversed this ruling holding that the plaintiff faced a "threat of

20   imminent or actual harm" by not being able to rely on defendant's labels in the future, which was

21   sufficient to confer standing to seek injunctive relief.  *Id.* at 1112-13.  In so finding, the Court noted that it

22   was an "open question in this circuit to what extent a previously deceived customer who brings a false

23   advertising claim can allege that her inability to rely on the advertising in the future is an injury sufficient

24   to grant her Article III standing to seek injunctive relief."  *Id.* at 1113.  The Court went on to resolve this

25   split of authority "in favor of plaintiffs seeking injunctive relief."  *Id.* at 1115.  In particular, the Court

26   found that:

27                   [T]he threat of future harm may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once

28

---

marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved.

*Id.* In holding that the plaintiff in *Davidson* had sufficiently alleged "imminent or actual threat of future harm," the Ninth Circuit relied on the plaintiff's allegations that "she continues to desire to purchase wipes that are suitable for disposal in a household toilet" and "would purchase truly flushable wipes…if it were possible," but that she "has no way of determining whether the representation 'flushable' is in fact true." *Id.* at 1116. Thus, a plaintiff's inability to rely on a defendant's representations in deciding whether to make a future purchase constitutes a "threatened injury [that is] certainly impending," establishing Article III standing to assert injunctive relief. *Id.* at 1113 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Inherent in the Ninth Circuit's ruling is that this inability to rely on the defendant's representations rests on the defendant making changes to its product, not simply on the plaintiff being willing to repurchase the product in the same form. In *Davidson*, the plaintiff had no desire to repurchase wipes that were not "truly flushable," and, indeed had not purchased any wipes since. *Id.* at 1108.

Consistent with the ruling in *Davidson*, this Court previously found Plaintiffs' allegations in the complaint to be sufficient to confer standing on the basis that the Plaintiffs "may consider" or "would consider" purchasing SeaWorld tickets or merchandise in the future. Dkt. No. 90 at 6. In so finding, "the Court took into account the allegations that SeaWorld had announced certain changes in its practices on orca breeding and the orca shows to be significant. The Court reasoned that those allegations demonstrated that the product or service at issue might be changing to a product or service the Plaintiffs would want if they could rely on SeaWorld's advertising." *Id.* at 7. In light of *Davidson* and this Court's prior rulings, SeaWorld's argument that "Plaintiffs' deposition testimony revealed that none of them has a "'certainly impending' future injury, because none has a present intent to buy future SeaWorld tickets or merchandise" is specious. *See* Mot. at 22.

First, Nelson has established that she would consider returning to SeaWorld if she could rely on SeaWorld's statements in the future and, therefore, has standing to seek injunctive relief. To refute this, SeaWorld has cherry-picked portions of Nelson's testimony discussing her earlier feelings about SeaWorld prior to SeaWorld's announcements that it would be making certain changes relating to its orcas, including ending breeding and theatrical shows. For example, while Nelson wrote in a Yelp

message from 2015 that she "despise[d] SeaWorld" at that time, she testified that she no longer despises SeaWorld and is now much more open-minded about SeaWorld and whether she would return.  Nelson Tr. at 81:18-83:20 ("Q: You said you've taken a broader view. . . . What is your broader view?  A: It's just that I have a more open mind.  Q: Open mind about what?  A: SeaWorld. . . .*Q: Open mind about whether you'd go back?  A: Uh-huh.*"); *see also id.* at 199:2-25, 204:3-24, 214:2-215:20.

Ms. Nelson's testimony also established that she is unable to rely on SeaWorld's representations in deciding whether to make a future purchase, which, under *Davidson*, constitutes an impending injury.  *See* Nelson Tr. at 81:18-83:20 (in discussing what caused her to have an "open mind" about returning to SeaWorld, stating that "there might be changes to the business model in the future," such as "the elimination of breeding orcas in captivity," or the end of "the orca show," but also stating that she could not be certain those changes have been done).

Given Nelson's stated change in outlook, Nelson's testimony that she might consider returning to SeaWorld if their "product" were to change to match their statements is more than plausible.  *Id.* at 233:6-10, 237:5-17, 242:1-3.  Nelson also testified that even if SeaWorld's practices were to change, she would be unable to rely on SeaWorld's statements in the future because she does not believe that they have been honest in the past.  *Id.* at 186:3-16 (noting Nelson's uncertainty about SeaWorld's credibility); 232:13-234:4 ("I don't believe they've been honest.  But there's no way to know.").  Nelson's testimony is also consistent with her allegations in the complaint which the Court found sufficient to confer standing to seek injunctive relief.  Dkt. No. 90 at 6-7.  Therefore, Nelson has Article III standing to pursue an injunctive relief claim.

