**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC ANDERSON, et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>SEAWORLD PARKS AND ENTERTAINMENT, INC.,<br><br>   Defendant. | Case No. 15-cv-02172-JSW<br><br>**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 136 |

Now before the Court for consideration is the motion for summary judgment filed by Defendant SeaWorld Parks and Entertainment, Inc. ("SeaWorld"). The Court has considered the parties' papers, relevant legal authority, and the record in this case, and the Court has had the benefit of oral argument. For the reasons set forth herein, the Court GRANTS, IN PART, AND DENIES, IN PART, SeaWorld's motion.

**BACKGROUND**

The Court has recited the underlying facts and the procedural history of this lawsuit in several prior orders and shall not repeat them here. (*See* Dkt. Nos. 46, 90; *see also* Dkt. No. 80, published at *Anderson v. SeaWorld Parks and Entertainment, Inc.*, 15-cv-2172-JSW, 2016 WL 4076097 (N.D. Cal. Aug. 1, 2016).) The Court will address the facts specific to the motion in its analysis.

(1) Plaintiff Mark Anderson brings individual claims and putative class claims for alleged violations of California's False Advertising Law, Business and Professions Code sections 17500, *et seq.* ("FAL"), and California's Unfair Competition Law, Business and Professions Code

1   sections 17200, *et seq.* ("UCL").  Those claims are premised on Anderson's purchase of a Shamu

2   stuffed animal (the "Shamu toy") that he alleges he purchased in reliance on the following two

3   statements from SeaWorld's website: (1) "orca lifespans in captivity are comparable to orca

4   lifespans in the wild"; and (2) "SeaWorld does not separate calves from mother orcas."  (TAC

5   ¶ 18.)  For ease of reference, the Court refers to these statements, and the similar statements that

6   Plaintiff Kelly Nelson ("Nelson") alleges she relied on as the "mother-calf separation" statement

7   and the "captive orca lifespan" statement.

8        (2) Nelson brings individual and putative class claims for alleged violations of the FAL,

9   UCL, and California's Consumer Legal Remedies Act, Civil Code sections 1750, *et seq.*

10  ("CLRA") based on the purchase of tickets to SeaWorld.  Nelson alleges that when making the

11  decision to purchase a ticket to SeaWorld, she relied the mother-calf separation statement and the

12  orca lifespan statement.  (TAC ¶ 19.)  According to the TAC, Nelson saw each of those statements

13  on television and on SeaWorld's website.  (*Id.*)

14       (3) Plaintiff Juliette Morizur brings individual and putative class claims for alleged

15  violations of the unfair prong of the UCL based on her purchase of a Shamu toy.  Morizur alleges

16  that she purchased the Shamu toy based on the following statements: (1) collapsed dorsal fins are

17  "normal, and also equally common in the wild"; and (2) "captivity in general does not harm

18  orcas."  (*Id.* ¶ 20.)  Nelson alleges that a SeaWorld trainer made the statements to her at SeaWorld

19  before she purchased the Shamu toy.  (*Id.*)[1]

## ANALYSIS

**A.   Legal Standards Applicable to Motion for Summary Judgment.**

"A party may move for summary judgment, identifying each claim or defense … on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment, or partial summary judgment, is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant

---

[1]   For each of the Plaintiffs, these are the claims that remain as a result of the Court's rulings on SeaWorld's motions to dismiss.

2

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not weigh evidence or make determinations of credibility. Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *see also* Fed. R. Civ. P. 56(c). An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson*, 477 U.S. at 248-49. A fact is "material" if it may affect the outcome of the case. *Id.* at 248. If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, that party must produce evidence which either negates an essential element of the non-moving party's claims or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party meets its initial burden, the non-moving party must "'identify with reasonable particularity the evidence that precludes summary judgment.'" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995). It is not the Court's task "'to scour the record in search of a genuine issue of triable fact.'" *Id.* (quoting *Richards*, 55 F.3d at 251); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted). If the non-moving party fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

//

//

**B.      The Court Denies SeaWorld's Motion for Summary Judgment on the Issue of Standing to Seek Injunctive Relief.**

SeaWorld argues that Plaintiffs' deposition testimony establishes they lack Article III standing to seek injunctive relief. Because this issue comes before the Court on a motion summary judgment, Plaintiffs must show there are triable issues of fact on the issue of standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("each element" of the standing inquiry "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation"). "In a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 985 (9th Cir. 2007); *cf. Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) ("Unless the named plaintiffs themselves are entitled to seek injunctive relief, they may not represent a class seeking that relief."). Nelson is the only plaintiff whose claims are premised on the purchase of tickets to SeaWorld. Although Anderson and Morizur each base their claims on the purchase of a Shamu toy, they did not rely on the same statements when they made those purchases. Therefore, the Court will evaluate each named Plaintiff's standing to seek injunctive relief.

"Past exposure to harmful or illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010). In the context of requests for injunctive relief, the standing inquiry requires a plaintiff to "demonstrate that he has suffered or is threatened with a concrete and particularized legal harm coupled with a sufficient likelihood that he will again be wronged in a similar way." *Bates*, 511 F.3d at 985 (internal quotations and citations omitted); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). The latter inquiry turns on whether the plaintiff has a "'real and immediate threat of repeated injury.'" *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).

