# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

MARC ANDERSON, KELLY NELSON, and
JULIETTE MORIZUR,

      Plaintiffs,

      v.

SEAWORLD PARKS AND ENTERTAINMENT,
INC.,

      Defendant.

Case No.: 4:15-cv-02172-JSW-JCS

**JOINT [PROPOSED] FINAL
PRETRIAL ORDER FOR PHASE 1
TRIAL (PLAINTIFFS' STANDING)**

Pursuant to the Court's Guidelines for Trial and Final Pretrial Conference in Civil Bench Cases (last revised June 2019) ("Guidelines"), and in advance of the pretrial conference in this case scheduled for February 10, 2020, Plaintiffs Marc Anderson, Kelly Nelson, and Juliette Morizur ("Plaintiffs") and Defendant SeaWorld Parks and Entertainment, Inc. ("SeaWorld" or "Defendant") hereby submit this Joint [Proposed] Final Pretrial Order for the Phase 1 Trial concerning Plaintiffs' standing to bring their respective claims and seek their requested relief.

Per the Court's Guidelines, this Joint [Proposed] Final Pretrial Order sets forth: **(I)** a brief description of the substance of claims and defenses which remain to be decided; **(II)** a statement of all relief sought; **(III)** all stipulated facts; and **(IV)** a list of all factual issues that remain to be tried, stating the issues and organized by claims. Consistent with the Guidelines, this Joint [Proposed] Final Pretrial Order also includes two appendices: Appendix **(A)** is a joint exhibit list in numerical order, including a

JOINT [PROPOSED] FINAL PRETRIAL ORDER FOR
PHASE 1 TRIAL (PLAINTIFFS' STANDING)

1

brief description of the exhibit and Bates numbers, a blank column for when it will be offered into evidence, a blank column for when it may be received into evidence, and a blank column for any limitations on its use; and Appendices **(B)** and **(C)**, respectively, are Plaintiffs' and SeaWorld's separate witness lists for their case-in-chief witnesses (including those appearing by deposition) providing, for all such witnesses other than an individual plaintiff and an individual defendant, a short statement of the substance of his/her testimony and, separately, what, if any, non-cumulative testimony the witness will offer, along with an hour/minute time estimate for direct and for cross examination.

## I. BRIEF DESCRIPTION OF SUBSTANCE OF CLAIMS AND DEFENSES TO BE DECIDED IN THE PHASE 1 TRIAL IN THIS CASE[1]

### A. Plaintiff Marc Anderson

Claims: Marc Anderson is a California resident. On or around April 8, 2014, Mr. Anderson purchased a ticket to SeaWorld San Diego on the Internet. Mr. Anderson then visited SeaWorld San Diego on or around June 11, 2014. Prior to his visit, Mr. Anderson was exposed to certain statements on SeaWorld's website concerning SeaWorld's captive orcas. Specifically, Mr. Anderson saw the following claims by SeaWorld (or claims materially identical to the following):

## OUR KILLER WHALES ARE HEALTHY AND THRIVING

## OUR KILLER WHALES LIVE AS LONG AS THOSE IN THE WILD

Mr. Anderson had no reason to doubt the veracity of SeaWorld's aforesaid claims and took them at face value. In June 2014, while at SeaWorld San Diego, Mr. Anderson visited a gift shop and purchased an orca souvenir, a "Shamu Plush" toy. Mr. Anderson subsequently watched *Blackfish* and learned that SeaWorld's claims about its captive orcas were false and/or misleading, and that, contrary to its

---

[1] Each of the following subsections (A, B, and C), contains a statement of "Claims" drafted by Plaintiffs' counsel and a statement of "Defenses" drafted by SeaWorld's counsel. SeaWorld does not concede that the "Claims" sections drafted by counsel for Plaintiffs accurately reflect the facts underlying Plaintiffs' claims or the scope of those claims. Likewise, Plaintiffs do not concede that the "Defenses" sections drafted by counsel for SeaWorld accurately reflect the facts underlying SeaWorld's defenses.

representations, SeaWorld's orcas did not have lifespans comparable to wild orcas nor were SeaWorld's orcas healthy and thriving. Mr. Anderson would not have visited SeaWorld San Diego nor purchased a Shamu Plush souvenir from SeaWorld had he known at the time that SeaWorld's claims were not true.

Mr. Anderson cares about animals and has a practice of avoiding animal-exhibition facilities that fail to care properly for their animals. For example, Mr. Anderson did not visit California's Great America in Vallejo during a period when he believed the amusement park was failing to care properly for its animals. As with California's Great America, Mr. Anderson is interested in purchasing tickets and merchandise from SeaWorld should SeaWorld's practices evolve sufficiently. In recent years, Mr. Anderson has seen SeaWorld's announcements of changes to its practices relating to animals, including with respect to orcas. He is, however, unable to rely on the accuracy of SeaWorld's representations, the veracity of which is difficult to ascertain based solely on SeaWorld's representations and without actually visiting SeaWorld.

In light of the above facts, Mr. Anderson is pursuing claims against SeaWorld under California's False Advertising Law, Business and Professions Code sections 17500, *et seq.* ("FAL"), and California's Unfair Competition Law, Business and Professions Code sections 17200, *et seq.* ("UCL").

Defenses: SeaWorld contends that Mr. Anderson lacks Article III and statutory standing to assert a claim under the FAL or UCL because he has not suffered an economic injury caused by SeaWorld's conduct. As a preliminary matter, contrary to Plaintiffs' contention above, Mr. Anderson's claims are based solely on a statement purportedly appearing on the SeaWorld website that he alleges he relied upon between April and June of 2014 – that "orca lifespans in captivity are comparable to orca lifespans in the wild." No other purported SeaWorld "statements" are at issue. SeaWorld contends that the evidence will show that (a) Mr. Anderson was not exposed to the alleged statement about orca lifespans prior to his visit to SeaWorld; (b) Mr. Anderson did not purchase a killer whale stuffed animal; and (c) even if Mr. Anderson is found to have been exposed to the statement and purchased the killer whale stuffed animal, he did not make the purchase in reliance upon the alleged statement (i.e., he would have purchased the killer whale stuffed animal absent the alleged statement).

SeaWorld further contends that Mr. Anderson lacks standing to seek and/or obtain injunctive relief under Article III because the evidence will show that he does not have a present intent to purchase

3

SeaWorld merchandise in the future, and thus does not face a realistic threat of future injury.  Specifically, SeaWorld contends that the evidence will show that Mr. Anderson will not visit SeaWorld, or purchase SeaWorld merchandise, unless SeaWorld increases the size of the pools in the killer whale habitat, relief which is not the subject of the lawsuit.  Even if it were believable that Mr. Anderson actually has the desire to do business with SeaWorld again, Mr. Anderson cannot establish an ongoing "distrust" injury due to his alleged inability to rely upon SeaWorld's representations because, to the extent Mr. Anderson refrains from doing business with SeaWorld, it is for reasons that are unrelated to SeaWorld's killer whale lifespan representation; namely, that SeaWorld's killer whale enclosures are too small and, in Mr. Anderson's view, SeaWorld mistreats its animals.

