1

2

3

4                             UNITED STATES DISTRICT COURT

5                           NORTHERN DISTRICT OF CALIFORNIA

6

7   KELLY NELSON and JULIETTE                Case No.  15-cv-02172-JSW
    MORIZUR,
8                                            **FINDINGS OF FACT AND**
                    Plaintiffs,              **CONCLUSIONS OF LAW ON**
9                                            **DEFENDANT'S MOTION FOR**
             v.                              **PARTIAL JUDGMENT AND**
10                                           **FOLLOWING BENCH TRIAL ON**
    SEAWORLD PARKS AND                       **STANDING**
11  ENTERTAINMENT, INC.,
                                             Dkt. No. 547
12                  Defendant.

13

14          On March 9, 10, and 11, 2020, the parties appeared before the Court for a bench trial on

15  the issues of whether Plaintiffs, Juliette Morizur ("Ms. Morizur") and Kelly Nelson ("Ms.

16  Nelson") (collectively Plaintiffs, unless otherwise noted), have Article III standing to seek

17  injunctive relief and statutory standing to pursue claims against Defendant SeaWorld Parks and

18  Entertainment, Inc. ("SeaWorld") under California's Unfair Competition Law, Business and

19  Professions Code section 17200, *et seq.* (the "UCL Claims"), California's False Advertising Law,

20  Business and Professions Code section 17500, *et se$^1$q.* (the "FAL claim"), and California's

21  Consumer Legal Remedies Act, Civil Code sections 1780, *et seq.* (the "CLRA Claim").

22          Ms. Nelson brings individual claims for alleged violations of the UCL, the FAL, and the

23  CLRA.  She alleges economic injury based on the cost of her ticket to SeaWorld® San Diego.$^2$

24  Ms. Nelson's claims have been limited by prior rulings to the following statements: (1) SeaWorld

25

26  _____
    [1]      The Court granted SeaWorld's motion to bifurcate the issue of standing from the merits.

27  [2]      When the Court refers to SeaWorld or any of its parks in the remainder of these findings of
28  fact ("FOF") and conclusions of law ("COL"), it has omitted the "®" symbol.

United States District Court
Northern District of California

United States District Court
Northern District of California

1 "did not separate calves from mothers"; and (2) SeaWorld's "captive orcas had similar lifespans to

2 those in the wild." (Third Amended Complaint ("TAC") ¶ 19.) Ms. Nelson alleges she saw these

3 statements on SeaWorld's website.

4       Ms. Morizur brings an individual claim for alleged violations of the unfair prong of the

5 UCL. She claims economic injury based on the cost of a stuffed orca toy (the "Shamu plush") that

6 she allegedly purchased at SeaWorld San Diego. Ms. Morizur's claims are based on the following

7 statements: (1) collapsed dorsal fins are "normal, and also equally common in the wild"; and (2)

8 "captivity in general does not harm orcas." (TAC ¶ 20.) Ms. Morizur claims a SeaWorld trainer

9 made these statements during her visit to SeaWorld San Diego.

10       Ms. Nelson and Ms. Morizur allege they would not have expended money on the ticket and

11 the Shamu plush, respectively, had they known the statements they claim to have relied on were

12 false. (*See, e.g., id.* ¶¶ 68, 82.) They seek restitution and ask the Court to issue an order that

13 would require "SeaWorld to inform the purchasing public on its website that captivity in general

14 negatively impacts orca health, that orca lifespans are shorter in captivity than in the wild, that

15 collapsed dorsal fins are common only in captive orcas, and that SeaWorld separates closely

16 related and tightly-knit orca family members." (*Id.* ¶¶ 60, 70, 84, 85.b.)

17       At the close of Plaintiffs' case, SeaWorld orally moved for judgment on partial findings on

18 Ms. Nelson's claims, pursuant to Federal Rule of Civil Procedure 52(c). The Court reserved

19 ruling on that motion. (Trial Transcript ("Tr.") at 348:11-367:17.) On April 17, 2020, SeaWorld

20 filed its motion for judgment on partial findings addressing each Plaintiff's standing to seek relief.

21       The Court has carefully considered the trial testimony, the exhibits admitted in evidence,

22 and the parties' arguments in their briefs on the Rule 52(c) motion, their post-trial briefs, and their

23 proposed findings of fact and conclusions of law. The Court issues the following findings of fact

24 and conclusions of law, which result in the Court's conclusion that Plaintiffs lack Article III to

25 seek injunctive relief and lack statutory standing and that SeaWorld is entitled to a judgment in its

26 favor.

27 //

28 //

2

United States District Court
Northern District of California

**Plaintiff's Witnesses**

**Kelly Nelson –** Ms. Nelson testified that she visited SeaWorld San Diego in 2015 and testified about the statements she allegedly relied on in making the decision to take that trip. She also testified that her husband, Kenneth Nelson, obtained the tickets and testified about the manner of payment. She also testified about whether she would return to SeaWorld in the future. At trial, Ms. Nelson was hesitant in responding to certain questions, but her overall demeanor was neither evasive nor hostile. The Court finds that Ms. Nelson's testimony was not always credible, although it found her more credible than Ms. Morizur. The Court will detail specific findings below.

**Juliette Morizur –** Ms. Morizur testified about her visit to SeaWorld San Diego in April 2012, with her parents, her sister, and her grandparents, and testified about her alleged purchase of the Shamu plush and its subsequent destruction. Ms. Morizur also testified about a conversation with a SeaWorld trainer and the statements on which she allegedly relied. Ms. Morizur also testified about whether she would return to SeaWorld or purchase its merchandise in the future. Ms. Morizur's demeanor was composed but defensive. The Court finds that Ms. Morizur dissembled at times. As a result, it does not find Ms. Morizur's testimony entirely credible but has not discredited her testimony in its entirety. The Court details its specific findings below.

**Peter J. Frey –** Plaintiffs presented Mr. Frey through his deposition testimony. Mr. Frey is a senior marketing officer for SeaWorld. He testified about some of the materials that included statements on which Ms. Nelson stated she relied. The Court finds that Mr. Frey was a credible witness, but it finds his testimony was not highly probative on the issues for which it was presented.

**Frederick Jacobs –** Plaintiffs presented Mr. Jacobs through his deposition testimony. Mr. Jacobs was Vice President of Communications at SeaWorld between 2010 through 2015 and testified about SeaWorld's public responses to the *Blackfish* film. The Court finds that Mr. Jacobs was a credible witness, but it finds his testimony was not highly probative on this issues for which it was presented.

**Michelle Kermes –** Plaintiffs presented Ms. Kermes through her deposition testimony.

3

Ms. Kermes worked at SeaWorld as a senior corporate affairs officer from 2013 until the summer of 2016, when she was promoted to chief communications officer.  Ms. Kermes testified about SeaWorld's responses to *Blackfish* and about materials that included statements on which Ms. Nelson stated she relied.  The Court finds that Ms. Kermes was a credible witness, but it finds her testimony was not highly probative on the issues for which it was presented.

### SeaWorld's Witnesses

**Joelle Morizur –** Mrs. Morizur is Juliette Morizur's mother, and SeaWorld was permitted to treat her as a hostile witness.  Mrs. Morizur testified about her recollections of the family trip to SeaWorld San Diego, Ms. Morizur's discussions with SeaWorld personnel, and the alleged purchase and subsequent destruction of the Shamu plush.  Mrs. Morizur was not able to recall many events.  On the whole, the Court finds Mrs. Morizur's testimony credible, but it does not find her testimony particularly probative.

**Jean-Christophe Morizur** – Mr. Morizur is Juliette Morizur's father, and SeaWorld was permitted to treat him as a hostile witness.  Mr. Morizur testified about his recollections of the family trip to SeaWorld, Ms. Morizur's discussions with SeaWorld personnel, and the alleged purchase and subsequent destruction of the Shamu plush.  Mr. Morizur was not able to recall many events.  On the whole, the Court finds Mr. Morizur's testimony credible, but it does not find his testimony particularly probative.

**Nicholas Robbins –** Mr. Robbins is Ms. Morizur's fiancé, and SeaWorld was permitted to treat him as a hostile witness.  Mr. Robbins testified about his knowledge of the alleged purchase and subsequent destruction of the Shamu plush and Ms. Morizur's views about SeaWorld.  The Court finds Mr. Robbins' testimony credible and probative on the issues about which he testified.