Second, with respect to Anderson, SeaWorld points to testimony that he would not purchase a ticket to SeaWorld unless it changed its practices, including installing "bigger pools" and that he would not go back as long as the pools are the same size.  *Id.* at 22-23.  However, SeaWorld omits the context of Anderson's testimony.  Anderson testified that he would consider purchasing a ticket to SeaWorld if SeaWorld changed its "policies and practices," and gave examples of things that SeaWorld could change including "captivity, small pools, and that [orcas] get diseases earlier than . . . [those] in the wild." Anderson Tr. at 211:18- 212:20.  Anderson then immediately clarified that SeaWorld would not need to end captivity of its whales altogether but would need to take steps to improve the treatment of their

1    animals such as having larger pools, banning breeding and not separating mothers from calves.  *Id.* at

2    212:21-214:17.  Increasing the size of pools was only one example given.  While SeaWorld has argued

3    that Plaintiffs have not asked the Court to order SeaWorld to increase the sizes of its pools, Plaintiffs have

4    alleged that SeaWorld misrepresented that the lifespans of its orcas are the same as those in the wild, and

5    there is a genuine dispute as to what factors contribute to this lifespan discrepancy, including those

6    mentioned by Anderson such as pool size and diseases that orcas are exposed to in captivity versus the

7    wild.  SeaWorld's argument that there is "nothing imminent about any future purchase from Anderson" is

8    also contrary to *Davidson* and to Anderson's testimony.  In *Davidson*, the "imminent harm" was the

9    plaintiff's inability to rely on the defendant's statements that the wipes were flushable, even though she

10   desired to purchase "truly flushable" wipes, because she had no way of knowing whether or not the

11   statement was true given the defendant's previous misrepresentation.  Similarly, Anderson testified that he

12   could not rely on SeaWorld's statements because he could not "decide whether they're true or false."

13   Anderson Tr. at 254:1-12.  Anderson also testified that he would purchase another ticket to SeaWorld if it

14   changed its practices, and gave a specific example of another occasion on which he refused to purchase

15   tickets to a theme park due to their mistreatment of animals, but later returned to that theme park after they

16   changed their practices:

17          Q: Could you explain to me what is meant by "a reasonable but firm
             commitment to animal welfare"?
18

19          A: I think I kind of made that clear when I was talking about the Six Flags
             in Vallejo and about the -- that hurt animals and not going to the park
20           because it was hurting the animals. When they rectified that situation, we
             went to the park.
21

22   Anderson Tr. at 210:2-9; *see also id.* at 76:1-19.

23          Anderson's testimony therefore established that he would return to SeaWorld if its practices were

24   to evolve in a way that might make the challenged statements true, but that given SeaWorld's previous

25   misrepresentations he cannot be certain about the truth of any future statements.  Thus, Anderson, like

26   Nelson, has Article III standing to pursue an injunctive relief claim.  At a minimum, there is a genuine

27   dispute of fact regarding what changes to SeaWorld's treatment of orcas would be needed to make

28   SeaWorld's statements true, which cannot be resolved at this stage of the proceedings.

---

1    Finally, SeaWorld attempts to portray Morizur as anti-SeaWorld and anti-captivity (*see* Mot. at 24)

2    in an effort to support its argument that she never intends to return to SeaWorld.  But Morizur's deposition

3    testimony establishes that she supports some of the work that SeaWorld has done (*see* Morizur Tr. at

4    182:16-183:4 (describing "awesome SeaWorld rescue")), and she generally enjoys and purchases tickets

5    to educational marine parks and animal exhibitions (*see id.* at 232:18-233:5, 233:16-236:9 ("I agree with

6    the way that Monterey Bay Aquarium puts on -- or exhibits their animals [] because they do it in a very

7    educational way").  Further, the portion of Morizur's testimony that SeaWorld quotes at length in its brief

8    establishes that she too has Article III standing under *Davidson*.  Specifically, Morizur testified that "if

9    [SeaWorld] end[s] up changing . . . Maybe they could win me back as a customer."  Morizur Tr. at

10   175:22-24.  SeaWorld's argument that Morizur lacks standing because she would not return to the park

11   *right now*, without any changes to SeaWorld's practices, is in tension with *Davidson*.  In *Davidson*, the

12   plaintiff would not repurchase, and had not repurchased, wipes in their current form, and had no stated

13   intention of purchasing wipes "right now."  873 F.3d at 1108.  Yet this did not prevent the Court from

14   finding Article III standing.  *Id.* at 1112-16.  Likewise, Morizur's testimony that she would not return to

15   SeaWorld right now is not fatal to her injunctive relief claim as SeaWorld represents.  Also in line with

16   *Davidson*, Morizur testified that she cannot currently rely on SeaWorld's representations given their prior

17   false statements.  Morizur Tr. at 171:24-173:16.  While she would consider returning to SeaWorld if its

18   practices changed, she cannot currently rely on its statements given its past misrepresentations.  For

19   example, SeaWorld has stated that it is "getting rid of its killer whale show," which Morizur testified

20   made her extremely happy at the time of the announcement in 2015, but that because she believes that no

21   progress has been made since that time, she cannot know if or when it will ever happen.  *Id.* at 225:8-15,

22   245:16-246:17, 262:21-263:5.  Morizur's testimony is also consistent with her allegations in the TAC,

23   which this Court previously found sufficient to confer standing.  Dkt. No. 90 at 6-7.

24   SeaWorld's arguments fail in light of *Davidson* and this Court's prior orders.  All three Plaintiffs

25   have sufficiently established a "threatened injury [that is] certainly impending," stemming from their

26   inability to rely on SeaWorld's representations in deciding whether to make a future purchase, thereby

27   establishing Article III standing to assert injunctive relief.

28

**IV.    CONCLUSION**

Plaintiffs respectfully request that the Court deny Defendant's motion.


                                        Respectfully submitted,

Dated:  November 13, 2017               COVINGTON & BURLING LLP


                                        By:   _/s/ Christine Saunders Haskett_
                                              Christine Saunders Haskett
                                              Attorneys for Plaintiffs