The Ninth Circuit recently addressed the issue of what is necessary to allege standing to seek injunctive relief when a plaintiff brings claims under the CLRA, FAL, and UCL based on

4

allegedly false advertising. In *Davidson v. Kimberly-Clark Corp.*, the plaintiff sued manufacturers of pre-moistened wipes that were marketed and labeled as flushable. 873 F.3d 1103, 1113 (9th Cir. 2017). According to the plaintiff, the term "flushable" meant the wipes were suitable to dispose of in a toilet, and defendants' wipes were not flushable. The plaintiff also alleged she paid a premium for the defendants' flushable wipes and would not have purchased them if she had known they were not flushable. *Id.* at 1107-08. The district court found the plaintiff did not have standing to seek injunctive relief, reasoning that the plaintiff was unlikely to purchase the wipes in the future and could not show the risk of a future injury. *Id.* at 1109.

The Ninth Circuit reversed and held the "inability to rely in the future upon a representation made on a package, … is an ongoing injury that may justify an order barring the false advertising." *Id.* at 1107. The court reasoned that a consumer previously deceived by false advertising could have standing to pursue injunctive relief in at least two situations.

> In some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to. … In other cases, the threat of future harm may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved.

*Id.* at 1115 (citations omitted). The plaintiff in *Davidson* alleged that she wanted to purchase wipes that were truly flushable and would purchase defendants' wipes if it were possible, but when she was presented with their packaging at stores, she had "no way of determining whether the representation 'flushable' is in fact true." *Id.* at 1116.

> We are required at this stage of the proceedings to presume the truth of Davidson's allegations and construe all of the allegations in her favor. … Though we recognize it is a close question, based on the FAC's allegations, we hold that Davidson adequately alleged that she faces an imminent or actual threat of future harm due to [defendants'] false advertising. Davidson has alleged that she desires to purchase [defendants'] flushable wipes. Her desire is based on her belief that "it would be easier and more sanitary to flush wipes than to dispose of them in the garbage."

*Id.* (internal citations omitted).

The court found there were no allegations to discount the plaintiff's intent and concluded

5

that the plaintiff's allegation that she had "'no way of determining whether the representation 'flushable' is in fact true' when she 'regularly visits stores … where Defendants' 'flushable wipes are sold,'" was sufficient to establish Article III standing to seek injunctive relief. *Id.* (quoting *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012)).

SeaWorld contends that the Plaintiffs' deposition testimony establishes that none of them intend to return to SeaWorld in the future and, therefore, they have not shown they face a realistic threat of future injury. SeaWorld fails to focus on the difference between the Plaintiffs' claims and the products or services at issue. For Anderson and Morizur, the appropriate inquiry is whether their testimony establishes that they would consider purchasing merchandise from SeaWorld in the future. The Court finds SeaWorld has failed to meet its burden on the question of whether Anderson has standing to seek injunctive relief. That is because all of the testimony on which it presented on this issue relates to whether Anderson would purchase tickets to SeaWorld in the future; not whether he would purchase SeaWorld merchandise if he could rely on its advertising.[2] (*See generally* Dkt. No. 136-1, Declaration of John M. Simpson ("Simpson Decl."), ¶ 5, Ex. D, Excerpts of Mark Anderson Deposition ("Anderson Depo.") at 210:25-215:6.)

In contrast to Anderson, SeaWorld did ask Morizur about whether she would purchase merchandise from SeaWorld in the future. She testified that if the Court ordered SeaWorld to correct its advertising and state that collapsed dorsal fins are not normal and that captivity is harmful to orcas, she would not purchase merchandise from SeaWorld and testified that "currently" she does not plan on buying SeaWorld merchandise. (Simpson Decl., ¶ 11, Ex. J, Excerpts of Deposition of Juliette Morizur ("Morizur Depo.") at 175:7-16, 176:1-13.) She also testified that if SeaWorld changed perhaps it could win her back as a customer, and that if she could be sure that SeaWorld was not lying about its orca program, she would consider purchasing

---

[2] During his deposition, Anderson testified about what would be necessary for him to go back to SeaWorld, which included changes in practices and the need to believe statements that those practices had changed. As discussed in the following section, there is testimony in the record relating to whether Anderson would purchase SeaWorld merchandise. For the reasons outlined in that section, the Court also would find there are disputed issues of fact about whether Anderson would purchase SeaWorld merchandise in the future, at SeaWorld or at some other location.

1   merchandise from SeaWorld. (*Id.* at 175:17-24, 263:1-5.)[3] SeaWorld cites to other testimony

2   about Ms. Morizur's views of SeaWorld that may impact her credibility, but the Court cannot

3   make credibility determinations at this stage of the proceedings. The Court concludes Morizur has

4   presented triable issues of fact on the issue of whether she has standing to seek injunctive relief.