### B.    Plaintiff Kelly Nelson

<u>Claims</u>: Kelly Nelson resides in Southern California, near San Diego. Sometime prior to August 2015, Ms. Nelson watched the documentary *Blackfish* and learned of various criticisms made against SeaWorld concerning its captive orcas.  She  learned, however, that SeaWorld disputed these criticisms and maintained that its captive orcas were healthy and thriving.  Specifically, Ms. Nelson saw the following claims by SeaWorld (or claims materially identical to the following):



**We do not separate killer whale moms and calves.** SeaWorld recognizes the important bond between mother and calf. On the rare occasion that a mother killer whale cannot care for the calf herself, we have successfully hand raised and reintroduced the calf. Whales are only moved to maintain a healthy social structure.

**SeaWorld's killer whales' life spans are equivalent with those in the wild.** While studies continue to define the average life span of killer whales in the wild, the most recent science suggests that our killer whales' life spans are comparable — indeed, five of our animals are older than 30, and one of our whales is close to 50.

In reliance on SeaWorld's aforesaid claims,[2] Ms. Nelson decided she would visit the park and see for herself whether the criticisms of SeaWorld in *Blackfish* were credible.  In or around August 2015, Ms. Nelson visited SeaWorld San Diego along with her husband and children.  She spent money that she and her husband jointly owned at the SeaWorld San Diego ticket counter to pay for her and her family's admission tickets.  Although her husband physically handled the transaction at the ticket counter, the decision to visit the park and purchase tickets was Ms. Nelson's, and she had a property interest in the money spent to purchase the tickets.  Subsequent to her trip, Ms. Nelson concluded that SeaWorld's claims were false and/or misleading, and that, contrary to its representations, SeaWorld did separate "killer whale moms" and calves, nor were SeaWorld's orcas thriving with lifespans comparable to wild orcas.  Ms. Nelson would not have visited SeaWorld San Diego nor decided to spend money to purchase admission tickets had she known at the time that SeaWorld's claims were not true.

Although Ms. Nelson avoids animal-exhibition facilities that fail to care properly for their animals, she generally enjoys visiting places that provide the opportunity to observe animals that are healthy and well cared for.  For example, during her deposition in this case in September 2017, Ms. Nelson was led to believe that SeaWorld's practices relating to its orcas were evolving and so she purchased a ticket and visited SeaWorld San Diego on or around February 2, 2018.  She visited the park to see for herself whether SeaWorld's practices had meaningfully improved, but concluded that they had not.  Ms. Nelson remains interested in purchasing a ticket and visiting SeaWorld again in the future should SeaWorld's practices evolve sufficiently.  Ms. Nelson has seen SeaWorld's announcements of changes to its practices relating to animals, including with respect to orcas.  She is, however, unable to rely on the accuracy of those representations, the veracity of which is difficult to ascertain based solely on the representations and without actually visiting SeaWorld.

---

[2] The latter two claims read as follows: "**We do not separate killer moms and calves.** SeaWorld recognizes the important bond between mother and calf. On the rare occasion that a mother killer whale cannot care for the calf herself, we have successfully hand raised and reintroduced the calf. Whales are only moved to maintain a healthy social structure;" and "**SeaWorld's killer whales' life spans are equivalent with those in the wild.** While studies continue to define the average life span of killer whales in the wild, the most recent science suggests that our killer whales' life spans are comparable — indeed, five of our animals are older than 30, and one of our whales is close to 50."

In light of the above facts, Ms. Nelson is pursuing claims against SeaWorld under the FAL and UCL, as well as California's Consumers Legal Remedies Act, Civil Code sections 1750, *et seq.* ("CLRA").

Defenses: SeaWorld contends that Ms. Nelson lacks Article III and statutory standing to assert a claim under the FAL, UCL, or CLRA because she has not suffered an economic injury caused by SeaWorld's conduct. As a preliminary matter, contrary to Plaintiffs' contention above, Ms. Nelson's claims are based solely on two statements purportedly appearing on the SeaWorld website that she alleges she relied upon in 2015 – that SeaWorld's "orcas had similar lifespans to orcas in the wild" and that SeaWorld does "not separate calves and mothers." No other purported SeaWorld "statements" are at issue. SeaWorld contends that the evidence will show that (a) Ms. Nelson was not exposed to the alleged statements about separation and orca lifespans prior to her visit to SeaWorld; (b) Ms. Nelson did not purchase, or make the decision to purchase, a ticket to SeaWorld; and (c) even if Ms. Nelson is found to have been exposed to the statements and purchased the ticket, she did not make the purchase in reliance upon the alleged statements (i.e., she would have purchased the ticket absent the alleged statements).

SeaWorld further contends that Ms. Nelson lacks standing to seek and/or obtain injunctive relief under Article III because the evidence will show that she does not have a present intent to purchase a ticket to SeaWorld in the future, and thus does not face a realistic threat of future injury. Specifically, SeaWorld contends that the evidence will show, among other things, that Ms. Nelson does not enjoy the kind of animal entertainment and education that SeaWorld provides, that Ms. Nelson joined PETA in November 2015 (after her purported visit to SeaWorld) so she could protest SeaWorld, that she believes that SeaWorld "enslaves" killer whales to make them do tricks and keep "a greedy and unethical" "business model going," and that she is against the exhibition of animals for money. Even if it were believable that Ms. Nelson actually has the desire to do business with SeaWorld again, Ms. Nelson cannot establish an ongoing "distrust" injury due to her alleged inability to rely upon SeaWorld's representations. To the extent that Ms. Nelson refrains from doing business with SeaWorld, it is for reasons that are unrelated to SeaWorld's killer whale lifespan or separation representation; namely, the animus and dislike of SeaWorld that Ms. Nelson has consistently expressed. Ms. Nelson also has conditioned her willingness to return to SeaWorld on totally speculative circumstances, namely the "evolution" of unidentified

SeaWorld "practices" at some unknown future date, which does not constitute a real and immediate threat of repeated injury.  Furthermore, Ms. Nelson's litigation-motivated trip to SeaWorld San Diego on February 2, 2018, confirms the lack of any injury on her part necessitating an injunction.  She undertook that trip with no relief from this Court to enjoin or correct the SeaWorld statements that Ms. Nelson claims she relied upon in making the decision to visit SeaWorld in 2015, thereby admitting that her purported "distrust" of SeaWorld has no relevance to her decisions to do business with SeaWorld.