**Kenneth Nelson –** SeaWorld presented Mr. Nelson through his deposition testimony.  Mr. Nelson testified about the Nelsons' trip to SeaWorld in 2015 and the purchase of the tickets.  Mr. Nelson testified that he had a brain tumor removed in March 2018, which has affected his memory.  (Deposition of Kenneth Nelson ("K. Nelson Depo.") at 9:24-10:4, 10:13-11:3, 11:8-

10.)[3]  The Court can neither credit nor discredit Mr. Nelson's testimony, and it finds it marginally

probative on the issues about which he testified.

**Melissa Fay –** Ms. Fay is a senior trainer at SeaWorld, has worked exclusively with the

orcas since 2008, and was a trainer in April 2012.  Ms. Fay also is depicted in one of the photos

Ms. Morizur took, which shows Ms. Fay participated in the One Ocean show the Morizur family

attended during that trip.  She testified about her practices when she interacts with SeaWorld San

Diego guests after performances and also provided some testimony about the general practices of

SeaWorld trainers.  The Court finds Ms. Fay was a credible witness, but her testimony was not

necessary to the Court's decision.

## ANALYSIS

> If a party has been fully heard on an issue during a nonjury trial and
> the court finds against the party on that issue, the court may enter
> judgment against the party on a claim or defense that, under the
> controlling law, can be maintained or defeated only with a favorable
> finding on that issue.  The court may, however, decline to render any
> judgment until the close of the evidence.  A judgment on partial
> findings must be supported by findings of fact and conclusions of
> law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).  SeaWorld stated its intent to "reserve on Ms. Morizur until the entire case

has been presented."  (Tr. at 357:13-14.)  In its written motion, SeaWorld did not clearly delineate

where it believes Ms. Nelson failed to meet her burden based on the evidence she presented and

where it believes she failed to meet her burden based on the record in its entirety.  The Court

exercises its discretion to resolve the motion based on the record as a whole.

Because the Court is the finder of fact, when it considers SeaWorld's motion for judgment

on partial findings, it "is not required to draw any inferences in favor of the non-moving party;

rather the [Court] may make findings in accordance with its own view of the evidence."  *Ritchie v.*

*United States*, 451 F.3d 1019, 1023 (9th Cir. 2006).  That does not preclude the Court from

drawing inferences in Plaintiffs' favor where the evidence warrants; it simply is not required to do

so.  *See Mother v. Hawaii*, 283 Fed. Appx. 514, 515 (9th Cir. 2008).

---

[3]     SeaWorld presented Mr. Nelson's testimony on March 10, 2020.  (Trial Transcript ("Tr.") at 395:8-10.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**FINDINGS OF FACT[4]**

1.      Plaintiffs are residents of California.  (Dkt. No. 544, Stipulated Finding of Fact ("SFOF") 1.)  They retained counsel in this case in February 2016.  (Tr. at 149:12-150:6, 296:13-298:2, Exhibits ("Ex.") 18, 42 (engagement letters).)

2.      SeaWorld is a corporation organized under the laws of the state of Delaware and maintains its principal place of business in Orlando, Florida.  SeaWorld owns and operates SeaWorld San Diego, SeaWorld San Antonio, and SeaWorld Orlando, each of which exhibits to the public various species of animals, birds, and aquatic creatures, including *Orcinus orca*, which is the scientific name for a killer whale.  SeaWorld sells tickets to the public for admission to SeaWorld San Diego, including at ticket counters at the entrance of SeaWorld San Diego.  (SFOF 2, 4-6.)

3.      In 2012, and continuing to the present day, SeaWorld maintained a website at the address www.seaworld.org.  In 2014 and 2015, SeaWorld maintained a website at the address www.seaworldcares.com.  (SFOF 7.)

4.      The film *Blackfish* was released in 2013.  After *Blackfish* was released, SeaWorld publicly responded to the claims made against SeaWorld in that film.  (SFOF 15; Deposition of Jill Kermes ("Kermes Depo.") at 23:11-13, 23:16, 23:18-20, 23:23-24:10.)[5]

5.      On or about March 17, 2016, SeaWorld publicly announced that it would discontinue breeding its orcas and announced that it would discontinue theatrical orca shows.  (SFOF 8-9.)

**FINDINGS OF FACT REGARDING MS. NELSON**

6.      Ms. Nelson, her husband, and their children visited SeaWorld in 2015, and she made the decision to do so.  (Tr. at 18:22-19:2, 20:3-7.)  SeaWorld argues the Court could find

---

[4]      To the extent that any of the Court's findings of fact are included in the Court's conclusions of law, they shall be deemed findings of fact.  Similarly, to the extent that any of the Court's conclusions of law are included in the findings of fact, they shall be deemed conclusions of law.

[5]      Plaintiffs presented Ms. Kermes' testimony on March 10, 2020.  (*See* Tr. at 339:16-343:8.)

United States District Court
Northern District of California

1  that Ms. Nelson and her family did not, in fact, visit SeaWorld.[6]  The Court finds Ms. Nelson's

2  testimony that she visited SeaWorld to be credible and is sufficient to establish the fact of the visit.

3  Moreover, Ms. Nelson's testimony is corroborated by her husband's account of paying for

4  admission, even though he could not recall when they visited SeaWorld San Diego.  (See K.

5  Nelson Depo. at 16:19-25, 22:23-25, 23:3.)  It is undisputed that Mr. Nelson turned over the funds

6  used to pay for admission.  The Court finds that the tickets were purchased at SeaWorld San

7  Diego.  (Tr. at 48:16-17; K. Nelson Depo. at 22:6-11.)  For reasons set forth in Finding of Fact

8  ("FOF") 7, the Court finds that the visit took place before August 8, 2015.

9       7.      While at SeaWorld, Ms. Nelson attended an orca show, which she found to be a

10  "circus type of exhibition."  (Tr. at 44:2-6.)  On August 8, 2015, Ms. Nelson, using a pseudonym,

11  posted a negative review of the visit on Yelp!.  That review refers to paying to visit SeaWorld.

12  (Id. at 46:1-23, 124:8-9, Ex. 38.)  With the exception of the Yelp! review, there is no documentary

13  evidence of the ticket purchase, such as ticket stubs, a receipt, or credit card statements.

14       8.      Ms. Nelson testified she believed the tickets cost $90 to $100 per person and

15  testified that she believed her husband used cash to pay for the tickets, which would have come

16  from a joint bank account.  (Tr. at 48:5-14, 49:3-5, 49:11-16.)  When she was deposed in 2017,

17  Ms. Nelson could not recall how Mr. Nelson paid for the tickets, but she testified that if Mr.

18  Nelson used a credit card, it would have been in Mr. Nelson's name.  (Tr. at 54:11-12.)  Mr.

19  Nelson testified that it was "most likely" that he would have paid for the tickets with a credit card.

20  (K. Nelson Depo. at 22:23-25, 23:3.)  Mr. Nelson also testified that he no longer has the credit

21  cards that he used during that time period.  (Id. at 23:3-24:5, 25:17-26:6.)

22       9.      Although the Nelsons had some financial difficulties after they moved to California

23  in 2008, by 2015 they had recovered from those difficulties.  (See Tr. at 19:20-23.)  Ms. Nelson

24  testified that she and Mr. Nelson have had joint finances for 25 years, and the Court credits that

25  testimony.  (Tr. at 49:21-24.)  Ms. Nelson was not able to explain why her recollection of how Mr.

26  Nelson paid for the tickets was better at trial than it was during her deposition.  The Court finds

27

28  _____

[6]      See Dkt. No. 544-3, SeaWorld Proposed Findings of Fact and Conclusions of Law ("SW
PFOF" or "SW PCOL"), ¶¶ 15-16.)

the discrepancy between her testimony on this point immaterial for reasons set forth in Conclusions of Law ("COL") 15 through 17.

10.     Ms. Nelson testified that she watched *Blackfish* and that her best recollection was that she saw it "anywhere between the beginning of 2015 and August 2015." (Tr. at 151:22-152:2.) Based on Facebook posts identified in the following paragraph, which express a negative view of SeaWorld, the Court credits the testimony that Ms. Nelson saw *Blackfish* during that time frame.