5       Nelson's claims are premised on the purchase of SeaWorld tickets. Nelson testified that

6   she is uncertain about whether she can rely on SeaWorld's statements. When queried why

7   SeaWorld's honesty might make a difference to her and whether she intended to return to

8   SeaWorld, Nelson testified "I could. … If things were different." (Dkt. No. 145, Declaration of

9   Tracy O. Zinsou ("Zinsou Decl."), ¶ 2; Dkt. No. 143-4, Zinsou Decl. Ex. A, Excerpts of Kelly

10  Nelson Deposition ("Nelson Depo.") at 232:19-233:10.) Nelson further explained it would require

11  "more objective information about how the animals are treated. … It's a question of satisfying

12  whether … orcas live as long in captivity as they do in the wild and whether they're separated

13  from their mothers." (*Id.* at 233:11-23; *see also id.* at 233:24-234:2.) Finally, Nelson affirmed the

14  allegation that "[a]ssuming SeaWorld's practices were to evolve to improve the level of animal

15  care and to be honest about the health and status of the orcas," she "may be inclined to purchase

16  SeaWorld tickets or merchandise in the future." (*Id.* at 234:10-17.)

17      Nelson also testified that, if SeaWorld's practices were to evolve and it was honest, "at the

18  moment" she could not say whether she would be "willing" to think about going back or whether

19  she would "actually go back." Yet, almost immediately thereafter, SeaWorld asked "Do you have

20  any intention, as you sit here today, of ever going back to SeaWorld," and Nelson responded "I

21  might." (Simpson Decl., Ex. H, Nelson Depo. at 240:24-241:15, 242:1-3; *see also* Zinsou Decl.,

22  Ex. A, Nelson Depo. at 81:18-82:17.) SeaWorld cites to other portions of Nelson's testimony that

---

[3] During Morizur's deposition, SeaWorld objected to the form of the question posed at 263:1-3, and it argues the Court should not consider this leading testimony. The Court overrules SeaWorld's objections. *See Celotex,* 477 U.S. at 324 (stating non-moving party need not "evidence in a form that would be admissible at trial in order to avoid summary judgment"); *accord Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001). The facts elicited by the leading question are evidence that would be admissible at trial, and the Court shall consider those facts.

1  relates to her involvement with People for the Ethical Treatment of Animals and her past views
2  about SeaWorld. While this testimony may cast doubts on the credibility of Nelson's intention to
3  return to SeaWorld, the Court cannot make credibility determinations or weigh evidence at this
4  stage of the proceedings. The Court finds Nelson has presented triable issues of fact on the issue
5  of whether she has standing to seek injunctive relief.

Accordingly, the Court DENIES, IN PART, SeaWorld's motion for summary judgment on the issue of standing.

### C. The Court Grants, in Part, SeaWorld's Motion on Anderson's Individual Claims.

Sea World argues that it is entitled to summary judgment on Anderson's claims, because he has not established reliance, an essential element of each of Anderson's claims. A plaintiff bringing claims under the UCL and the FAL can prove reliance

> by showing that the defendant's misrepresentation or nondisclosure was an immediate cause of the plaintiff's injury-producing conduct. A plaintiff may establish that the defendant's misrepresentation is an immediate cause of the plaintiff's conduct by showing that in its absence the plaintiff *in all reasonable probability would not have engaged in the injury-producing conduct*.

*In re Tobacco II Cases,* 46 Cal. 4th 298, 326 (2009) (internal quotations and citations omitted, emphasis added). Here, the "injury-producing conduct" is Anderson's purchase of the Shamu toy.

> While a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct, the plaintiff need not demonstrate it was the only cause. It is not necessary that the plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct. *It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision.*

*Id.* (internal quotations, ellipses, citations and brackets omitted, emphasis added.) In order to survive SeaWorld's motion, Anderson "must point to specific facts indicating that [he] actually saw the misrepresentations about which" he complains, "and that those misrepresentations were 'substantial factor[s]' in" his decision to purchase the Shamu toy. *In re iPhone Application Litigation*, 6 F. Supp. 3d 1004, 1019-20 (N.D. Cal. 2013).

In *In re iPhone*, the court granted summary judgment in favor of the defendant where the

plaintiffs either disavowed reading the privacy policies about which they complained or could not recall reading them or any other representation by the defendant. *See id.*, 6 F. Supp. 3d at 1018-22. The Court concludes that, like the plaintiffs in *In re iPhone*, Anderson has not met his burden to overcome Sea World's motion to the extent his claims are premised on the mother-calf separation statement. Anderson was asked about the statements from SeaWorld's website that he saw and relied on before he visited SeaWorld. (Zinsou Decl., ¶¶ 6-7; Zinsou Decl., Ex. E, Anderson Depo. at 231:10-18, 231:23-233:11, 264:16-266:9; Zinsou Decl., Ex F, Anderson Depo. Ex. 28.) Anderson testified that he saw a statement on the website that reads "Breeding and the mother/calf bond." (*Id.*, Ex. E, Anderson Depo. at 266:2-4; Anderson Depo. Ex. 28 at p. 9.) That heading does not say anything about whether SeaWorld separates calves from its mothers, and there is no testimony in the record about what Anderson understood the statement to mean.

The text below the heading states "SeaWorld understands the importance of keeping mothers and their dependent calves together" and states that, in general, SeaWorld does not separate calves and mothers. (Anderson Depo. Ex. 28 at p. 9.) Anderson, however, testified that he did not read the text of "the article." (Zinsou Decl., Ex. E, Anderson Depo. at 266:2-9.) Anderson has not shown that he saw the mother-calf separation statement and, therefore, he could not have relied on that statement when he purchased the Shamu toy. *See, e.g., Doe v. Successful Match.com,* 70 F. Supp. 3d 1066, 1082 (N.D. Cal. 2014) ("[I]f Plaintiffs did not see the specified representations before they purchased Defendant's services, then Plaintiffs did not rely on these representations and suffered no injury."); *cf. Cohen v. DirecTV, Inc.*, 178 Cal. App. 4th 966, 980 (2009) (stating, in context of motion for class certification, that "we do not understand the UCL to authorize an award for injunctive relief and/or restitution on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice").