### C.    Plaintiff Juliette Morizur

Claims: On or around April 11, 2012, Juliette Morizur visited SeaWorld San Diego along with her family.  While at the orca exhibit in the park, Ms. Morizur spoke with a SeaWorld employee, who was interacting with park guests.  Ms. Morizur asked the SeaWorld employee questions about SeaWorld's orcas' collapsed dorsal fins and whether SeaWorld's orcas were happy.  In response to her questions, SeaWorld's employee made representations to Ms. Morizur to the effect that dorsal fin collapse is normal among orcas, that it occurs because the dorsal fins weigh too much, and that collapsed dorsal fins are equally common among wild orcas. The employee also represented to Ms. Morizur that SeaWorld's orcas are well cared for, that they are healthy and happy, and that captivity in general does not harm them.

Following this conversation and in reliance on the representations made, Ms. Morizur visited a gift shop at SeaWorld San Diego and purchased an orca souvenir, a "Shamu Plush."  Ms. Morizur subsequently learned that SeaWorld's claims about its killer whales were false and/or misleading, and that, contrary to SeaWorld's representations, dorsal fin collapse is not normal and occurs more frequently at SeaWorld than in the wild, and also that orcas were harmed by their captivity at SeaWorld.  Ms. Morizur would not have purchased a Shamu Plush souvenir from SeaWorld had she known at the time that SeaWorld's claims were not true.

Although Ms. Morizur enjoys observing animals, she avoids animal-exhibition facilities that fail to care properly for their animals.  Since her visit to SeaWorld in April 2012, Ms. Morizur has visited the Monterey Bay Aquarium on or around October 28, 2015, January 13, 2016, August 17, 2016, and April 10, 2017; has attended the Sea Life London Aquarium on or around July 10, 2018; has attended Six Flags Discovery Kingdom in Vallejo, California on or around May 12, 2018; has gone snorkeling in Guerrero, Mexico on or around December 18, 2017 to see underwater plants and animals; has visited the New

Orleans Zoo on or around July 4, 2017; has participated in the New Orleans Bayou swamp tour on or around July 3, 2017 to see various animals including alligators and wild boars; has attended the San Diego Zoo Safari Park on or around August 4, 2016; and has attended the Oceanopolis Aquarium in Brest, France on or around July 11, 2016.  Ms. Morizur remains interested in purchasing tickets and/or merchandise from SeaWorld should SeaWorld's practices evolve sufficiently.  Ms. Morizur has seen SeaWorld's announcements of changes to its practices relating to animals, including with respect to orcas. She is, however, unable to rely on the accuracy of SeaWorld's representations, the veracity of which is difficult to ascertain based solely on the representations and without actually visiting SeaWorld.

In light of the above facts, Ms. Morizur is pursuing claims against SeaWorld under the unfair prong of the UCL.

Defenses:   SeaWorld contends that Ms. Morizur lacks Article III and statutory standing to assert a claim under the UCL because she has not suffered an economic injury caused by SeaWorld's conduct.  As a preliminary matter, contrary to Plaintiffs' contention above, Ms. Morizur's claims are based solely on two statements she alleges a SeaWorld killer whale trainer told her in April of 2012– that dorsal fin collapse "was normal, and also equally common in the wild" and that "captivity in general does not harm orcas."  Contrary to Plaintiffs' position above, no other purported SeaWorld "statements" are at issue. SeaWorld contends that the evidence will show that (a) Ms. Morizur was not exposed to the alleged statements about dorsal fins and captivity; (b) that Ms. Morizur did not purchase a killer whale stuffed animal; and (c) even if Ms. Morizur is found to have been exposed to the statements and purchased the Shamu stuffed animal, that she did not make the purchase in reliance upon the alleged statements (i.e., she would have purchased the killer whale stuffed animal absent the alleged statements).

SeaWorld further contends that Ms. Morizur lacks standing to seek and/or obtain injunctive relief under Article III because the evidence will show that she does not have a present intent to visit SeaWorld, or to purchase SeaWorld merchandise, in the future, and thus does not face a realistic threat of future injury.  Specifically, SeaWorld contends that the evidence will show, among other things, that Ms. Morizur explicitly testified that she has no intent to return to SeaWorld or buy merchandise, that she has gotten her friends and family members to agree to never return to a marine park, and that she consistently posts derogatory messages about SeaWorld and its practices on her social media.  SeaWorld contends that

the evidence will also show that, even if the Court orders the corrective statements which Ms. Morizur is seeking, she would not visit SeaWorld or purchase any SeaWorld merchandise.  Even if it were believable that Ms. Morizur actually has the desire to do business with SeaWorld again, Ms. Morizur cannot establish an ongoing "distrust" injury due to her alleged inability to rely upon SeaWorld's representations. To the extent that Ms. Morizur refrains from doing business with SeaWorld, it is for reasons that are unrelated to the statements she claims a SeaWorld killer whale trainer made; namely, the animus and dislike of SeaWorld that Ms. Morizur has consistently expressed.  Ms. Morizur also has conditioned her willingness to return to SeaWorld or purchase future SeaWorld merchandise upon totally speculative circumstances; namely, the "evolution" of unidentified SeaWorld "practices" at some unknown future date, which does not constitute a real and immediate threat of repeated injury.  Further, Ms. Morizur's claimed injuries are not redressable by the relief she seeks in this lawsuit because she has disclaimed her request for restitution, and the injunctive relief sought—corrective statements on SeaWorld's website— would not remedy her injury because she does not claim to have seen or relied on SeaWorld website statements.

## II.    STATEMENT OF RELIEF SOUGHT

In Phase 1 of the trial in this case (*i.e.*, Plaintiffs' standing to bring their respective claims and seek their requested relief) Plaintiffs and SeaWorld seek the following relief:

### A.    Plaintiff Marc Anderson's Requested Relief

Mr. Anderson requests a finding that he has standing to bring UCL and FAL claims against SeaWorld and to seek restitution and injunctive relief, as well as attorneys' fees and costs.  Mr. Anderson further requests that the Court order that the Phase 2 trial in this case include a trial on whether the following SeaWorld claims are false or misleading: *(a)* its killer whales are healthy and thriving, and *(b)* its killer whales live as long as those in the wild.