11.     Although Ms. Nelson did feel *Blackfish* was slanted against SeaWorld, the movie left her with such a negative impression that it led her to "despise" SeaWorld, views that are supported by her Facebook posts between January and July 2015. (Tr. at 20:8-11, 22:5-19, 23:1-7, 101:24-104:23 (including Nelson Depo. at 191:20-192-6), 105:21-108:4 (including Nelson Depo. 202:13-24), 108:1-112:9 (including Nelson Depo. at 208:8-21), 112:11-15; Exs. 53, 56, 57-59.) Ms. Nelson subsequently did some research on the internet and became aware that SeaWorld had refuted "many of the things that were said in the movie." (Tr. at 23:20-24, 60:25-61:6; *see also id.* at 66:1-10 (including Nelson Depo. at 130:22-131:8), 75:2-5.)

12.     In particular, Ms. Nelson testified that she recalled seeing statements that SeaWorld did not separate calves from mothers and that orcas in captivity live as long as their counterparts in the wild. (*Id.* at 23:25-24:10, 34:9-35:13, 36:6-16, 39:5-40:4.) Ms. Nelson testified that she saw these statements on SeaWorld's website, before her visit to SeaWorld San Diego. According to Ms. Nelson, she saw them in a document entitled "Open Letter" and in a "small ad that says 'thriving' in it," which were contained in Exhibits 48 and 50. When challenged on cross-examination, Ms. Nelson admitted that she was not sure where she saw the statements but knew she "looked at SeaWorld's information after" she saw *Blackfish*. (*Id.* at 24:5-25:16; *see also id.* 25:17-28:2, 34:22-38:17, 68:18-69:3, 170:19-24, 171:8-10 (recalls seeing Exhibit 48 on SeaWorld website).) During her deposition Ms. Nelson could not recall where she saw either statement. (Tr. at 68:3-16 (including Nelson Depo. at 156:5-10), 69:4-70:7 (including Nelson Depo. at 132:2-25), 71:5-24 (including Nelson Depo. at 134:8-21), 73:20-74:10 (including Nelson Depo. at 156:23-157:7).)

United States District Court
Northern District of California

13.     Although at trial Ms. Nelson testified she knew what was on SeaWorld's website in 2015, at her deposition she testified she did not "know what exactly SeaWorld had on its website in 2015." (Tr. at 74:12-24 (including Nelson Depo. at 248:19-21).) During her deposition, Ms. Nelson also testified she had not previously seen Exhibit 50. (*Compare* Tr. at 87:12-21 *with* 87:22-88:18 (including Nelson Depo. at 167:23-168:18).) At trial, Ms. Nelson was not able to recall the specific language used in Exhibit 48 without referring to the Exhibit. In light of these inconsistencies, and in light of the fact that she was deposed closer in time to her visit to SeaWorld San Diego, the Court finds her deposition testimony and her inability to recall where she allegedly saw the statements to be more credible than her trial testimony.

14.     Ms. Nelson has been consistent in her testimony that she saw statements conveying the general message that SeaWorld's orcas have similar lifespans to orcas that live in the wild and that SeaWorld did not separate mothers and calves. However, Ms. Nelson's testimony at trial regarding the specific language she claims to have seen varies from the statements contained in the TAC.

15.     When she was deposed in 2017, Ms. Nelson testified that she recalled statements that orcas "lived the same amount, at least in captivity that they did in the wild" and testified that she did not know and could not recall with specificity what SeaWorld said about mother-calf separation. (*Id.* at 67:2-8, 71:11-24, 72:20-73:13 (including Nelson Depo. at 155:7-156:3, 134:8-21, and 156:11-22).) Ms. Nelson explained that lack of specificity by stating that she did not want to speculate about the statements. (Tr. at 33:1-5, 33:22-13, 72:2-8.) During discovery, Ms. Nelson also stated she could not "quote verbatim SeaWorld's statements" regarding orca life spans or mother calf separation. (Tr. at 92:19-95:13 (testifying about responses to interrogatories).)

16.     During discovery, SeaWorld requested documents "that reflect the statements purportedly made by Defendant 'disputing the allegations of mistreatment of the orcas raised in Blackfish' which [Ms. Nelson] allegedly relied upon in purchasing [her] ticket to SeaWorld San Diego[.]" (Tr. 76:15-77:23, 441:15-446:17; Ex. 61 (Nelson Response to Request for Production ("RFP") 14).) In response, Ms. Nelson stated her counsel collected the documents produced on her behalf "in or around May 2015," before the lawsuit was filed. The documents were Bates

1    labeled Nelson_000004-66, and included Exhibits 48 and 50.  (*See* SFOF 18, Tr. at 80:17-82:5,

2    Ex. 609 (identifying range of documents produced in response to RFP 14), Ex. 611 at 2.)[7]  The

3    Open Letter and the "thriving" advertisement (Exhibits 50 and 48) would have been available to

4    Ms. Nelson prior to her deposition and before she responded to SeaWorld's interrogatories.  For

5    that reason, the Court finds Ms. Nelson's trial testimony about seeing the specific language used in

6    Exhibits 48 and 50 less credible than her deposition testimony and her responses to interrogatories.

7         17.    Ms. Nelson's claims are based the statements that captive orcas have similar

8    lifespans to wild orcas and that SeaWorld does not separate calves and mothers.  The Court will

9    credit Ms. Nelson's testimony that she saw statements that, in general, conveyed those messages.

10   The Court also credits Ms. Nelson's testimony that she saw those general statements before her

11   trip to SeaWorld in 2015.  For the reasons set forth in FOF 18 through 21, the Court finds Ms.

12   Nelson did not meet burden to show she saw those statements on SeaWorld's website prior to her

13   visit to SeaWorld San Diego.

14        18.    As set forth in FOF 16, Ms. Nelson's counsel produced Exhibits 48 and 50.  Those

15   exhibits bear copyright dates of 2014, and they do not contain a URL marking that would show

16   they came from SeaWorld's website.  (Exs. 48, 50; SFOF 3 ("Documents bearing Bates numbers

17   with the prefix "SW-" were produced to Plaintiffs' counsel during discovery by SeaWorld.").)

18   Relying on Exhibit 611, Ms. Nelson urges the Court to find that her counsel downloaded the

19   exhibits from SeaWorld's website.  However, counsel did not state the exhibits were downloaded

20   from SeaWorld's website.  The Court finds Exhibit 611 does not provide probative evidence that

21   Exhibits 48 and 50 were on SeaWorld's website in 2015.

22        19.    SeaWorld could not verify from its own records whether Exhibit 48 was posted on

23   any of SeaWorld's websites in 2015.  (Tr. 29:24-30:2.)  Ms. Kermes testified that Exhibit 48

24   "looks like it's a printout of one of the pages on our SeaWorldCares website[,]" based on her

25   recollection of what that website looked like.  She did not provide any specific information about

26   when it may have appeared on the website, other than it would have been after December 2013,

27

28   _____

     [7]     Ms. Nelson was not exposed to, did not rely on anything, and does not base any of her
     claims against SeaWorld on Exhibits 45, 46, 47, 49, 51 or 52.  (SFOF 19-20.)

United States District Court
Northern District of California

1    noting the copyright date of 2014.  (Kermes Depo. at 57:2-8, 57:23-58:7, 60:11-17.)  After Ms.

2    Kermes testified and at the close of Plaintiffs' case, the Court admitted Exhibit 48 and stated that

3    "[i]f SeaWorld wants to, in their case-in-chief, debunk" the assertion that Exhibit 48 was on

4    SeaWorld's website in 2015 "with a witness, that information would be in their possession to

5    testify to that categorically, then I'll give it the weight it deserves."  (Tr. at 344:15-347:4.)

6    Although SeaWorld did not present any such witness, Ms. Nelson bears the burden to show she

7    has standing to pursue her claims, and the Court concludes the weight of the evidence does not

8    support a finding that Ms. Nelson saw Exhibit 48 on SeaWorld's website in 2015.