Whether Anderson relied on the captive orca lifespan statement is a closer issue. When questioned further about Exhibit 28, Anderson testified that he remembered reading the statement "[O]ur killer whales live as long as those in the wild" before he visited SeaWorld, although he admitted he did not read the text following that statement. (Zinsou Decl., Ex. E, Anderson Depo. at 265:18-21.) Anderson testified that when he purchased the Shamu toy, he intended it to be a

9

1 gift for his sister and was thinking about "[m]any different things. Mainly the show we just saw.
2 Souvenir of SeaWorld." (Simpson Decl., Ex. D, Anderson Depo., at 74:10-16, 74:23-24, 75:20-
3 21, 121:16-22.)

4 In *Baghdasarian v. Amazon.com,* the plaintiff alleged the defendant's shipping and handling policy for the Amazon Marketplace was deceptive, because the defendant charged a higher price for shipping and handling on items sold by independent sellers than the estimated rates and retained the difference for itself. No. 05-cv-8060 AG (CTX), 2009 WL 4823368, at *1 (C.D. Cal. Dec. 9, 2009), *aff'd*, 458 Fed. Appx. 622 (9th Cir. 2011). The defendant argued that plaintiff's deposition testimony precluded a finding of reliance, and the court agreed. The plaintiff testified that his "primary" reasons for purchasing goods from defendant were "cost and security." *Id.*, 2009 WL 4823368, at *5. The court recognized that this testimony was not dispositive, because the plaintiff "does not need to show that a misrepresentation was the primary factor in his decision to engage in injury causing conduct as long as it was a significant factor." *Id.*, 2009 WL 4823368, at *6. However, the plaintiff testified that "[i]t's not that if they had told me of the fees ... I would have never bought something from Amazon. But the fact that they hid it ... kind of turned me off ...." *Id.* The court reasoned that this testimony demonstrated the "alleged misrepresentation was not an influential factor in [plaintiff's] decision to buy from the marketplace" and also precluded plaintiff from relying on a presumption or inference of reliance. *Id.* (citing *Tobacco II*, 46 Cal. 4th at 327).

> Plaintiff's deposition testimony is that he would still have bought items from Amazon Marketplace if he had known about the holdback fees, and that the reason he stopped buying from Amazon Marketplace was because he learned that the money he was paying was for a hidden fee. [Record citation.] This establishes at most that he stopped transacting on Amazon Marketplace because he believed Defendant to be deceitful. But Plaintiff's evidence falls short of establishing the crucial point. Plaintiff does not show that he would have declined to enter into the transactions in the absence of the shipping policy.

*Id.*

Anderson testified that he was "motivated" to purchase the Shamu plush because it was big, soft, and something a girl would like. (*Id.* at 122:21-25.) This testimony elucidates

10

1  Anderson's primary reasons for purchasing the Shamu toy, which are unrelated to the alleged

2  misrepresentations set forth in the TAC.  However, as in the *Baghdasarian* case, the testimony is

3  not dispositive, because Anderson need not show the misrepresentations were the only factor

4  motivating his decision to purchase the Shamu Toy.  *Baghdasarian,* 2009 WL 4823368, at *6;

5  *accord In re Tobacco II*, 46 Cal. 4th at 326.

6  The Court also finds guidance in *Wilson v. Frito-Lay North America, Inc.*, 260 F. Supp. 3d

7  1202 (N.D. Cal. 2017).  There, the plaintiffs challenged two statements on the defendant's potato

8  chip packages: "0g Trans Fat" and "Made with All Natural Ingredients."  One plaintiff admitted he

9  did not notice any statements on the packaging during the relevant time period.  He also testified

10  he purchased the defendant's potato chips because of taste, the brand and the packaging.  The

11  court found this testimony showed the statement "played no part at all" in his decision to purchase

12  defendant's products and found that the plaintiff failed to establish a triable issue of fact on

13  reliance.  *Id.* at 1209-10.[4]

14  The other plaintiff similarly failed to put forth any "specific facts to indicate that the '0

15  grams Trans Fat' label was a substantial factor in [his] decision to purchase" the defendant's

16  products.  *Id.* at 1213.  That plaintiff also challenged the "Made with All Natural Ingredients"

17  statement and testified that he purchased the product because "they tasted good" and he liked the

18  flavor.  *Id.* at 1213-14.  When asked "whether there are 'other things he likes about the product,'

19  he simply responded, 'Well, they taste good.'"  *Id.* at 1214 (internal brackets omitted).  The

20  plaintiff also affirmed "that it was fair to say that the natural label isn't the reason that he bought

21  them."  *Id.* (internal quotations and brackets omitted).  The court, therefore, granted the

22  defendant's motion for summary judgment.

23  In contrast to *Wilson* and *Baghdasarian*, in *Rahman v. Mott's LLP*, the court denied

24  summary judgment on the issue of reliance.  No. 13-cv-03482-SI, 2014 WL 5282106, at *6-*7

---

[4]  The plaintiff did testify recalling seeing the "0 grams trans fat" statement on the last package of defendant's chips that he purchased.  However, the court found that purchase could not support a claim, because it was made at the direction of plaintiff's counsel.  The court did not consider testimony elicited on re-direct that attempted to rebut that testimony and to show the plaintiff had seen the 0 grams trans fat statement.  *Id.* at 1210-11.  For reasons set forth in this Order, this court shall consider the facts elicited in response to leading questions.