### B.    Plaintiff Kelly Nelson's Requested Relief

Ms. Nelson requests a finding that she has standing to bring UCL, FAL, and CLRA claims against SeaWorld and to seek restitution, injunctive relief, as well as attorneys' fees and costs.  Ms. Nelson further requests that the Court order that Phase 2 trial in this case include a trial on whether the following

SeaWorld claims are false or misleading: *(a)* SeaWorld's killer whales are thriving and are living as long as their counterparts in the wild; *(b)* SeaWorld's killer whales' life spans are equivalent with and comparable to those in the wild; and *(c)* SeaWorld does not separate killer moms and calves; it recognizes the important bond between mother and calf; on the rare occasion that a mother killer whale cannot care for the calf herself, SeaWorld has successfully hand raised and reintroduced the calf; and whales are only moved to maintain a healthy social structure.

### C. Plaintiff Juliette Morizur's Requested Relief

Ms. Morizur requests a finding that she has standing to bring a claim against SeaWorld under the unfair prong of the UCL and to seek restitution and injunctive relief, as well as attorneys' fees and costs. Ms. Morizur further requests that the Court order that the Phase 2 trial in this case include a trial on whether the following SeaWorld claims are false or misleading: that *(a)* dorsal fin collapse is normal among orcas, that it occurs because the dorsal fins weigh too much, and that collapsed dorsal fins are equally common among wild orcas; and *(b)* SeaWorld's orcas are well cared for, they are healthy and happy, and captivity in general does not harm them.

### D. SeaWorld's Requested Relief

SeaWorld seeks a finding that none of the Plaintiffs has standing to allege claims under Article III or under the FAL, UCL or CLRA because none of them has suffered a sufficient economic injury caused by SeaWorld conduct, and that Ms. Morizur lacks Article III standing because even if she had an injury caused by SeaWorld, it is not redressable by the relief she seeks in this lawsuit. SeaWorld also seeks a finding that each of the Plaintiffs lacks Article III standing to seek injunctive relief. Based on those findings, SeaWorld seeks an award in its favor and its costs for having to defend against Plaintiffs' claims. SeaWorld also contends that there is no basis for the claim for attorneys' fees by plaintiffs Morizur and Anderson and by plaintiff Nelson with respect to her UCL and FAL claims, which Plaintiffs have indicated is made under California Civil Procedure Section 1021.5.

Moreover, to the extent Plaintiffs establish standing to allege claims under Article III and under the FAL, UCL or CLRA, SeaWorld further requests an order that Phase 2 of the trial include a trial on each of the requisite elements of Plaintiffs' claims as well as SeaWorld's asserted affirmative defenses. SeaWorld further requests that the Court limit Phase 2 of the trial to statements that are actually at issue in this case.

As noted above, SeaWorld contends that (a) Mr. Anderson's claims are based solely on one SeaWorld website statement he alleges he relied upon between April and June of 2014 – that "orca lifespans in captivity are comparable to orca lifespans in the wild"; (b) Ms. Nelson's claims are based solely on two SeaWorld website statements she alleges she relied upon in 2015 – that SeaWorld's "orcas had similar lifespans to orcas in the wild" and that SeaWorld does "not separate calves and mothers"; and (c) Ms. Morizur's claims are based solely on two statements she alleges a SeaWorld killer whale trainer told her in April of 2012– that dorsal fin collapse "was normal, and also equally common in the wild" and that "captivity in general does not harm orcas."  Additional statements included by Plaintiffs above, not pleaded in the TAC, and not evidence that Plaintiffs' brought forth in opposition to summary judgment, should be rejected.

## III.   STIPULATED FACTS

1.    The Plaintiffs in this action are Mr. Marc Anderson, Ms. Kelly Nelson, and Ms. Juliette Morizur.  All Plaintiffs are residents of California.

2.    The Defendant in this action is SeaWorld Parks & Entertainment, Inc.  SeaWorld is a corporation organized under the laws of the state of Delaware and maintains its principal place of business in Orlando, Florida.

3.    *Orcinus orca* is the scientific name for a killer whale.

4.    SeaWorld owns and operates SeaWorld® San Diego, SeaWorld® San Antonio, and SeaWorld® Orlando, each of which exhibits to the public various species of animals, birds, and aquatic creatures, including killer whales.

5.    SeaWorld sells tickets to the public for admission to SeaWorld® San Diego, including at ticket counters at the entrance of SeaWorld® San Diego.  SeaWorld also sells souvenirs inside SeaWorld® San Diego.  An orca souvenir called "Shamu Plush" is sold inside SeaWorld® San Diego.

6.    In 2012, and continuing to the present day, SeaWorld maintained a website at the address www.seaworld.org.  In 2014 and 2015, SeaWorld maintained a website at the address www.seaworldcares.com.

11

## IV.    LIST OF FACTUAL ISSUES TO BE TRIED

Given the stipulated facts and the elements required to establish Plaintiffs' standing under the relevant statutes and Article III, the following issues remain to be tried:

### A.    Plaintiff Marc Anderson's Claims (First and Second Cause of Action)

1.    Whether Mr. Anderson visited SeaWorld San Diego in June 2014;

2.    If Mr. Anderson visited SeaWorld San Diego in June 2014, whether, prior to his visit, he read any statements by SeaWorld on SeaWorld's website that orca lifespans in captivity are comparable to orca lifespans in the wild[3];

3.    If Mr. Anderson visited SeaWorld San Diego in June 2014, whether he purchased a killer whale stuffed animal (a "Shamu Plush souvenir") during that visit;

4.    If Mr. Anderson visited SeaWorld San Diego in June 2014 and purchased a Shamu Plush souvenir during that visit, whether Mr. Anderson's purchase of the Shamu Plush souvenir was made in reliance on any statements by SeaWorld on SeaWorld's website that orca lifespans in captivity are comparable to orca lifespans in the wild; and

5.    Whether Mr. Anderson has any current or future intent to purchase merchandise from SeaWorld.

### B.    Plaintiff Kelly Nelson's Claims (First, Second, and Third Cause of Action)

1.    Whether Ms. Nelson visited SeaWorld San Diego in August 2015;

2.    If Ms. Nelson visited SeaWorld San Diego in August 2015, whether Ms. Nelson made the decision to visit SeaWorld and purchase an admission ticket;

---

[3] **Comment by SeaWorld:** During the preparation of this joint document, SeaWorld repeatedly requested that the list of factual issues to be tried directly quote the statements on which Plaintiffs claim to have been exposed to and relied on in the operative complaint. Plaintiffs, however, refused to use direct quotations. It is SeaWorld's position that Plaintiffs have to prove exposure to and reliance on the specific statements they alleged they relied on in their complaint, not statements similar to those statement. In the Statement of Requested Relief section, Plaintiffs ask that the second phase of the trial of this matter determine the truth of statements that Plaintiffs did not claim to have relied on in their complaint. SeaWorld disputes that such issues should be part of the second phase of the trial.