9        20.    The Court also conditionally admitted Exhibit 50, "for purposes of showing what"

10   Ms. Nelson "says she remembers seeing on the website", not as something promulgated by

11   SeaWorld.  (Tr. at 36:17-38:3.)  Ms. Kermes testified that SeaWorld's response to *Blackfish*

12   included Exhibit 68, which was produced by SeaWorld.  (SFOF 3.)  The content of Exhibits 50

13   and 68 are identical, except that Exhibit 68 includes a reference to "seaworldcares.com" at the

14   conclusion of the Open Letter.  (Exs. 58, 60.)  Ms. Kermes testified that SeaWorld published the

15   Open Letter in newspapers in December 2013, and she testified that Exhibit 68 was posted to

16   SeaWorld's website "SeaWorldCares.com".  However, Ms. Kermes did not specify when that

17   occurred.  (SFOF 15-17; Kermes Depo. at 36:20-37:1, 37:2, 38:6-13.)

18       21.    The Court finds Ms. Nelson failed to meet her burden to establish that Exhibits 48

19   and 50 were on SeaWorld's website before she visited SeaWorld San Diego and, thus, she failed

20   to meet her burden to show she actually saw the statements on which she claims to have relied on

21   SeaWorld's website before her trip to SeaWorld.

22       22.    Ms. Nelson testified that, at the time she decided to visit SeaWorld San Diego and

23   spend money on the tickets, she believed the lifespan and separation statements and that they were

24   "important" to her decision to visit SeaWorld because they refuted statements made about

25   SeaWorld in *Blackfish*.  (Tr. at 34:25-35:2, 40:11-13, 40:23-42:4, 96:23-97:7, 172:7-17.)  During

26   her deposition, however, she testified that she did not know whether SeaWorld was "credible or

27   not credible" on the issue of separation or lifespans, and "that's why I went."  (Tr. at 99:24-100:19

28   (including Nelson Depo. at 186:3-10).)  Ms. Nelson's deposition testimony is consistent with her

United States District Court
Northern District of California

11

direct testimony at trial that she viewed the Open Letter (Ex. 50) as "an invitation by SeaWorld to visit their parks to see what the truth is versus in the movie" and that she "wanted to visit the park to see for myself what was truth."  (Tr. at 42:10-22; *see also id.* at 123:14-21 (including Nelson Depo. at 144:14-17).)

23.    Ms. Nelson testified during her deposition that, after her visit, she thought SeaWorld misrepresented the information on lifespans and that she did not believe the lifespan or separation statements, in part, because the information came from SeaWorld rather than outside sources.  She also testified consistently that, after her visit to SeaWorld, she did not know whether either statement was true or false.  (Tr. at 112:16-113:7, 114:15-115:18, 116:13-20, 117:10-23, 117:25-123:6 (including Nelson Depo., citations to deposition omitted for brevity).)

24.    Ms. Nelson visited SeaWorld San Diego again in 2018, to "see if anything had changed."  Although Ms. Nelson discovered there were no more orca shows, she thought nothing else was different.  (Tr. at 52:12-23.)  Ms. Nelson testified that if she was able to trust SeaWorld's advertising, she "absolutely" would like to go back to SeaWorld because she has learned they are not breeding orcas in captivity and it might be her last time to see orcas up close.  (Tr. at 51:25-52:6.)  However, Ms. Nelson also testified that she does not support businesses that make animals do tricks, including rodeos and horse racing.  The Court credits that testimony, which is consistent with her deposition testimony that she has stopped patronizing zoos and acknowledged it would be fair to say she is "against the exhibition of animals for money."  (Tr. 131:7-21, 132:1-133:17 (including Nelson Depo. at 78:22-79:13 and 77:9-11).)  She also testified in her deposition that, contrary to what is alleged in paragraph 19 of the TAC and contrary to some of her trial testimony, she does not "enjoy the kind of animal entertainment and education SeaWorld provides."  (*Id.* at 133:23-136:7 (reading from Nelson Depo. at 242:17-243:2).)  There also is evidence that Ms. Nelson has been a member of People for the Ethical Treatment of Animals.  (Tr. at 136:9-137:10.)

25.    The Court does not credit Ms. Nelson's trial testimony that she absolutely would purchase a ticket to SeaWorld in the future.  That testimony is belied by the consistency of her negative views about SeaWorld, as set forth in her social media posts, and also is belied by her deposition testimony, where she was not as definitive about her desire to return.  (Tr. at 142:18-

United States District Court
Northern District of California

United States District Court
Northern District of California

1    143:19 (reading from Nelson Depo. at 240:24-241:15).)  Ms. Nelson's social media posts also are

2    consistent with her testimony that she does not like businesses that display or exhibit animals,

3    testimony the Court does find credible and finds to be reflective of Ms. Nelson's true views.

4    **FACTUAL FINDINGS REGARDING MS. MORIZUR**

5    26.    On or about April 10, 2012, when she was fifteen, Ms. Morizur visited SeaWorld

6    San Diego, with her mother, her father, her sister, and her grandparents.  (SFOF 10-12; Tr.

7    200:17-201:5, 363:3-16.)  During her visit, Ms. Morizur attended the One Ocean show featuring

8    SeaWorld's orcas.  (Tr. at 202:6-11, Ex. 13 at 4.)  According to Ms. Morizur, she and her family

9    attended that show around noon, and it lasted an hour.  (Tr. at 203:19-204:2, 206:7-12.)

10    27.    Ms. Morizur testified that after the One Ocean show she went back to Shamu

11    Stadium because she wanted to speak with a trainer about what it was like to work with the orcas.

12    At the time of her visit, Ms. Morizur hoped to work with orcas "and possibly even be a trainer"

13    when she grew up.  (Tr. at 206:15-18, 206:21-207:6.)  According to Ms. Morizur, approximately

14    one hour after the One Ocean show ended, she was able to speak to a female trainer in an

15    underground viewing area at the orca pools.  (*Id.* at 207:9-24, 246:12-19, 250:15-251:20

16    (including Morizur Depo. at 102:25-103:8), 251:24-252:20 (including Morizur Depo. at 107:15-

17    21), Ex. 13 (at 16, 30).)

18    28.    Ms. Morizur testified she asked the trainer why the dorsal fins on SeaWorld's orcas

19    were not straight, which was different from what she saw of photos of orcas in the wild.  (Tr.

20    208:9-20.)  According to Ms. Morizur, the trainer responded by telling her, "[O]h, it's equally as

21    common in the wild.  Usually what happens is the reason the dorsal fin isn't straight because it's

22    too heavy and the orca just can't support it so it starts bending over because it's a muscle[.]"  (*Id.*

23    at 208:20-23.)  At her deposition, Ms. Morizur testified the trainer told her the "dorsal fins weigh

24    too much and that it often happens in the wild too" and told her bent dorsal fins were "normal and

25    equally common in the wild."  (*Id.* at 254:19-255:17 (including Morizur Depo. at 78:21-79:19),

26    256:10-257:8 (including Morizur Depo. at 88:24-89:12).)

27    29.    At trial, Ms. Morizur also testified that she asked the trainer whether the "orcas

28    were happy? You know, are they healthy?"  (*Id.* at 209:5-7.)  According to Ms. Morizur, the

13

United States District Court
Northern District of California

trainer responded, "Yes, the orcas here that we have at SeaWorld they're very – they're happy, they're healthy, and, you know, compared to the ones in the wild, captivity does not harm them in general."  (*Id.* at 209:8-11.)  At her deposition, Ms. Nelson testified the trainer "mentioned along the lines that the orcas are healthy and happy and well taken care of at SeaWorld" and testified she was told that "captivity in general does not harm orcas."  (*Id.* at 255:21-22 (including Morizur Depo. at 78:21-79:19), 257:9-16 (including Morizur Depo. at 88:12-89:24), 260:17-261:8 (including Morizur Depo. at 89:21-90:8).)

30.    Ms. Morizur's trial testimony about the statements she allegedly relied on was more expansive than the statements in the TAC and varied from her deposition testimony.  However, she consistently testified about the general content of those statements.  Ultimately, the Court finds any variations in the actual statements are immaterial because it concludes Ms. Morizur has not met her burden to show she purchased a Shamu plush during her visit.