11

1   (N.D. Cal. Oct. 15, 2014). In that case, the plaintiff alleged the statement "No Sugar Added" on
2   defendant's apple juice did not comply with federal and state regulations for such claims and, as a
3   result, caused him to believe that it had fewer calories than other kinds of apple juice. The
4   plaintiff testified that "taste and price [were] the two most important factors he relie[d] on when
5   purchasing food and beverage products," that he had purchased defendant's apple juice even when
6   the "No Sugar Added" statement was not on the label, and that he had not relied on that label "to
7   tell how many calories or sugar were in the beverage, or how healthy it was." *Id.*, 2014 WL
8   5282106, at *7. However, he also testified that the statement "caused him to believe that there
9   were fewer calories than comparable apple juice products," that it caused him to "believe the
10  product was healthier than other juices," and that he "purchased more" of the product "because
11  when I saw the label that said 'No sugar added,' I thought it would be less sugar content than the
12  other apple juice products." *Id.* The court noted the conflicts in the plaintiff's testimony and
13  concluded there was a triable issue of fact on the issue of reliance. *Id.*

14  In addition to the testimony discussed above about Anderson's reasons for purchasing the
15  Shamu toy, when asked by defendant's counsel whether he had identified "all the reasons [he]
16  made a decision to purchase that souvenir orca for [his] sister," Anderson responded "[t]o the best
17  of my knowledge, yes." (Simpson Decl., Ex. D, Anderson Depo. at 123:5-8.) Anderson also
18  denied that at the time he purchased the Shamu toy, he was thinking "that the whales at SeaWorld
19  don't live as long as whales in the wild[.]" (*Id.* at 139:3-10; *see also* Dkt. No. 151-1, Reply
20  Declaration of John M. Simpson ("Simpson Reply Decl."), ¶ 2, Ex. A, Anderson Depo. at 237:7-
21  11.)

22  Anderson argues that notwithstanding this testimony there are triable issues of fact about
23  reliance. For example, he relies on the testimony that if he "would have known what [he does]
24  now regarding the treatment or mistreatment of the animals, that [*sic*] I probably would not have
25  purchased a ticket. In fact, I'm pretty sure I would not have purchased a ticket[.]" (Zinsou Decl.,
26  Ex. E, Anderson Depo. at 174:25-175:2; *see also id.* at 175:3-8 (if he had not purchased the
27  tickets, he would not have been at the park and "would not have purchased a souvenir as well").)
28  It is reasonable to infer that the captive orca lifespan statement influenced Anderson's decision to

12

1  visit the park and, consistent with the allegations in the TAC, may have reassured him that
2  "SeaWorld takes good care of its orcas." (TAC ¶ 18.)  It does not necessarily follow that the
3  captive orca lifespan statement also played a substantial factor in his decision to purchase the
4  Shamu toy.

5  However, Anderson testified that as part of his general commitment to animal welfare, he
6  tries not to patronize parks that mistreat animals. (Zinsou Decl., Ex. E, Anderson Depo. 210:2-
7  211:4). Anderson's deposition testimony also shows that, at the time he purchased the Shamu toy,
8  he had not seen *Blackfish* and was not aware of the allegedly misleading nature of the captive orca
9  lifespan statement. (Zinsou Decl., Ex. E, Anderson Depo. at 120:6-121:8, 231:9-234:5; *see also*
10 Dkt. No. 187, Declaration of Udit Sood, Ex. A, Anderson Depo. at 140:18-141:8.)[5] Finally,
11 Anderson did testify that he would not buy merchandise outside of the park, because of what he
12 learned about captive orca lifespans. (Zinsou Decl., Ex. E, Anderson Depo. at 135:18-136:21,
13 176:12-19.) When the Court considers Anderson's testimony in its entirety, the Court finds the
14 record is sufficient for a reasonable juror to find that if Anderson had known what he contends to
15 be the truth about orca lifespans in captivity, in all reasonable probability he would not have
16 purchased the Shamu toy. SeaWorld is, of course, free to "attempt to impeach [Anderson] at trial
17 with prior statements" it believes "are inconsistent, but such disputes preclude judgment as a
18 matter of law at this stage." *Ries*, 287 F.R.D. at 531.

19 Accordingly, the Court GRANTS, IN PART, AND DENIES, IN PART, SeaWorld's
20 motion for summary judgment on Anderson's claims.

21 **D. The Court Grants, in Part, and Denies, in Part, Denies SeaWorld's Motion on Nelson's Individual Claims.**
22

23 SeaWorld argues that it is entitled to judgment on Nelson's claims because: (1) she has not

---

[5] In this testimony, Anderson is referring to a meeting he had with Mark Palmer of the International Marine Mammal Project at Plaintiffs' counsel's office. (Simpson Decl., Ex. D, Anderson Depo. at 21:7-21, 22:7-23:3, 24:17-25:12.) The import of this meeting is relevant to SeaWorld's motion for sanctions, but the Court concludes it is not material to this motion. Further, to the extent it may impact Anderson's credibility, the Court cannot make credibility determinations at this stage of the litigation.

13

shown she suffered an economic injury and, therefore, lacks Article III and statutory standing; (2) she has not shown she was exposed to the captive orca lifespan and to the mother-calf separation statements; and (3) her claims are premised on a "lack of substantiation theory," which she cannot pursue as a private plaintiff.