3.      If Ms. Nelson made the decision to purchase a ticket to SeaWorld in August 2015, whether Ms. Nelson's property was used to purchase the ticket;

4.      If Ms. Nelson made the decision to purchase a ticket to SeaWorld in August 2015, whether, prior to making that decision, Nelson read any statements by SeaWorld on SeaWorld's website that SeaWorld's orcas had similar lifespans to orcas in the wild;

5.      If Ms. Nelson made the decision to purchase a ticket to SeaWorld in August 2015, whether, prior to making that decision, Nelson read any statements by SeaWorld on SeaWorld's website that SeaWorld does not separate calves and mothers;

6.      If Ms. Nelson made the decision to purchase a ticket to SeaWorld in August 2015, whether Ms. Nelson's purchase decision was made in reliance on the statement by SeaWorld on SeaWorld's website that SeaWorld's orcas had similar lifespans to orcas in the wild;

7.      If Ms. Nelson made the decision to purchase a ticket to SeaWorld in August 2015, whether Ms. Nelson's purchase decision was made in reliance on the statement by SeaWorld on SeaWorld's website that SeaWorld does not separate calves and mothers; and

8.      Whether Ms. Nelson has any current or future intent to purchase a ticket to SeaWorld.

C.      **Plaintiff Juliette Morizur's Claims (Second Cause of Action)**

1.      Whether Ms. Morizur visited SeaWorld San Diego in April 2012;

2.      If Ms. Morizur visited SeaWorld San Diego in April 2012, whether during that visit, Ms. Morizur purchased a Shamu Plush souvenir;

3.      If Ms. Morizur visited SeaWorld San Diego in April 2012 and purchased a Shamu Plush souvenir, whether prior to that purchase, a SeaWorld employee[4] told Ms. Morizur that killer whale dorsal fin collapse was normal and equally common in the wild;

---

[4] **Comment by SeaWorld:** Because Ms. Morizur alleged in her complaint that the statements on which she relied were made by a SeaWorld trainer, it is SeaWorld's position that Plaintiffs should have to prove that she was exposed to and relied upon statements by a trainer. Plaintiffs, however, were unwilling to agree to such language, and thus appear to be improperly attempting to change the basis for Ms. Morizur's claim.

4. If Ms. Morizur visited SeaWorld San Diego in April 2012 and purchased a Shamu Plush souvenir, whether prior to that purchase, a SeaWorld employee told Ms. Morizur that captivity in general does not harm orcas;

5. If Ms. Morizur visited SeaWorld San Diego in April 2012 and purchased a Shamu Plush souvenir, whether Ms. Morizur's purchase of a Shamu Plush souvenir was made in reliance on a statement by a SeaWorld trainer that killer whale dorsal fin collapse was normal and equally common in the wild;

6. If Ms. Morizur visited SeaWorld San Diego in April 2012 and purchased a Shamu Plush souvenir, whether Ms. Morizur's purchase of a Shamu Plush souvenir was made in reliance on a statement by a SeaWorld killer whale trainer that "captivity in general does not harm orcas";

7. Whether Ms. Morizur has any current or future intent to purchase SeaWorld merchandise; and

8. Whether Ms. Morizur's claimed injuries are redressable by the relief she seeks in this lawsuit.

## V. JOINT EXHIBIT LIST

The parties' Joint Exhibit List, including unresolved objections thereto, is attached hereto as Appendix A. The Joint Exhibit List is also included on the CD-ROM provided to the Court.

## VI. WITNESS LISTS FOR CASE-IN-CHIEF WITNESSES

Plaintiffs' and SeaWorld's Witness Lists are attached hereto as Appendices B and C, respectively. The Witness Lists are also included on the CD-ROM provided to the Court.

DATED: January 27, 2020                    COVINGTON & BURLING LLP


By:          */s/ Lindsey Barnhart*

*Attorneys for Plaintiffs Marc Anderson, Kelly Nelson, and Juliette Morizur*


DATED: January 27, 2020                    KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP


By:          */s/ Lawrence Y. Iser*

*Attorneys for Defendant*
*SeaWorld Parks & Entertainment, Inc.*


## CERTIFICATION

Pursuant to Civil L.R. 5-1(i)(3), the undersigned hereby attests that Lawrence Y. Iser has concurred in the filing of this document.


DATED:  January 27, 2020                    COVINGTON & BURLING LLP


By:          */s/ Lindsey Barnhart*

*Attorneys for Plaintiffs Marc Anderson, Kelly Nelson, and Juliette Morizur*

15

**APPENDIX A: JOINT EXHIBIT LIST[1] [2]**

| Ex. # | Description | Bates | Offered Into Evidence | Received Into Evidence | Limitations on Use |
|---|---|---|---|---|---|
| 7 | First Amended Class Action Complaint (05/11/15) (ECF 9-1) | N/A | | | |
| 8 | Second Amended Class Action Complaint (08/22/16) (ECF 81) | N/A | | | |
| 9 | Third Amended Class Action Complaint (11/22/16) (ECF 94) | N/A | | | |
| 13 | Juliette Morizur Flickr photographs of SeaWorld trip (pages 1-43) | N/A | | | |
| 17 | Juliette Morizur Facebook photographs of SeaWorld trip | Morizur_000096-189 | | | |
| 30 | Marc Anderson Visa credit card statement | Anderson_000073-76 | | | |
| 37 | Kelly Nelson's 08/08/15 Yelp review of SeaWorld San Diego | Nelson_000095 | | | |

---

[1] The parties' stipulations regarding various exhibits on this list follow the chart of exhibits.

[2] Comment by Plaintiffs: Both parties included on their respective exhibit lists Exhibits 28, 29, 48, 50, 502, and 503.  Plaintiffs do not object to SeaWorld's use of these exhibits at trial.  SeaWorld objects to Plaintiffs' use of these same exhibits at trial.  Accordingly, even though both parties listed these exhibits as exhibits they intend to offer at trial, the exhibits are included on the list of exhibits subject to objection, rather than this joint exhibit list.