31.    Ms. Morizur testified although she spoke to other employees that day, this was the only conversation she had with a trainer and testified that no one else participated in that conversation.  (*Id.* at 209:12-17.)  Mrs. Morizur testified that she saw Ms. Morizur speaking to a male SeaWorld employee following the One Ocean show.  (*Id.* at 363:17-364:1.)  During her deposition, Mrs. Morizur testified that Ms. Morizur had told her "the SeaWorld guy" lied to her about dorsal fins.  (*Id.* at 364:21-365:10 (reading from Mrs. Morizur Depo. at 19:16-20:2).)  Mr. Morizur also testified that he saw Ms. Morizur talking with a SeaWorld employee right after the show, but he did not know if the person was a trainer.  (*Id.* at 375:23-374:4.)  He also testified that at some later point, Ms. Morizur told him that person had lied to her about dorsal fins.  (*Id.* at 376:11-21.)  Again, the Court finds any inconsistencies about the individual with whom Ms. Morizur allegedly spoke are immaterial because it finds Ms. Morizur did not meet her burden to show she purchased a Shamu plush during her visit.

32.    SeaWorld sells souvenirs inside SeaWorld San Diego, including the Shamu plush at issue in this case.  (SFOF 6.)  Ms. Morizur testified that, after the conversation with the trainer, she purchased the Shamu plush from a boutique stand or a gift shop near Shamu Stadium for $25.00 and paid for it with cash.  (*Id.* at 209:18-210:2, 211:2-8.)  She claims that she purchased

the Shamu plush, in part, because the trainer's statements "reassured me in a sense" and made her

feel "good at that time" about turning money over to SeaWorld.  (Tr. at 210:7-22.)  Ms. Morizur's

trial testimony about when she purchased the Shamu plush is contradicted by her deposition

testimony, where she testified she "went and bought [the Shamu plush] straight after what the

trainer told me[.]"  (Tr. at 264:2-17 (including Morizur Depo. at 121:22-122:2).)

33.     Mr. Morizur testified that he accompanied Ms. Morizur to a gift shop, but he did

not recall that Ms. Morizur purchased anything there.  Mr. Morizur also did not recall Ms. Morizur

going off by herself during the trip.  He also did not recall her leaving SeaWorld San Diego with a

stuffed animal, although he testified it was "possible" that she did.  (Tr. at 377:10-378:17

(including Mr. Morizur Depo. at 24:17-21), 379:17-19.)  Mrs. Morizur also testified that she

accompanied her daughter into a SeaWorld gift shop, but she did not remember if Ms. Morizur

purchased anything.  Mrs. Morizur did not remember any of her family members having any

SeaWorld merchandise in the car on the way home.  (*Id.* at 365:15-21, 366:13-24, 373:4-6.)

34.     Mr. Robbins has known Ms. Morizur since 2013, and he has seen Ms. Morizur

almost every day since then.  He testified that had no knowledge that Ms. Morizur claimed to have

owned a Shamu plush before he read about it in Ms. Morizur's deposition.  (Tr. at 383:25-384:5;

385:1-16.)  Mr. Robbins also testified that he never saw a Shamu plush with a SeaWorld tag on it.

(*Id.* at 385:17-19.)  The Court credits this testimony.

35.     Ms. Morizur did not produce a receipt for her purchase.  Ms. Morizur took, or

posed for, numerous photographs during her visit and posted ninety-four (94) photographs to her

Facebook page.  One of those photographs shows her posing in a gift shop with a shark plush,

which she did not purchase.  There are no photographs of the Shamu plush.  (Tr. at 201:6-202:1,

204:1-205:11, 65:22-266:14, 267:21-24; *see, e.g.,* Ex. 17 (at 33, 47-49, 51, 54, 61, 62, 65, 66, 94).)

Ms. Morizur also testified that she carried the Shamu plush in a backpack.  (Tr. at 267:13-15.)

None of the photographs introduced into evidence show Ms. Morizur with a backpack, but they do

show her with a small cross-body purse.  (*See* Ex. 17 (at 33, 61, 65).)

36.     Ms. Morizur suggested that there were no photographs because she was not active

on social media at that time, but that testimony is belied by the number of photographs posted to

1    her Facebook page after the trip.  Ms. Morizur also testified she became more active on Twitter in

2    2012 and 2013, shortly after her trip.  (Tr. 338:2-9.)  The Court does not find Ms. Morizur's

3    explanation for the lack of photographic evidence credible.

4         37.    Ms. Morizur's family owns a dog named Brutus.  (SFOF 13.)  Ms. Morizur claims

5    she cannot produce the Shamu plush because Brutus destroyed it.  Neither of her parents nor Mr.

6    Robbins recalled Brutus destroying a Shamu plush, although Mr. Morizur testified that Brutus had

7    a "habit of chewing on anything that is stuffed." (*Compare* Tr. at 215:11-24, 216:7-9, *with*

8    366:25-4, 379:20-24, 382:6, 385:24-386:10.)  The only additional evidence that Brutus destroyed

9    the Shamu plush is one of Ms. Morizur's tweets from February 5, 2016 at 1:36 p.m.  That tweet

10   was posted after a call Ms. Morizur scheduled with counsel for that morning, which also was the

11   day Ms. Morizur decided to become a plaintiff.  (Tr. 284:20-286:24, 291:12-21, Exs. 18, 254,

12   502.)  The tweet reads, "My dog chewed up the stuffed orca I bought at @SeaWorld years ago[.]  I

13   guess the money didn't go to waste after all."  (Ex. 502.)

14        38.    Ms. Morizur's testimony about when the plush was destroyed was inconsistent.  At

15   trial, she testified the Shamu plush was destroyed in "very late of 2015, very early of 2016" and

16   that "it was still in January, from what I recall."  (Tr. at 215:25-216:6.)  Ms. Morizur then admitted

17   on cross-examination that the plush was destroyed on the morning of February 5, 2016 or the prior

18   evening.  That testimony was consistent with her deposition testimony on this issue.  (*Id.* at

19   279:21-280:12 (including Morizur Depo. at 126:3-12), 292:8-10.)

20        39.    Ms. Morizur testified that she posted the February 5, 2016 tweet about the

21   destruction of her Shamu plush because "talking with Covington or my lawyers at that time

22   reminded me of" it.  (*Id.* at 292:3-7.)  Ms. Morizur testified about her love of orcas and all things

23   orca, and that is one aspect of her testimony that the Court does credit.  Given Ms. Morizur's love

24   of orcas and orca merchandise, and assuming arguendo the Shamu plush had been destroyed

25   shortly before the call, the Court cannot credit that Ms. Morizur's memory of the incident would

26   have not been fresh enough that it would need to be refreshed by a telephone call about this

27   lawsuit.  Ms. Morizur's lack of candor at trial, including admitted exaggerations and

28   embellishments, as well as the fact that neither her parents nor her fiancé could corroborate the

United States District Court
Northern District of California

United States District Court
Northern District of California

1   fact that the Shamu plush was destroyed lead the Court to discredit Ms. Morizur's variation of "the

2   dog ate my homework excuse" as an explanation for why she did not produce the Shamu plush.

3          40.     Having weighed the testimony and considered the evidence, the Court does not find

4   credible Ms. Morizur's testimony that she purchased a Shamu plush during her April 2012 visit to

5   SeaWorld San Diego.  For that reason, the Court finds she has not met her burden to show she

6   spent money on a Shamu plush.

7          41.     Ms. Morizur testified that she would still like to purchase SeaWorld merchandise

8   and would go back to SeaWorld, but right now she does "not know if [she] can trust them as a

9   brand or organization."  (Tr. at 216:10-22.)  Ms. Morizur also explained that "if I could trust them,

10  I would have no issue giving my money to an organization that is truthful to the public about its

11  practices and takes care of its … animals" and that she would trust SeaWorld "[i]f they told [her]

12  the truth about their practices or let's – per se [*sic*] their old practices."  (*Id.* at 216:23-217:2,

13  218:6-8.)  That testimony contradicts Ms. Nelson's allegations in the TAC that she would not have

14  purchased the Shamu plush if she had known the truth about the alleged misrepresentations.

15  (TAC ¶ 20.)

16         42.     Ms. Morizur also testified that she loves SeaWorld's work on conservation and

17  rescue programs.  (Tr. at 217:3-13.)  Ms. Morizur took a behind the scenes tour of SeaWorld on

18  the trip in 2012, which addressed some of those issues.  However, she admitted that after the trip

19  she posted many statements that are extremely critical of SeaWorld, including posts made during

20  this litigation.