### 1. There Are Triable Issues of Fact About Whether Nelson Suffered an Economic Injury.

In order to prove she has Article III and statutory standing to bring each of her claims, Nelson must be able to show injury in fact and that she lost money or property as a result of SeaWorld's conduct. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011); *see also Hinojos v. Kohls Corp.*, 718 F.3d 1098, 1103-04, 1107-08 (9th Cir. 2013). Nelson claims to have spent money on a ticket she would not have spent if she had known the truth, and lost money is "a classic form of injury in fact." *Kwikset*, 51 Cal. 4th at 323.

It is undisputed that it was Nelson's husband exchanged money, either in cash or with a credit card, for the tickets.[6] (Simpson Decl., Ex. H, Nelson Depo. at 154:20-155:6.) SeaWorld argues this fact precludes Nelson from pursuing her claims, because she has not established that *she* lost money or property, and it relies on *Bird v. First Alert, Inc.*, No. 14-cv-3585-PJH, 2015 WL 3750225 (N.D. Cal. June 15, 2015). In that case, the plaintiff alleged the defendant violated the CLRA by misrepresenting the safety of a particular type of smoke detector. *Id.*, 2015 WL 3750225, at *1. The defendant moved to dismiss on the basis that the plaintiff alleged that her husband purchased the smoke detector and, therefore, had not alleged an economic injury. The plaintiff argued that she did have standing and asserted that her husband had used community property when he purchased the smoke detector.

The court agreed that plaintiff lacked standing and was "not persuaded" by the plaintiff's community property argument, reasoning that "the fact remains that it was [plaintiff's husband], not plaintiff, who chose to purchase" the smoke detector. *Id.*, 2015 WL 3750025, at *3, *5-6. The court also reasoned that because her husband made the decision about which smoke detector to

---

[6] Nelson testified that if her husband used a credit card, it would have been in his name. (Simpson Decl., Ex. H, Nelson Depo. at 155:2-6.)

14

1  purchase, "plaintiff could not have relied on anything disclosed (or not disclosed) on the

2  packaging in making the decision to purchase that particular smoke alarm and could not have been

3  injured by the purchase." *Id.*; *see also id.,* 2015 WL 3750225, at *7 ("Because plaintiff did not

4  make the decision as to which alarm to buy, and did not review the packaging until after [her

5  husband] had purchased the smoke alarm, she cannot establish reliance, causation, or damages.").

6  SeaWorld argues that "[o]nly the actual purchaser of the product at issue, not the person

7  for whose benefit or on whose behalf it the item was purchased has standing." (SeaWorld Mot. at

8  11 n.7) To support this proposition, SeaWorld cites *Peviani v. Natural Balance, Inc.*, 774 F. Supp.

9  2d 1066 (S.D. Cal. 2011). In that case, the plaintiff purchased a product for her husband, and the

10  defendant argued the plaintiff "could not have relied on the statements because she is a woman,

11  and the product is a men's formula." *Id.* at 1070. The court was not called upon to consider

12  whether, or under what circumstances, her husband might also have had standing. Therefore, the

13  Court finds *Peviani* inapposite.

14  SeaWorld also relies on *Millett v. Experian Information Solutions, Inc.*, 319 Fed. Appx.

15  562 (9th Cir. 2009) and *Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949 (2005). In

16  each case, the courts determined that a plaintiff who had not purchased a product could not assert a

17  claim under the CLRA. *Millet*, 319 Fed. Appx. at 563; *Schauer*, 125 Cal. App. 4th at 960.

18  Neither of those two cases addressed the issue of whether the plaintiff acted in reliance on the

19  representations and there is no discussion of whether that plaintiff's money was used to conduct

20  the transaction.

21  Nelson testified that she relied on the captive orca lifespan statement and on the mother-

22  calf separation statement when she made the decision to visit SeaWorld. (Simpson Decl., Ex. H,

23  Nelson Depo. at 155:13-22, 167:21-168:17, 168:9-23, 160:1-12; Zinsou Decl., ¶ 4, Ex. C, Nelson

24  Depo. Ex. 50; Zinsou Decl., Ex. A, Nelson Depo. at 151:3-21, 151:25-152:3; *see also* Dkt. No.

25  147, Declaration of Kelly Nelson ("Nelson Decl."), ¶¶ 3-4.) Thus, unlike the situation presented

26  in *Bird*, the record here supports an inference that it was Nelson, not her husband, who made the

27  decisions to visit SeaWorld and to purchase tickets and that she relied on the alleged

28

15

misrepresentations when making those decisions.[7]

Nelson also attests that she and her husband have two joint bank accounts, that she places her earnings in those accounts, and that she and her husband pay their bills, including credit card bills, from those joint accounts. (Nelson Decl., ¶ 2.) SeaWorld counters that Nelson has not provided any further evidence to show that the funds used were community property. However, "if parties to an account are married to each other, whether or not they are so described in the deposit agreement, their net contribution to the account is presumed to be and remain their community property." Cal. Prob. Code § 5305(a); *see also* Cal. Fam. Code § 760.[8]

The Court concludes that Nelson has put forth sufficient evidence to create a triable issue of fact about whether she suffered an economic injury. Absent further guidance from the California Supreme Court and the Ninth Circuit, the Court is not willing to find as a matter of law that Nelson lacks standing simply because her husband turned over the funds that were used to purchase the tickets, when there is sufficient evidence in the record from which the trier of fact could conclude that she made the decision to purchase those tickets and did so based on SeaWorld's alleged misrepresentations. For that reason, the Court finds SeaWorld's reliance on *Millett* and *Schauer* unpersuasive.