| Ex. # | Description | Bates | Offered Into Evidence | Received Into Evidence | Limitations on Use |
|---|---|---|---|---|---|
| 38 | Enlarged Version of Kelly Nelson's 08/08/15 Yelp review of SeaWorld San Diego | N/A | | | |
| 40 | November 2015 Yelp message exchange between Kelly Nelson and L. Bridgeman | Nelson_000103-04 | | | |
| 45 | Pamphlet entitled "Killer Whale Care, Conservation, and Education" | Nelson_000004-15 | | | |
| 46 | Pages entitled "Killer Whale Care" | Nelson_000027-28 | | | |
| 47 | Pages entitled "Killer Whale Health & Daily Care" | Nelson_000064-66 | | | |
| 49 | Pages entitled "Killer Whale Social Structures" | Nelson_000061-63 | | | |
| 51 | Pages entitled "Truth About Blackfish" | Nelson_000023-26 | | | |
| 52 | Chart entitled "*BLACKFISH ANALYSIS:* Misleading and/or Inaccurate Content." | Nelson_000029-60 | | | |
| 53 | 01/08/15 Kelly Nelson Facebook post | Nelson_000102 | | | |

| Ex. # | Description | Bates | Offered Into Evidence | Received Into Evidence | Limitations on Use |
|---|---|---|---|---|---|
| 56 | 03/10/15 Kelly Nelson Facebook post | Nelson_000101 | | | |
| 57 | 06/06/15 Kelly Nelson Facebook post | Nelson_0000100 | | | |
| 154 | 07/11/18 Juliette Morizur "Tweet" | N/A | | | |
| 155 | 08/05/14 Juliette Morizur "Tweet" | Morizur_000012 | | | |
| 156 | 07/07/14 Juliette Morizur "Tweet" | Morizur_000013 | | | |
| 157 | 03/01/15 Juliette Morizur "Tweet" | Morizur_000070 | | | |
| 158 | 07/13/16 Juliette Morizur "Tweet" | N/A | | | |
| 161 | 11/06/18 Juliette Morizur "Tweet" | N/A | | | |
| 231 | Photograph of Juliette Morizur posted on social media | Morizur_000189 | | | |
| 232 | 01/16/16 Juliette Morizur "Tweet" | N/A | | | |
| 238 | 11/06/15 Juliette Morizur Facebook post | Morizur_000038 | | | |
| 240 | 05/30/14 Juliette Morizur "Tweet" | Morizur_000015 | | | |
| 241 | 07/16/15 Juliette Morizur "Tweet" | Morizur_000011 | | | |

3

| Ex. # | Description | Bates | Offered Into Evidence | Received Into Evidence | Limitations on Use |
|---|---|---|---|---|---|
| 253 | 01/11/16 email from J. Morizur to M. Palmer | EARTHISLAND_0001950-57 | | | |
| 254 | 02/01/16 Email from J. Morizur to M. Palmer | EARTHISLAND_0002894-99 | | | |
| 342 | Kelly Nelson Yelp Reviews | N/A | | | |
| 343 & 344 | 11/19-20/17 exchange of posts on Facebook between Kelly Nelson and others | Nelson_0000126-27 | | | |
| 504 | Juliette Morizur Instagram Post | Morizur_000018 | | | |
| 505 | Juliette Morizur Tweet | Morizur_000029 | | | |
| 600 | Document compilation produced by Plaintiffs' counsel as reflecting the statements purportedly made by SeaWorld on which Kelly Nelson allegedly relied | Nelson_000016-66 | | | |

4

| Ex. # | Description | Bates | Offered Into Evidence | Received Into Evidence | Limitations on Use |
|---|---|---|---|---|---|
| 601 | Juliette Morizur Compilation of Social Media Posts (excerpts from Exhibit 12) | Morizur_000001-2<br><br>Morizur_000004-5<br><br>Morizur_000008-17<br><br>Morizur_000035<br><br>Morizur_000037-38<br><br>Morizur_000042<br><br>Morizur_000044<br><br>Morizur_000046-52<br><br>Morizur_000069-72 | | | |
| 612 | Plaintiffs' Certification of Discovery Supplemental (10/31/18) (ECF 254) | N/A | | | |
| 613 | Declaration of Kelly Nelson in Support of Plaintiffs' Opposition to SeaWorld's Motion for Summary Judgment (11/13/17) (ECF 147) | N/A | | | |
| 614 | Class Action Complaint (04/13/15) (ECF 1-1) | N/A | | | |

| Ex. # | Description | Bates | Offered Into Evidence | Received Into Evidence | Limitations on Use |
|---|---|---|---|---|---|
| 615 | [Proposed] Second Amended Class Action Complaint (04/07/16) (ECF 69-2) | N/A | | | |
| 616 | 11/14/13 Juliette Morizur "Tweet" | N/A | | | |
| 619 | 10/12/14 Juliette Morizur "Tweet" | N/A | | | |
| 620 | 12/31/14 Juliette Morizur "Tweet" | N/A | | | |
| 621 | 02/11/16 Juliette Morizur "Tweet" | N/A | | | |
| 622 | 06/28/16 Juliette Morizur "Tweet" | N/A | | | |
| 623 | 12/13/17 Juliette Morizur "Tweet" | N/A | | | |
| 626 | 09/20/18 Juliette Morizur "Tweet" | N/A | | | |
| 627 | 9/22/18 Juliette Morizur "Tweet" | N/A | | | |
| 629 | 10/08/18 Juliette Morizur Facebook post | N/A | | | |
| 630 | 11/06/18 Juliette Morizur "Tweet" | N/A | | | |

**<u>Stipulations:</u>**

The parties agree that the above-listed exhibits are not objected-to, subject to the following stipulations:

1.  As to Exhibits 40, 53, 57, 154, 156, 157, 161, 238, 240, 253, 254, 343, 344, 600, 616, 618, 620, 622, 623, 627, SeaWorld does not offer any non-Plaintiff statement in the document for the truth of the matter asserted.

2.  Plaintiffs do not object to SeaWorld's offer of Exhibits 45-47, 49, and 51-52, and have withdrawn those exhibits from Plaintiffs' exhibit list.  Those exhibits are listed as not objected-to above based on Plaintiffs' representation that they will not offer those exhibits in their case.  Plaintiffs reserve their right to use these exhibits depending on whether and how SeaWorld uses the exhibits.

**APPENDIX B: PLAINTIFFS' LIST OF CASE-IN-CHIEF WITNESSES**

| Witness[1] | Live or by Deposition | Brief Description of Testimony | Non-Cumulative Testimony | Plaintiffs' Direct Exam Estimate | SeaWorld's Cross-Exam / Cross-Designations Estimate | Total Estimate |
|---|---|---|---|---|---|---|
| Marc Anderson | Live | Plaintiff Anderson's standing to pursue his claims. | Not applicable: Mr. Anderson is an individual plaintiff. | 45 mins | 120 mins | 2 hours 45 mins |
| Kelly Nelson | Live | Plaintiff Nelson's standing to pursue her claims. | Not applicable: Ms. Nelson is an individual plaintiff. | 45 mins | 120 mins | 2 hours 45 mins |
| Juliette Morizur | Live | Plaintiff Morizur's standing to pursue her claims. | Not applicable: Ms. Morizur is an individual plaintiff. | 45 mins | 120 mins | 2 hours 45 mins |

---

[1] Plaintiffs reserve the right to call any witness disclosed by Defendant in its witness list.