21         43.     Indeed, Ms. Morizur consistently posted negative statements about SeaWorld on

22  social media.  (*See, e.g.,* Exs. 154-156, 238, 601-A (at 3-4, 11, 16, 17), 616, 623-624.)  According

23  to Ms. Morizur, many of her social media posts reflect her anger, and she testified she made the

24  posts in "the heat of the moment."  She also tried to explain away her posts as "exaggerations."

25  (*See, e.g.,* Tr. at 274:9-14.)  In her deposition, Ms. Morizur admitted to embellishing a homework

26  assignment to "make [herself] look a little better in front of the teacher[.]"  (Tr. at 322:3-235:9

27  (including Morizur Depo. at 177:19-24).)  The Court credits Ms. Morizur's testimony that she will

28  sometimes exaggerate or embellish her statements to portray herself in a better light.  Accepting

1    that testimony as true supports the Court's conclusion about her overall credibility.

2         44.     In one of the photos Ms. Morizur posted to Facebook, she stated, "I was literally

3 crying right here." (Tr. at 269:22-270:8, Ex. 17 at 95.) Ms. Morizur testified the tears "were

4 happy tears," but at her deposition she stated that "seeing [the orcas] in captivity made [her] sad

5 like right now." (Tr. at 270:14-271:6 (including Morizur Depo. at 109:8-23).) The Court credits

6 Ms. Morizur's deposition testimony, which is consistent with what the Court finds to be her views

7 about orcas in captivity.

8         45.     Mr. Morizur testified that his understanding of Ms. Morizur's goal in bringing this

9 case was "that killer whales will no longer be held in captivity anywhere by" anyone. (Tr. at

10 381:7-14.) Mr. Robbins similarly testified that Ms. Morizur told him she would never go back to

11 SeaWorld as long as the orcas are in captivity. (*Id.* at 391:12-15, 392:1-4.) The Court finds Mr.

12 Morizur's and Mr. Robbins's testimony on Ms. Morizur's current views of SeaWorld and her

13 intent to return more credible than Ms. Morizur's testimony.

14         46.     The Court does not doubt that Ms. Morizur has a genuine love of orcas and that

15 Ms. Morizur is passionate about orca welfare. However, it finds Ms. Morizur's statements

16 criticizing SeaWorld are a more accurate reflection of her views, and it finds her change of heart at

17 trial about SeaWorld to be litigation motivated. The Court also does not find credible Ms.

18 Morizur's trial testimony that she would return to SeaWorld if the Court ordered it to say what she

19 believes to be the truth, *i.e.* that captivity does harm orcas and that bent dorsal fins are not normal.

20 Ms. Morizur has made numerous public statements that she would not return to SeaWorld, has

21 urged friends and family to do the same, and has stated that she wants to end captivity. Ms.

22 Morizur made at least some of those statements after she testified in deposition that SeaWorld

23 might win her back as a customer. (*See, e.g.,* Exs. 20 (at 9, 12), 154-156, 238, 254-1, 601A (at 1,

24 4, 11), 616, 620, 624, 636.) The Court credits her deposition testimony in which she stated

25 unequivocally that she would not buy a ticket and go back to SeaWorld if the Court ordered

26 SeaWorld to make such statements. (Tr. at 328:19-329:18 (reading from Morizur Depo. at 175:7–

27 176:5).)

28    //

United States District Court
Northern District of California

**CONCLUSIONS OF LAW**

**A.    Ms. Nelson and Ms. Morizur Have Not Met Their Burden to Show They Have Standing to Seek Injunctive Relief. [8]**

1.      Questions of Article III standing go to a federal court's subject-matter jurisdiction. In order to demonstrate Article III standing, Plaintiffs must show they: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, -- U.S. --, 136 S.Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  In addition to restitution, Plaintiffs seek injunctive relief, and they must establish Article III standing for both forms of relief.  *Friends of the Earth v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)); *see also Bates v. United Parcel Serv.*, 511 F.3d 974, 985 (9th Cir. 2007).

2.      Plaintiffs must support each element of the standing inquiry "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Accordingly, Plaintiffs must prove they have standing by a preponderance of the evidence.  *Id.*; *see also Aguilar v. Atl. Richfield Co.*, 25 Cal. 4th 826, 866 (2001) (stating that plaintiff bears burden of proving UCL claim by a preponderance of the evidence).

3.      "Past exposure to harmful or illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010).  Therefore, Plaintiffs must prove that they have "suffered or [are] threatened with a 'concrete and particularized' legal harm, … coupled with a 'sufficient likelihood that [they] will again be wronged in a similar way.'" *Bates*, 511 F.3d at 985 (quoting *Lujan*, 504 U.S. at 560 and then *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). The latter inquiry turns on whether Plaintiffs face a "real and immediate threat of repeated injury." *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).  The threat of future injury cannot be "conjectural or hypothetical" but must be "certainly impending" to constitute an injury in fact for

---

[8]      For that reason, the Court does not reach the issue of whether the injunctive relief Ms. Morizur seeks would redress her alleged injury.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   injunctive relief purposes. *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018)

2   (internal quotations and citations omitted).

3       4.    A consumer may have standing to sue for injunctive relief based on allegedly false

4   advertising even if they "now know[] or suspect[] that the advertising was false at the time of the

5   original purchase[.]" *Davidson*, 889 F.3d at 969. For example, a plaintiff may be able to prove

6   they would want to purchase the product, but they are unable to rely on a defendant's advertising

7   or labels and so will refrain from purchasing a product they want. *Id.* at 970. Alternatively, a

8   plaintiff might prove that they "might purchase the product in the future, despite the fact it was

9   once marred by false advertising or labeling, as [they] may reasonably, but incorrectly, assume the

10   product was improved." *Id.* In either instance, in order to establish standing under *Davidson*, a

11   plaintiff must prove they want to or intend to purchase the product in the future. *See also Lanovaz*

12   *v. Twinings N. Am., Inc.*, 726 Fed. Appx. 590, 591 (9th Cir. 2018) ("A some day intention -

13   without any description of concrete plans, or indeed even any specification of when the some day

14   will be - does not support a finding of the actual or imminent injury that Article III requires.")

15   (internal quotations, citations and alterations omitted).

16       5.    As set forth in FOF 43 through 46, the Court concludes that Ms. Morizur is

17   refraining from doing business with SeaWorld for reasons other than her alleged inability to trust

18   it as a brand; it is because she is opposed to holding orcas in captivity. Therefore, the Court

19   concludes Ms. Morizur has not satisfied the "refraining from" scenario outlined in *Davidson*.

20       6.    Neither Ms. Nelson nor Ms. Morizur provided any testimony that suggests they

21   regularly were confronted with SeaWorld's allegedly false statements, which also differentiates

22   them from the plaintiff in *Davidson*, who alleged she "regularly visit[ed] stores that" sold the

23   defendant's wipes and, thus, was regularly confronted with the alleged false advertising and could

24   not determine if the wipes were truly flushable from the packaging. 889 F.3d at 962.

25       7.    In *Lanovaz*, the plaintiff testified that she would not purchase the defendant's

26   products again, even if it removed the allegedly misleading labels. 726 Fed. Appx. at 590-91.

27   The court concluded an interrogatory response, in which the plaintiff stated she "would consider"

28   purchasing the product again was not sufficient to create a disputed issue of fact, reasoning a

"someday intention" unsupported by "concrete plans" was insufficient to establish an imminent injury. *Id.* at 591. Having found that neither Ms. Nelson's nor Ms. Morizur's trial testimony that they do, in fact, intend to return to or purchase merchandise from SeaWorld is credible, the Court concludes they have not met their burden to prove they are faced with a real and immediate threat of an ongoing or repeated injury. Accordingly, Ms. Nelson and Ms. Morizur have failed to meet their burden to show they have Article III standing to seek injunctive relief on their claims. *See, e.g., Allen v. Iranon*, 283 F.3d 1070, 1078 n.8 (9th Cir. 2002) (citing *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)) (noting trial court's findings on credibility are entitled to deference).[9]

8.      SeaWorld is entitled to judgment in its favor on the claims for injunctive relief.

**B.      Ms. Morizur Has Not Met Her Burden to Show Economic Injury.**

9.      In order to demonstrate statutory standing to pursue claims under the UCL, Ms. Morizur must show she "suffered injury in fact and … lost money or property" as result of SeaWorld's conduct. *Kwikset Corp. v. Sup. Ct.*, 51 Cal. 4th 310, 320-21 (2011) (citing Cal. Bus. Prof. Code § 17204, 17535). There are many ways to prove economic injury. For example, "[a] plaintiff may … surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have[.]" *Id.* at 323. Ms. Morizur did not present any testimony that would have supported this theory of economic injury. At trial, her testimony only supported a theory that she would not have purchased the Shamu plush if she had known what the trainer allegedly told her was not true. Lost money is "a classic form of injury in fact." *Id.*

10.      Based on the facts found by the Court above in FOF 32 through 40, the Court concludes that Ms. Morizur failed to meet her burden to prove that she purchased the Shamu plush upon which she bases her UCL claim.