Accordingly, the Court DENIES, IN PART, SeaWorld's motion for summary judgment on this basis.

**2. There Are Triable Issues of Fact About Whether Nelson Was Exposed to SeaWorld's Alleged Misrepresentations on Its Website.**

SeaWorld also moves for summary judgment on the basis that Nelson has not shown she was exposed to the captive orca lifespan and mother-calf separation statements. According to the TAC, Nelson saw those statements on television and on SeaWorld's website.[9] Nelson also

---

[7] The Court addresses whether there is sufficient evidence of exposure to those representations in the following section.

[8] This presumption is rebuttable. *See id.* § 5305(b).

[9] The only evidence in the record to support the allegation that Nelson saw these statements on television is her statement that she saw them in *Blackfish* when it aired on CNN. That testimony is not entirely consistent with the allegations in the TAC, in which Nelson alleged that

16

1   testified she *saw* the captive orca lifespan and the mother-calf separation statements. (Simpson

2   Decl., Ex. H, Nelson Depo. at 155:13-19, 156:1-3, 11-22.) The real issue is *where* and *when*

3   Nelson saw these statements.

4   When questioned about where she saw the captive orca lifespan statement, Nelson testified

5   she had seen articles in the *Los Angeles Times*, but did not specify when she had seen such

6   articles, and that "it … might have been something online" but could not be sure of a "specific

7   site." (*Id.* at 132:2-12.) She also testified that she had "no idea" whether any of the statements

8   were on SeaWorld's website, and she could not recall where SeaWorld made such statements. (*Id.*

9   at 132:13-20, 155:21-157:7.) Nelson also was questioned about Exhibits 48 and 50, documents

10  produced in response to SeaWorld's requests for production. (Simpson Decl., ¶¶ 7-8, 10, Exs. F-

11  G, I, Ex. H, Nelson Depo. at 167:21-169:12 (discussing Exhibit 50); Zinsou Decl., ¶¶ 3-4, Exs. B-

12  C, Ex. A, Nelson Depo. at 163:4-165:19 (discussing Exhibit 48).)[10] Nelson testified that "I know I

13  have never seen this [Exhibit 50] as a document before" but testified the content was familiar, in

14  particular the second and fourth bullet points. (Simpson Decl., Ex. H, Nelson Depo. at 167:21-

15  169:12.) Those bullet points state that SeaWorld does not separate calves from their mothers and

16  that its orcas' life spans are equivalent to those in the wild. (Zinsou Decl., Ex. C.)

17  Nelson also testified that Exhibit 48 "look[ed] familiar" and that it looked like a website

18  "but I don't know for sure." (Zinsou Decl., Ex. A, Nelson Depo. at 163:6-19.) Nelson also

19  identified the "content" that looked familiar in Exhibits 48 and 50 was the captive orca lifespan

20  and mother-calf separation statements. (*Id.*, Nelson Depo. at 163:20-164:20, 166:11-16 ("I don't

21  know if it's this document, but it's the content here that looks familiar.").) The Court concludes

---

she saw *Blackfish* and then saw statements on SeaWorld's website and on television "disputing the allegations of mistreatment of the orcas raised in *Blackfish*." (TAC ¶ 19.) Nelson then alleged that the particular statements at issue were the mother-calf separation statement and the captive orca lifespan statement. (*Id.*) Those allegations do not suggest that Nelson relied on statements SeaWorld may have made in *Blackfish* as part of her decision making process. Instead, the allegations suggest that the statements she allegedly saw on television were statements that were not contained in *Blackfish*. Accordingly, because Nelson has not established that she saw the captive orca lifespan statement or the mother-calf separation statement on television after she saw *Blackfish*, her claims shall be limited to statements made on SeaWorld's website. The Court grants, in part, SeaWorld's motion on that basis.

[10]   SeaWorld does not dispute the Exhibits are excerpts of SeaWorld's website.

17

that Nelson has put forth sufficient evidence to show that there are triable issues of fact as to whether Nelson saw the statements at issue on SeaWorld's website.

SeaWorld also argues that during her deposition Nelson could not state when she saw the captive orca lifespan and mother-calf separation statements. (Simpson Decl., Ex. H, Nelson Depo. at 173:20-174:2; Simpson Reply Decl., Ex. B, Nelson Depo. at 163:6-15, 163:24-164:2.) On redirect, Nelson explicitly testified that she saw those statements before the visit to SeaWorld. (Simpson Decl., Ex. H, Nelson Depo. at 249:7-23.)[11]  The Court finds that Nelson has put forth sufficient evidence to show there are triable issues of fact as to when she saw the statements at issue. SeaWorld is, of course, free to "attempt to impeach [Nelson] at trial with prior statements" it believes "are inconsistent, but such disputes preclude judgment as a matter of law at this stage." *Ries*, 287 F.R.D. at 531.

Accordingly, the Court DENIES, IN PART, SeaWorld's motion for summary judgment on this basis.