| Witness[1] | Live or by Deposition | Brief Description of Testimony | Non-Cumulative Testimony | Plaintiffs' Direct Exam Estimate | SeaWorld's Cross-Exam / Cross-Designations Estimate | Total Estimate |
|---|---|---|---|---|---|---|
| Kristine Burtis (Fact + 30(b)(6)) | Deposition | Education and career history of Dr. Kristine Burtis, Supervisor of Orca Trainers at SeaWorld San Diego during the relevant time period. Dr. Burtis's interactions with park guests relating to questions about orca dorsal fin collapse and general orca health, as relevant to Plaintiff Morizur's standing. SeaWorld's lack of training of orca trainers with respect to interactions with park guests, as relevant to Plaintiff Morizur's standing. | Dr. Burtis' non-cumulative testimony will rebut SeaWorld's anticipated presentation of testimony from two orca trainers that SeaWorld orca trainers "had information that they routinely provided, and language that they consistently used, when answering questions by guests, including information regarding killer whale dorsal fins and the general well-being of the killer whales." Dr. Burtis, who acted as those trainers' superior during the relevant time period, testified to the contrary. | 10 mins | 10 mins | 20 mins |

2

| Witness[1] | Live or by Deposition | Brief Description of Testimony | Non-Cumulative Testimony | Plaintiffs' Direct Exam Estimate | SeaWorld's Cross-Exam / Cross-Designations Estimate | Total Estimate |
|---|---|---|---|---|---|---|
| Fred Jacobs | Deposition | Education and career history of Fred Jacobs, former Vice Present of Communications at SeaWorld. Development and publication of SeaWorld communications in response to Blackfish, as relevant to the statements communicated to and relied on by Plaintiffs, particularly Plaintiff Nelson. Materiality of representations made to and relied on by Plaintiffs. | Mr. Jacobs testified that the purpose of SeaWorld's anti-*Blackfish* statements (including those relied on by Plaintiffs) was to encourage those who had formed a negative impression of SeaWorld to visit SeaWorld and "come see for themselves." This testimony is non-cumulative and corroborates Ms. Nelson's account that SeaWorld's statements regarding its orcas led her to decide to visit SeaWorld and determine for herself whether *Blackfish* fairly portrayed SeaWorld and its orcas. Mr. Jacobs additionally provides non-cumulative testimony regarding background information on killer whales that SeaWorld provides its employees. Specifically, Mr. Jacobs' testimony will contradict anticipated testimony from SeaWorld's trainers Ms. Fay and Ms. Chase that SeaWorld's provision of killer whale information to employees is effective in preventing employees from making misstatements to guests. Finally, Mr. Jacobs provides non-cumulative testimony that statements regarding the health and welfare of SeaWorld's orcas are important to the average consumer and thus material, which creates a presumption of reliance. | 30 mins | 5 mins | 35 mins |

3

| Witness[1] | Live or by Deposition | Brief Description of Testimony | Non-Cumulative Testimony | Plaintiffs' Direct Exam Estimate | SeaWorld's Cross-Exam / Cross-Designations Estimate | Total Estimate |
|---|---|---|---|---|---|---|
| Peter Frey | Deposition | Education and career history of Peter Frey, Senior Marketing Officer at SeaWorld. Development of advertisements and various communications in response to Blackfish, as relevant to the statements communicated to and relied on by Plaintiffs. Changes to SeaWorld's orca program and the communication of those changes to the public, as relevant to Plaintiffs' standing to seek injunctive relief. | Some of Mr. Frey's testimony may be cumulative of Jill Kermes' testimony regarding statements relied on by Plaintiffs and changes to SeaWorld's orca program, but not unreasonably cumulative. Mr. Frey's testimony is necessary to corroborate Plaintiffs' testimony regarding these issues, given SeaWorld's attacks on their credibility. Mr. Frey will also provide non-cumulative testimony regarding the target audiences for SeaWorld's marketing and statements. | 15 mins | 5 mins | 20 minutes |

4

| Witness[1] | Live or by Deposition | Brief Description of Testimony | Non-Cumulative Testimony | Plaintiffs' Direct Exam Estimate | SeaWorld's Cross-Exam / Cross-Designations Estimate | Total Estimate |
|---|---|---|---|---|---|---|
| Michelle (Jill) Kermes | Deposition | Education and career history of Michelle (Jill) Kermes, former Chief Communications Officer at SeaWorld. Development of advertisements and various communications in response to Blackfish, as relevant to the statements communicated to and relied on by Plaintiffs. Changes to SeaWorld's orca program and the communication of those changes to the public, as relevant to Plaintiffs' standing to seek injunctive relief. | Some of Ms. Kermes' testimony may be cumulative of Peter Frey's testimony regarding statements relied on by Plaintiffs and changes to SeaWorld's orca program, but not unreasonably cumulative.  Ms. Kermes' testimony is necessary to corroborate Plaintiffs' testimony regarding these issues, given SeaWorld's attacks on their credibility. Ms. Kermes will also offer non-cumulative testimony regarding the "Open Letter" and life span ad relied on by Plaintiff Nelson, including when and where it was published. Ms. Kermes will also provide non-cumulative testimony on public consumer sentiment regarding the changes to SeaWorld's orca program. | 15 mins | 15 mins | 30 mins |
| | | | **TOTAL TIME ESTIMATE** | 3 hours 25 mins | 6 hours 35 mins | 10 hours |

5

**APPENDIX C: SEAWORLD'S LIST OF CASE-IN-CHIEF WITNESSES**

| WITNESS | SUMMARY OF TESTIMONY/ | STATEMENT OF WHETHER TESTIMONY IS CUMULATIVE | SEAWORLD'S DIRECT EXAM ESTIMATE | PLAINTIFFS' CROSS EXAM / RE-DIRECT ESTIMATE[1] | TOTAL ESTIMATE |
|---|---|---|---|---|---|
| Melissa Fay<br><br>(Live witness) | Current SeaWorld San Diego killer whale trainer, who appears in photographs taken by plaintiff Juliette Morizur during the show she attended at SeaWorld San Diego in April 2012, will testify regarding SeaWorld San Diego's practices in 2012 with respect to killer whale trainer interaction with guests after the killer whale shows (including communications made in response to guests' questions on particular topics), information provided to or made available to her by SeaWorld regarding killer whales, and her interactions with guests during 2012, including her approach to discussing the issues raised by Juliette Morizur's allegations. | Some of Ms. Fay's testimony regarding SeaWorld San Diego's practices with respect to trainer interactions with guests in 2012 may be cumulative of Karen Chase's testimony, but will not be unreasonably cumulative and is necessary to refute Ms. Morizur's testimony regarding the circumstances under which she allegedly spoke to a trainer at SeaWorld San Diego in April 2012 and the statements which she claims the trainer made during that conversation. The testimony also corroborate practices of other SeaWorld San Diego killer whale trainers in responding to guest questions on the topics raised by Juliette Morizur's allegations during the relevant time period. | 25 minutes | 15 minutes | 40 minutes |