11.      The Court also takes into consideration her inconsistent testimony about when the alleged Shamu plush was destroyed as discussed in FOF 38 and 39. "[A] trial court also has the

---

[9]      The Court recognizes that it found Ms. Nelson's and Ms. Morizur's deposition testimony, which was not definitive about their intent to return to SeaWorld, was sufficient to survive SeaWorld's motion for summary judgment. The Court reaches a different conclusion here based on the record as it has developed since it decided that motion.

broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). A finding of bad faith is not a prerequisite and "simple notice of potential relevance to the litigation" will suffice. *Id.* (internal quotations and citations omitted). Ms. Morizur's claims were based only on her purchase of the Shamu plush. If a Shamu plush had been destroyed the night before Ms. Morizur decided to become a plaintiff, rather than late 2015 or early 2016, the Court draws the reasonable inference that Ms. Morizur would have saved or documented the remnants. At that point this case had been filed, and adding her as a plaintiff was anticipated. The Court draws the reasonable inference that the Shamu plush and its "potential relevance to the litigation" would have been evident to Ms. Morizur and to her counsel, and Ms. Morizur would have had a duty to preserve relevant evidence.

12.     Plaintiffs are correct that they need not produce documentary evidence to prove up economic injury. *See Rahman v. Mott's LLP*, No. 13-cv-3482 SI, 2014 WL 5282106, at *4 (N.D. Cal. Oct. 15, 2014) ("Testimony from the plaintiff as to how much he spent on the product is competent evidence of damages; he need not furnish sales receipts or other extrinsic evidence."); *cf. Ries v. Arizona Beverages USA, LLC*, 287 F.R.D. 523, 530 (N.D. Cal. 2012) (denying summary judgment where plaintiffs did not produce receipts but provided sworn testimony about economic harm suffered). However, both *Rahman* and *Ries* addressed economic injury at the summary judgment phase. Ms. Morizur must now prove her claim by a preponderance of the evidence, and she relies solely on her testimony. The Court has not credited that testimony; therefore, it concludes Ms. Morizur has failed to carry her burden of proving that she sustained an economic injury for purposes of statutory standing under the UCL.

13.     SeaWorld is entitled to judgment in its favor on Ms. Morizur's UCL claim.

**C.     Ms. Nelson Has Not Met Her Burden to Show She Has Statutory Standing to Pursue Her Claims.**

14.     Ms. Nelson must show she suffered an economic injury to pursue her UCL and FAL claims. Ms. Nelson did not testify that she would have paid less for admission to SeaWorld had she known what she claims is the truth about the lifespan and separation statements. *See*

*Kwikset*, 51 Cal. 4th at 323.  Ms. Nelson may demonstrate economic injury showing she was deprived "of money or property to which [she] has a cognizable claim." *Kwikset*, 51 Cal. 4th at 323.  In order to demonstrate standing under the CLRA, she must show damage as a result of SeaWorld's conduct.  Cal. Civ. Code § 1780(a).  The CLRA's "'any damage' standard includes even minor pecuniary damage[.]" *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1108 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013).  If Ms. Nelson is able to show she "lost money or property" under the UCL, she "will, *a fortiori*, have suffered 'any damage' for purposes of establishing CLRA standing." *Id.* (citations omitted).

15.     Based on FOF 8 and 9, Ms. Nelson established that at least two presumptions apply to show the funds used to purchase her ticket were community property, in which she would have an interest.  First, at the time of their 2015 visit to SeaWorld, Ms. Nelson and her husband had maintained joint finances since approximately 1995.  This supports the inference that the money spent on the admission tickets in 2015 was acquired during the marriage, and was therefore community property.  *See* Cal. Fam. Code § 760 ("Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property.")  Second, a presumption applies because the tickets were a family expense.  *See, e.g., In re Marriage of Mix*, 14 Cal. 3d 604, 612 (1975).  SeaWorld did not present any evidence that would overcome those presumptions.  *See Wilson v. Wilson*, 76 Cal. App. 2d 119, 126 (1946) (burden is on party claiming property is separate property "to establish that fact").

16.     SeaWorld argues that even if the funds used were community property, Ms. Nelson still did not meet her burden to show economic injury because, if Mr. Nelson paid with a credit card, there is no proof the bill was paid.  In *Price v. Synapse Group, Inc.*, which involved a challenge to automatic renewals charged to the plaintiffs' credit cards for magazine subscriptions, the defendants argued the plaintiffs could not show standing absent an allegation they paid the charges.  No. 16-cv-01524-BAS-BLM, 2017 WL 3131700 at *1-*2 (S.D. Cal. July 24, 2017).  The court rejected that argument, reasoning that "[e]conomic injury under the FAL and UCL may be shown in 'innumerable ways,' … and in a modern economy in which credit card transactions are a

United States District Court
Northern District of California

ubiquitous feature, deprivation of a consumer's credit line is surely among the most common. *Id.*, 2017 WL 3131700 at *4 (quoting *Kwikset*, 51 Cal. 4th at 323).

17.    Although the Court has found other aspects of Ms. Nelson's testimony less than credible, it does credit her testimony and her husband's testimony that tickets were purchased at the SeaWorld ticket counter.  For that reason, and for the reasons set forth in COL 15 and 16, the Court concludes that Ms. Nelson has met her burden, albeit barely, to show she was "deprived of money or property to which … she has a cognizable claim," *i.e.* the cost of the ticket to SeaWorld, and thus that she suffered an economic injury under the UCL and the FAL and damage under the CLRA.  *Kwikset Corp.*, 51 Cal. 4th at 323.  This does not end the inquiry because Ms. Nelson also must prove that the damage or economic injury she suffered was "as a result" of SeaWorld's conduct.

18.    The term "as a result of" requires a causal connection between SeaWorld's conduct and Ms. Nelson's injury.  *Kwikset*, 51 Cal. 4th at 322, 326.  Where, as here, the alleged conduct is false advertising, Ms. Nelson "must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions."  *Id.* at 326-27 (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009)).  In order to show actual reliance, Ms. Nelson must demonstrate that the misrepresentation or omission was an "immediate cause of the injury-causing conduct[.]"  *In re Tobacco II*, 46 Cal. 4th at 328; *see also Kwikset*, 51 Cal. 4th at 327 n.10 (plaintiff can show reliance by demonstrating he or she was "motivated to act or refrain from action based on the truth or falsity of a defendant's statement"); *accord Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015).  Ms. Nelson need not prove the misrepresentation or omission was the "only," "sole," "predominant," or "decisive" cause of the injury-causing conduct.  *In re Tobacco II,* 46 Cal. 4th at 328.  Rather, she may show that the misrepresentation or omission was a substantial factor in her decision-making process.  *Id.*; *accord Daniel*, 806 F.3d at 1225.

19.    Ms. Nelson argues that because the statements at issue are material, she can rely on a presumption or inference of reliance.  *See In re Tobacco II*, 46 Cal. 4th at 327 (quoting *Engalla v. Permanente Medical Grp., Inc.*, 15 Cal. 4th 951, 977 (1997); *Daniel,* 806 F.3d at 1225 ("That

one would have behaved differently can be presumed, or at least inferred, when the omission is material."); *Mullins v. Premier Nutrition Corp.*, No. 13-cv-01271-RS, 2016 WL 3440600, at *3 (N.D. Cal. June 20, 2016) ("A plaintiff satisfies the burden of proving reliance by showing the alleged 'misrepresentation was an immediate cause of the injury producing conduct' … or that the representation was material.  When a misrepresentation is material, a presumption of reliance arises.") (quoting and citing *In re Tobacco II*, 46 Cal. 4th at 326-27).  A representation may be material if "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining [her] choice of action[.]"  *Kwikset,* 51 Cal. 4th at 332 (internal quotations and citations omitted).