### 3. The Court Concludes Nelson Is Not Relying on a Lack of Substantiation Theory of Liability.

SeaWorld argues that Nelson's testimony demonstrates that her claims are premised on a theory that SeaWorld has not been able to substantiate the captive orca lifespan and mother-calf separation statements. "Consumer claims for a lack of substantiation are not cognizable under California law." *In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1232 (N.D. Cal. 2012); *see also National Council Against Health Fraud, Inc. v. King Bio Pharm, Inc.*, 107 Cal. App. 4th 1342-43 (2003). Nelson argues that her claims are not based on the theory that SeaWorld failed to substantiate its statements.

Nelson did testify that she, personally, could not say whether particular statements were true or false and that there were certain statements she believed were not backed up by independent parties or were not verifiable. (Simpson Decl., Ex. H, Nelson Depo. at 170:4-16,

---

[11] The Court overrules SeaWorld's objections to that testimony as leading. The underlying facts would be admissible at trial, and the Court shall consider them. *See Celotex,* 477 U.S. 324; *Block*, 253 F.3d at 418-19.

18

1   179:6-181:4, 226:14-21, 255:14-2578:25; Zinsou Decl., Ex. A, Nelson Depo. at 233:24-234:4.)[12]

2   Nelson also testified that if the Court required SeaWorld to publicly state that its orcas do not live

3   as long as those in the wild that would not necessarily redress her injury, because "we still don't

4   know for sure if that is the case." (Simpson Decl., Ex. H, Nelson Depo. at 229:4-12.) However,

5   Nelson testified that information from other sources led her to believe that the mother-calf

6   separation statement is incorrect and testified that she continues to believe that statement and the

7   captive orca lifespan statement are misleading. (*Id.*, Nelson Depo. at 169:17-23, 170:17-171:16;

8   Zinsou Decl., Ex. A, Nelson Depo. at 214:9-215:20.) The Court concludes that there is sufficient

9   evidence in the record to show Nelson is not relying on a lack of substantiation theory of liability

10  on her claims. Further, the Court shall hold her to her representation that she is not.[13]

11  Accordingly, the Court DENIES, IN PART, SeaWorld's motion for summary judgment on

12  this basis as well.

### E.   The Court Denies SeaWorld's Motion on Morizur's Claim for Restitution.

14  SeaWorld argues that Morizur has abandoned her claim for restitution, because she

15  testified that she does not "care about the money"; is not "in this for the money"; and is asking the

16  Court to give her "0.00 dollars." (Simpson Decl., Ex. J, Morizur Depo." at 163:2-164:5.) Morizur

17  also testified that she "spent that money" on the Shamu toy "after being lied to" and then

18  explained that "the money part is not my biggest concern." (Zinsou Decl., ¶ 9; Dkt. No. 143-6,

19  Zinsou Decl., Ex. H, Morizur Depo. at 160:1-3, 17-18.) Morizur also clarified on re-direct that

20  she still was asking for the money she spent on the Shamu toy to be returned but was not asking

21  for "damages." (*Id.*, Morizur Depo. at 261:15-23.)[14]

---

[12] Plaintiffs suggest that the Court should "not attach significant weight" to the testimony at pages 255:14-258:25. (Opp. Br. at 9 n.5.) The Court cannot weigh the testimony at this stage of the litigation, and it has not done so.

[13] Whether Nelson and the other Plaintiffs can meet their burden to show a reasonable consumer would be likely to be deceived by those statements is not at issue in this motion.'

[14] In its opposition, SeaWorld objects to this testimony on the basis that it was obtained through improper leading questions. SeaWorld did not object to that testimony during Morizur's deposition. Accordingly, the Court overrules SeaWorld's objection as waived. Fed. R. Civ. P. 32(d)(3)(B)(i)-(ii). Even if SeaWorld had not waived the objection, for reasons previously stated in this Order, the Court would overrule the objection and would consider the testimony that she is

19

The Court concludes Morizur has put forth sufficient evidence to create a genuine issue of material fact on the issue of whether she abandoned her claim for restitution and concludes that resolution of this issue may involve issues relating to Morizur's credibility as a witness, which cannot be resolved on this motion.

Accordingly, the Court DENIES, IN PART, SeaWorld's motion on this basis.

## CONCLUSION

For the foregoing reasons, the Court GRANTS, IN PART, AND DENIES, IN PART, SeaWorld's motion for summary judgment. Under this Court's standing orders, "[a]bsent of a showing of good cause, the Court will address only one motion for summary judgment per side." *See* Civil Standing Orders, ¶ 9. The Court issued an Order advising SeaWorld it would consider its motion, if SeaWorld wished to proceed with the knowledge of the Court's standing order. SeaWorld chose to proceed. Accordingly, if SeaWorld seeks to file a second motion for summary judgment, it must file a properly noticed motion for leave to do so, which shows good cause for the request. In order to ensure the record is clear on this point, SeaWorld cannot file a second motion for summary judgment with an administrative motion under Northern District Local Rule 7-11 asking for the Court to consider a second motion for summary judgment. Before the Court will permit a second motion for summary judgment to be filed, SeaWorld must file a properly noticed motion under Local Rule 7-2 asking for leave to file a second motion for summary judgment and setting forth good cause to do so.

**IT IS SO ORDERED.**

Dated: February 20, 2018

_____
JEFFREY S. WHITE
United States District Judge

---

asking for the money she spent on the toy to be returned to her. The Court has not relied on the declaration submitted by Morizur. Accordingly, SeaWorld's objections to that declaration on the basis that it is a sham affidavit are overruled as moot.