[1] Plaintiffs have included cross examination time estimates for each witness to the extent that Plaintiffs' objections are overruled or corresponding motions *in limine* are denied and the witness is permitted to testify.

| WITNESS | SUMMARY OF TESTIMONY/ | STATEMENT OF WHETHER TESTIMONY IS CUMULATIVE | SEAWORLD'S DIRECT EXAM ESTIMATE | PLAINTIFFS' CROSS EXAM / RE-DIRECT ESTIMATE[1] | TOTAL ESTIMATE |
|---|---|---|---|---|---|
| Karen Chase (Live witness) | Employee of SeaWorld San Diego and former SeaWorld San Diego killer whale trainer who will testify regarding SeaWorld San Diego's practices in 2012 with respect to killer whale trainer interaction with guests after the killer whale shows (including communications made in response to guests' questions on particular topics), information provided to or made available to her by SeaWorld regarding killer whales, and her interactions with guests during 2012, including her approach to discussing the issues raised by plaintiff Juliette Morizur's allegations. | Some of Ms. Chase's testimony regarding SeaWorld San Diego's practices with respect to trainer interactions with guests in 2012 may be cumulative of Melissa Fay's testimony, but will not be unreasonably cumulative and is necessary to refute Ms. Morizur's testimony regarding the circumstances under which she allegedly spoke to a trainer at SeaWorld San Diego in April 2012 and the statements which she claims the trainer made during that conversation. The testimony also corroborate practices of other SeaWorld San Diego killer whale trainers in responding to guest questions on the topics raised by Juliette Morizur's allegations during the relevant time period. | 25 minutes | 15 minutes | 40 minutes |
| Sarah Anderson (Live witness) | Sister of plaintiff Marc Anderson who will refute Marc Anderson's claim that he gave her a killer whale stuffed animal, which he allegedly purchased at SeaWorld, and his claim that the stuffed animal was destroyed by her dog. Ms. Anderson will also | Ms. Anderson's testimony will not be cumulative. | 25 minutes | 10 minutes | 35 minutes |

2

| WITNESS | SUMMARY OF TESTIMONY/ | STATEMENT OF WHETHER TESTIMONY IS CUMULATIVE | SEAWORLD'S DIRECT EXAM ESTIMATE | PLAINTIFFS' CROSS EXAM / RE-DIRECT ESTIMATE[1] | TOTAL ESTIMATE |
|---|---|---|---|---|---|
| | testify about Mr. Anderson's alleged "reasonable but firm commitment to animal welfare," and discussions between them regarding such issues and regarding SeaWorld. | | | | |
| Jean-Christophe Morizur (Live witness) | Father of plaintiff Juliette Morizur who will testify (1) that he and other family members accompanied Juliette Morizur on her visit to SeaWorld San Diego in April 2012; (2) that he does not recall Juliette Morizur purchasing a killer whale stuffed animal during the visit, and does not recall Juliette Morizur having any killer whale stuffed animal destroyed; and (3) regarding his conversations with Juliette Morizur about killer whales and SeaWorld and that Juliette Morizur has stated that she will never return to SeaWorld. | Some of Jean-Christophe Morizur's testimony may be cumulative of Joelle Morizur's testimony that she and other family members accompanied Juliette Morizur on her visit to SeaWorld in April 2012, but will not be unreasonably cumulative and is necessary to refute Ms. Morizur's allegations. | 25 minutes | 10 minutes | 35 minutes |
| Joelle Morizur (Live witness) | Mother of plaintiff Juliette Morizur who will testify (1) that she and other family members accompanied Juliette Morizur on her trip to SeaWorld San Diego in April 2012; | Some of Joelle Morizur's testimony may be cumulative of Jean-Christophe Morizur's testimony that he and other family members accompanied Juliette Morizur on | 25 minutes | 10 minutes | 35 minutes |

3

| WITNESS | SUMMARY OF TESTIMONY/ | STATEMENT OF WHETHER TESTIMONY IS CUMULATIVE | SEAWORLD'S DIRECT EXAM ESTIMATE | PLAINTIFFS' CROSS EXAM / RE-DIRECT ESTIMATE[1] | TOTAL ESTIMATE |
|---|---|---|---|---|---|
| | (2) regarding the conversation Juliette Morizur allegedly had with a SeaWorld employee during that visit; (3) that she does not recall Juliette Morizur purchasing a killer whale stuffed animal during that visit and does not recall Juliette Morizur having any killer whale stuffed animal destroyed; and (4) regarding her conversations with Juliette Morizur about killer whales and SeaWorld and that Juliette Morizur has stated that she is never going back to SeaWorld. | her visit to SeaWorld in April 2012, but will not be unreasonably cumulative and is necessary to refute Ms. Morizur's allegations. | | | |
| Nicholas Robbins<br><br>(Live witness) | Fiancée of plaintiff Juliette Morizur who will testify (1) that, despite Juliette Morizur's claim that he purchased a killer whale stuffed animal for her, he has no recollection of making such a purchase; (2) that, prior to his reading Juliette Morizur's deposition, he had no knowledge of Juliette Morizur purchasing a killer whale stuffed animal at SeaWorld or of any of her stuffed animals being destroyed by her dog; (3) regarding his conversations with Juliette | Mr. Robbins' testimony will not be cumulative. | 20 minutes | 10 minutes | 30 minutes |

| WITNESS | SUMMARY OF TESTIMONY/ | STATEMENT OF WHETHER TESTIMONY IS CUMULATIVE | SEAWORLD'S DIRECT EXAM ESTIMATE | PLAINTIFFS' CROSS EXAM / RE-DIRECT ESTIMATE[1] | TOTAL ESTIMATE |
|---|---|---|---|---|---|
| | Morizur about killer whales, captivity and SeaWorld (including her feelings at the time of her visit to SeaWorld in April 2012); and (4) regarding statements by Juliette Morizur that she will not return to SeaWorld as long as killer whales are housed there. | | | | |
| Ken Nelson (By deposition) | Husband of plaintiff Kelly Nelson who will testify regarding the purchase of tickets to SeaWorld San Diego for Ms. Nelson's alleged visit and the lack of documentary evidence of such purchase. | Mr. Nelson's testimony is not cumulative. | 5 minutes | 5 minutes | 10 minutes |
| | | **TOTAL TIME ESTIMATE** | 2 hours 30 minutes | 1 hour 15 minutes | 3 hours 45 minutes |