20.     The presumption or inference of reliance can be rebutted.  *See Engalla*, 15 Cal. 4th at 977 (stating a plaintiff can survive summary judgment by making "a showing that the misrepresentations were material, and that therefore a reasonable trier of fact could infer reliance from such misrepresentations, … *absent evidence conclusively rebutting reliance*") (emphasis added); *see also Konik v. Cable*, No. 07-cv-763 SVW (RZx), 2009 WL 10681970, at *18-*21 (C.D. Cal. Dec. 2, 2009) (stating defendant can rebut presumption "by producing evidence that in fact [plaintiffs] did not rely on [defendant's] statements" and finding defendant did not rebut presumption).  For example, a plaintiff cannot rely on the presumption if they were never exposed to the false advertising at issue.  *See, e.g., Konik*, 2009 WL 10681970, at *20 (noting that in cases where reliance is disproved, defendants have, *inter alia*, demonstrated the plaintiff "did not hear or see the alleged misstatement before making the decision").  A defendant also could overcome the presumption by showing a plaintiff knew the statement was false at the time when the statement was made or "did not in fact consider the statement" at the time the plaintiff decided to make a purchase.  *Id.* (citing cases); *cf. Daniel*, 806 F.3d at 1225 (when omissions are at issue, plaintiff must be able to allege they would have been aware of a defendant's disclosure from which information was omitted).

21.     Contrary to SeaWorld's argument, the court in *Hall v. SeaWorld Entertainment Inc.* did not reject the proposition that a plaintiff could establish reliance by showing a representation was material.  No. 15-cv-660-CAB-RBB, 2015 WL 9659911, at *3-4 (S.D. Cal. Dec. 23, 2015).

United States District Court
Northern District of California

Instead, the court noted that the plaintiffs "effectively concede[d] that they have not specifically alleged reliance on any particular statement" and argued they were entitled to the presumption set forth in *In re Tobacco II* to establish reliance. *Id.* The *Hall* court reasoned that *In re Tobacco II* did not stand for the proposition that if a plaintiff was not exposed to the advertising in question, they would be entitled to restitution. *Id.* The court rejected the plaintiff's argument that "so long as a complaint alleges misrepresentations, it cannot be dismissed for failure to allege reliance." *Id.*, 2015 WL 9659911, at *3 n.4. "Applying the *Tobacco II* presumption in this manner would all but eliminate the actual reliance requirement for fraud-based claims by allowing a complaint to survive *even if the plaintiff had never seen the allegedly false advertisements.*" *Id.* (emphasis added). Thus, the *Hall* court recognized that *In re Tobacco II* allowed a plaintiff to rely on a presumption to show reliance, but it found the presumption will not apply when a plaintiff does not show they were exposed to the advertising in question. The court held the plaintiffs failed to allege facts to show the type of longstanding advertising campaign at issue in *In re Tobacco II*. Thus, the plaintiffs were required to establish with specificity the advertisements on which they relied. *Id.*, 2015 WL 9659911, at *4. The *Hall* plaintiffs did not allege they "actually saw or read *any* advertising or statements made by SeaWorld prior to purchasing their tickets." *Id.*, 2015 WL 9659911, at *4-5 (emphasis in original). Therefore, the plaintiffs' allegations in *Hall* defeated their ability to rely on an inference of or presumption of reliance.

22.     Based on the facts found by the Court above in FOF Nos. 12, 13 and 18 through 21, the Court concludes that Ms. Nelson failed to prove exposure to a specific SeaWorld representation; that is, Ms. Nelson failed to prove she saw the advertisements at issue on SeaWorld's website before her trip. Ms. Nelson's failure to prove the specific statements she claims she was exposed to defeats her claim of statutory standing under the UCL, the FAL, and the CLRA. *Doe v. SuccessfulMatch.com,* 70 F. Supp. 3d 1066, 1082 (N.D. Cal. 2014) ("[I]f Plaintiffs did not see the specified representations before they purchased Defendant's services, then Plaintiffs did not rely on these representations and suffered no injury"); *In re iPhone Application Litig.*, 6 F. Supp. 3d 1004, 1019-20 (N.D. Cal. 2013) (vague testimony as to plaintiffs' "understanding" of the statements at issue with no details as to when and where the statements

1    allegedly were made insufficient to establish standing).

2        23.    In addition to failing to meet her burden to show exposure to the alleged

3    misrepresentations, Ms. Nelson offered no evidence that the lifespan or separation statements have

4    any bearing on why people buy tickets to SeaWorld.  Plaintiffs offered the deposition testimony of

5    Fred Jacobs that SeaWorld is proud of its accreditation by the Association of Zoos and Aquariums

6    and for its overall animal care, but that aspect of his testimony was not linked specifically to the

7    lifespan and separation statements.  In their proposed findings of fact on this issue, Ms. Nelson

8    focuses on statements that SeaWorld allegedly made about the overall health and well-being of its

9    orcas.  Again, however, that information is not tied directly to the lifespan or separation

10   statements, which form the basis of Ms. Nelson's claims.  To the extent Ms. Nelson could rely on

11   a presumption of reliance, the Court concludes she failed to meet her burden for the limited

12   purpose of the standing inquiry that the statements would have been material.

13       24.    Moreover, even if the evidence were sufficient to show Ms. Nelson was exposed to

14   SeaWorld's statements before her trip, and the Court concludes it is not, Ms. Nelson also must

15   show she "repose[d] confidence in the *truth* of the relevant representation, and act[ed] upon this

16   confidence."  *Buckland v. Threshold Enter., Ltd.*, 155 Cal. App. 4th 798, 808 (2007) (emphasis in

17   original), *disapproved on other grounds by Kwikset*, 51 Cal. 4th at 337; *see also Kwikset*, 51 Cal.

18   4th at 327 n.10 (citing *Buckland* with approval and stating plaintiff must establish that she "was

19   motivated to act or refrain from action based on the truth or falsity of a defendant's statement, not

20   merely on the fact that it was made").  Ms. Nelson may have been aware of lifespan and separation

21   statements and they may have been important to her.  However, she did not present credible or

22   persuasive evidence that she believed either statement.  Therefore, she failed to prove that she

23   reposed any confidence in the *truth* of SeaWorld's statements and acted upon that confidence

24   when she allegedly made the decision to visit the park.  Indeed, the evidence clearly shows that

25   she did not give credence to either statement – before or after she made the 2015 trip to SeaWorld.

26   Where it is clear that the plaintiff did not actually believe the representation at issue, there can be

27   no actual reliance on it.  *See, e.g., Major v. Ocean Spray Cranberries, Inc.*, No. 12-cv-03067-EJD,

28   2015 WL 859491 at *4 (N.D. Cal. Feb. 26, 2015) (finding that to prevail on her theory of liability,

United States District Court
Northern District of California

plaintiff must have relied on "no sugar added" message to mean "low calorie" but granting summary judgment because plaintiff's testimony precluded reliance where it showed "she never believed Defendant's products were low calorie"); *Khasin v. Hershey Co.*, No. 12-cv-01862-EJD, 2014 WL 1779805, at *4 (N.D. Cal. May 5, 2014) (finding plaintiff could not show reliance based on aspects of label about which he testified he had no concerns).

25.     Because reliance is an essential element of a plaintiff's statutory standing to sue under the UCL, FAL, and CLRA, and because Ms. Nelson has not met her burden to show reliance, she has failed to meet her burden to show she has standing to pursue these claims against SeaWorld.

26.     SeaWorld is entitled to judgment on Ms. Nelson's claims.

**CONCLUSION**

For the foregoing reasons, the Court concludes Plaintiffs have failed to prove they have Article III standing to seek injunctive relief and fail to prove they have statutory standing to pursue their claims under the UCL and the CLRA.  The Court shall enter a separate judgment, and the Clerk shall close this file.

**IT IS SO ORDERED.**

Dated: October 13, 2020

_____
JEFFREY S. WHITE
United States District Judge